ELECTRONICALLY FILED
2020 Oct 21 AM 9:48
CLERK OF THE WYANDOTTE COUNTY DISTRICT COURT
CASE NUMBER:  2019-CV-000727

## IN THE 29TH JUDICIAL DISTRICT
## OF THE STATE OF KANSAS

**OLIN "PETE" COONES**,

     *Petitioner,*

  v.       Case No. **2019 CV 727**

**STATE OF KANSAS**,

     *Respondent.*

---

## PETITIONER'S CORRECTED FIRST AMENDED[1] MEMORANDUM OF FACT AND LAW IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER K.S.A. § 60-1507

---

**MORGAN PILATE LLC**

Branden A. Bell, KS #22618
Lindsay J. Runnels, Pro Hac Vice
926 Cherry Street
Kansas City, Missouri 64106
p 816.471.6694
e bbell@morganpilate.com
e lrunnels@morganpilate.com

**MIDWEST INNOCENCE PROJECT**

Tricia Bushnell, Pro Hac Vice
3619 Broadway Boulevard
Suite 2
Kansas City, Missouri 64111
p 816.221.2166
e tbushnell@themip.org

*Attorneys for Petitioner*

---

[1] This *Amended Memorandum* supplements the *Motion to Vacate, Set Aside, or Correct Sentence* filed on September 22, 2019, which raised Claim 1, an actual innocence claim. This *Amended Memorandum* supplements Claim 1 and further raises Claims 2 through 7. Petitioner previously informed the Court of his intention to file an amended memorandum raising additional claims. Respondent indicated it had no objection and consistent with its prior position, waived procedural defenses to the filing of the *Amended Memorandum*.

**EXHIBIT 1**

# APPENDIX 1 – TABLE OF CONTENTS

**Introduction**.......................................................................................1

**Facts**.......................................................................................................5

 *Kathleen's scheme to steal Patsy and Olin's money*........5

 *Kathleen starts drowning in debt*.....................................13

 *Kathleen's scheme to steal the bank's money*.................15

 *Kathleen's scheme to steal Pete's life*..............................17

 *The arrest*.............................................................................26

 *The crime scene*...................................................................27

 *The investigation and autopsies*.......................................29

 *The first trial*.......................................................................33

 *MRCU files a claim against Kathleen's estate*...............33

 *Robert Rupert*......................................................................34

 *The second trial*...................................................................55

 *What the jury never heard*.................................................68

  *The fourth bullet*............................................................68

  *The medical examiner*....................................................71

  *Kathleen's history of deceiving those closest to her*........72

  *Pete had no motive*.........................................................73

*Risk factors for suicide and murder-suicide*..........................74

**PROCEDURAL HISTORY**.............................................75

**ARGUMENTS & AUTHORITIES**................................77

**Claim 1: Pete Coones is innocent and the failure to consider his claims on the merits would constitute a manifest injustice under K.S.A. § 60-1507(f)**.............................................78

***A. Evidence presented in the first memorandum***...........82

*1. Kathleen's embezzlement scheme*........................................82

*2. Kathleen's forgery scheme*...................................................84

*3. The GSR on Kathleen's left hand*........................................85

*4. The lack of GSR on Pete's steering wheel*...........................85

***B. Evidence uncovered since the first memorandum***....86

*1. The missing bullet*................................................................86

*2. The medical examiner changes his conclusions*.................89

*3. Another medical examiner concludes murder-suicide*.......89

*4. Kathleen was drowning in debt*.........................................91

*5. Kathleen pressured Patsy to leave everything to Kathleen in Patsy's will*.......................................................92

*6. Jones told Michael and Garrison about Kathleen's embezzlement*...................................................................93

*7. The police knew about Kathleen's embezzlement*..............94

8. *The life insurance*...................................................94

9. *Rupert's history, motives, and coercion*..............................95

**C. Pete's conviction is a manifest injustice because**
**he is actually innocent**.....................................96

1. *What couldn't have happened*............................................99

2. *What really happened*.......................................................103

**Claim 2:   The State suppressed material,**
**exculpatory, and impeaching evidence**
**about Kathleen's dishonesty and motive to**
**commit suicide that prejudiced Pete in violation**
**of the Fifth, Sixth, and Fourteenth Amendments**
**to the United States Constitution and Section**
**Ten of the Kansas Constitution**......................................108

**A. The State failed to disclose evidence that**
**Kathleen had forged checks from Olin's account**....111

**B. The State failed to disclose evidence that**
**Kathleen embezzled from MRCU**................................114

**C. Evidence of Kathleen's forgery and embezzlement**
**was exculpatory because it would have**
**impeached Kathleen's hearsay statements**...............118

**D. Evidence of Kathleen's forgeries and**
**embezzlement was material because it**
**made it more likely she committed suicide**...............120

**Claim 3:   The State suppressed material,**
**exculpatory, and impeaching evidence about**
**Rupert's testimony that prejudiced Pete in**
**violation of the Fifth, Sixth, and Fourteenth**
**Amendments to the United States Constitution**
**and Section Ten of the Kansas Constitution**..............121

**A. The State knew Rupert had a reputation as being unreliable and mentally unstable.**................124

**B. Rupert wanted a deal before he would cooperate with the State**................125

**C. Brancart obtained Rupert's testimony by threatening him with jail time**....................127

**D. The State failed to turn over all of Rupert's letters**................................................128

**E. The State made a promise to Rupert in exchange for his testimony**............................133

**F. The State failed to disclose all Rupert's criminal history to the defense**....................135

**G. Had this evidence about Rupert disclosed, there's a reasonable probability the result of Pete's trial would've been different**................................137

**Claim 4:   The State's failure to disclose the missing bullet violated Pete's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section Ten of the Kansas Constitution**....................................142

**A. The fourth bullet was favorable evidence**................144

**B. The State suppressed the fourth bullet**....................144

**C. The fourth bullet was material evidence and its suppression prejudiced Pete's trial**............................145

**Claim 5:   The State suborned perjury from Rupert in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section Ten of the Kansas Constitution**.............147

***A. Brancart suborned perjury from Rupert about their communications***..................................147

***B. Brancart failed to correct Rupert's perjured testimony about their communications***...................149

***C. Brancart solicited perjury from Rupert about the Status of Rupert's criminal case***...............................150

***D. The perjury deprived Pete of a fair trial***.................152

**Claim 6:   The State committed prosecutorial error and misconduct that violated Pete's due-process rights in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section Ten of the Kansas Constitution**............................................154

***A. The State abused the inquisition statutes***................154

***B. The State's abuse of the inquisition statutes was prosecutorial misconduct that deprived Pete of his right to a fair trial***...............................................157

***C. The State's lack of candor about its communications with Rupert was prosecutorial misconduct that violated Pete's right to a fair trial***................................................................159

*1. Brancart misled the court and the defense about his communications with Rupert*...........................................159

2. *Brancart's misleading claims about his communications with Rupert were prosecutorial misconduct that violated Pete's right to a fair trial*..........163

**D. *The State was not candid with the court or opposing counsel when he said Rupert's criminal case was over***..................164

1. *Brancart failed to correct his misstatement to the court and counsel about the status of Rupert's criminal case*....164

2. *Brancart's failure to correct his own misstatement Constituted prosecutorial misconduct that violated Pete's right to a fair trial*....................166

**Claim 7:   Pete received ineffective assistance of counsel because his attorney failed to investigate in violation of the Fifth and Sixth Amendments to the United States Constitution.**....................167

**A. *Trial counsel's failure to investigate was deficient performance***....................168

1. *A reasonable investigation would have uncovered Kathleen's embezzlement in a public probate filing*........171

2. *A reasonable investigation would have uncovered evidence of Kathleen's embezzlement and financial distress within Kathleen's purse*....................172

3. *A reasonable investigation would have uncovered evidence of Kathleen's financial distress in her bank records*....................175

4. *A reasonable investigation would have uncovered Kathleen's embezzlement, financial distress, and plot to frame Pete by interviewing witnesses*....................177

5. *A reasonable investigation would have uncovered the Fourth bullet*......................................................................179

**B. Trial counsel's failure to retain necessary experts was deficient performance.**..........................................180

1. *Trial counsel's failure to consult with or retain a forensic pathologist was deficient performance*.............181

2. *Trial counsel's failure to consult with or retain an expert gunshot residue was deficient performance*...........182

**C. Trial counsel's failure to investigate or consult with necessary experts prejudiced Pete's trial**.........183

**CONCLUSION**......................................................................189

## APPENDIX 2 – PERSONS MENTIONED & ROLES

| Name | Role |
| --- | --- |
| Bryan Block | KCKPD Detective who investigated elder-abuse case against Kathleen Schroll and attended autopsies of Kathleen and Carl Schroll |
| Edmund "Ed" Brancart | Assistant District Attorney who prosecuted Pete Coones |
| Susan Brown | KCKPD Detective who investigated elder-abuse case against Kathleen Schroll |
| Trevor Christenson | KBI Forensic Scientist who performed GSR tests |
| Deidre "Dee" Coones | Wife of Pete Coones |
| Jeremiah Coones | Son of Pete Coones |
| Mariah Minks f/k/a Mariah Coones | Daughter of Pete Coones |
| Melody Bitzer f/k/a Melody Coones | Daughter of Pete Coones |
| Olin F. Coones | Father of Pete Coones |
| Olin L. "Pete" Coones | Petitioner |
| Olin "Ben" Coones | Son of Pete Coones |
| Quinn Coones | Son of Pete Coones |
| Clifton "Chip" De Moss | Attorney for Olin Coones and Patsy Van Vleck; drew up will for Van Vleck that she later disclaimed |

| Name | Role |
|---|---|
| John Duma | Kathleen Schroll's attorney during elder-abuse investigation and federal civil case |
| Angela Garrison | KCKPD Detective who investigated deaths of Kathleen and Carl Schroll |
| Jerome Gorman | District Attorney when Pete Coones was prosecuted; signed inquisition paperwork |
| Blair Hadley | Daughter of Kathleen Schroll |
| Therisa Harding | Worked at Olin Coones's bank during Kathleen Schroll's elder abuse |
| Elizabeth Horton | Mother of Kathleen Schroll |
| Randy Horton | Brother of Kathleen Schroll |
| Scott Horton | Brother of Kathleen Schroll |
| William Hutton | Attorney for the Estates of Kathleen Schroll and Carl Schroll |
| Thad Jones | Supervisor of Kathleen Schroll; discovered Kathleen Schroll's embezzlement on day of shootings |
| Patricia "Patti" Aylward Kalb | Pete Coones's defense attorney at trial |
| Bonnie Keith | Friend and former co-worker of Olin Coones; rescued him from Kathleen Schroll |
| Sandra "Sandy" Laymon | Co-worker of Kathleen Schroll; discovered Kathleen Schroll's embezzlement on day of shootings |

| Name | Role |
| --- | --- |
| Brian Levinson | Pete Coones's attorney for federal civil case |
| David Matthews | Assistant District Attorney who assisted Edmund Brancart in prosecuting elder-abuse cases |
| William Michael | KCKPD Detective who investigated deaths of Kathleen and Carl Schroll |
| Ross Minks | Former boyfriend, current husband of Mariah Minks |
| Erik Mitchell | Medical examiner who performed autopsies on the bodies of Kathleen and Carl Schroll |
| Darren Patterson | Robert Rupert's attorney |
| Susan Roe | Medical examiner who reviewed the work of Erik Mitchell |
| James Rumley | Purchaser of Pete Coones's mail jeep |
| Robert Rupert | Jailhouse informant |
| Jan Satterfield | Butler County Attorney |
| Carl Schroll | Alleged victim |
| Kathleen Schroll | Alleged victim |
| Patsy Van Vleck | Sister of Pete Coones |

# INTRODUCTION

Kathleen Schroll's last scheme was her most ambitious one. Granted, her first one netted her around $30,000 in cash, a house, and a $46,000 life-insurance policy. And her second one, requiring her to falsify bank records, paid her about $11,000. But with her last scheme, Kathleen aimed to steal someone's life.

By about 2:00 a.m. on April 7, 2008, it was almost complete. She walked out of her bedroom with the gun still in her hand, leaving her husband's bleeding body sprawled on the bed. She went to the front door, turning lights on in the living room as she moved through the house, and opened the front door. She left it halfway open, so that a person standing outside could see into the living room. No one was out there yet. But there would be soon. And they needed to see into the living room. That's why she'd turned on the lights.

She knew it had to be tonight, had known it for the past week. They had proven she forged the old man's name on all those checks — more than $30,000 worth. Her lawyer had told her about the handwriting analysis report last week. The police were still

investigating, and it was only a matter of time before they arrested her for it.

But that wasn't the immediate problem. The bank would find out about her embezzlement scheme. She'd gotten away with it for months, telling her boss that she didn't know why her ledger didn't balance. He'd finally lost his patience at the end of the week, telling her that someone else would have to help her balance it. She knew the first financial quarter was over now, and the books would be inspected by the bank's board at its quarterly meeting. Once someone started looking at her ledger, her theft would be exposed. She'd be fired. She'd go to jail. She'd lose everything.

She had kept everyone fooled, her family included, for so long. But now they would discover the truth. All the payday loans. The credit-card debt. How she had stolen the old man's life savings and then moved on to stealing from the bank. They would see her in an orange jumpsuit, ordered to repay thousands of dollars she didn't have, and then shipped off to prison. They would never look at her the same.

Mere suicide wouldn't be enough. Sure, it would save her from going to prison, but the bank would still want its money back even after she was gone. So would all the payday lenders and credit-card companies. And Pete would continue to press his lawsuit, taking back everything she'd taken from his father. Her life-insurance company wouldn't pay if it was a suicide, her family would still lose the house, and her daughter and granddaughter would be left with nothing. It couldn't be just a suicide. It had to look like murder.

She had seeded the ground. Days ago, Kathleen had told her lawyer that Pete had angrily confronted her at a gas station. Two days ago, she told her coworkers the same story, just changing the date. And the day before, she had told her daughter the same story, only changing the time. When the police asked them, she knew, they would tell the police about this confrontation. The police would focus on Pete. But she'd need to do more than that.

She turned away from the front door, walking past her cell phone and picking up her cordless one. The call had to come from her landline — her mother might not recognize the cell-phone number and ignore the call. She dialed her mother's number. She

couldn't call 911, she knew. The police might arrive too quickly and determine that no one else could've been in the house when it happened. That would ruin her plan. When her mother picked up the phone, Kathleen spoke the lines she'd crafted: Pete was there to kill her. When her mother said she didn't understand, Kathleen repeated the script — making sure her mother comprehended what she was saying. That was important. Then Kathleen pressed the button to end the call and let the phone fall to the floor. She turned her head to the right, put the gun against the back of her head, and closed her eyes.

Kathleen's final scheme survived more than 12 years. But like the others, it has unraveled. Her embezzlement has been revealed, the missing bullet discovered, and her manner of death changed to suicide.

# FACTS

Olin "Pete" Coones ("Pete") is the son of Olin Coones ("Olin").[1]
Before retiring from General Motors, Olin set up a life-insurance
policy, which gave money to his daughter Patsy Van Vleck
("Patsy").[2] If she was already dead, the benefit went to Pete.[3] Patsy
liked to spend time drinking at the VFW in Kansas City, where she
met Kathleen Schroll ("Kathleen").[4] In 2000, Olin and Patsy, both
now elderly, lived together in a house they owned on Parallel
Parkway.[5] Patsy reported that her silver revolver had been stolen
from that house in 2000.[6] The burglary was never solved, but the
police recovered the gun eight years later from Kathleen's house.

## *Kathleen's scheme to steal Patsy's and Olin's money*

At some point before 2004, Kathleen began working as a
housekeeper for Patsy and Olin at the Parallel house.[7] Both Olin

---

[1] In reality, Olin is Pete's grandfather. For most of Pete's life, he was told that
Olin was his father and Patsy was his sister. It would not be until much later
that Pete would discover that Patsy was actually his mother, and Olin his
grandfather.
[2] Ex. 15.
[3] *Id.*
[4] *See* Ex. 5 at 38.
[5] Ex. 84.
[6] *Id.*
[7] Ex. 5 at 38.

and Patsy were getting older and had medical problems.[8] Olin, specifically, began suffering from Alzheimer's.[9] Around September 2004, Patsy called an attorney named Clifton "Chip" De Moss.[10] Patsy told De Moss that she wanted De Moss to draw up a will that left everything Patsy had to Kathleen. And that she wanted a power-of-attorney form for Kathleen as well. De Moss prepared those documents and sent them to Patsy, but he never heard back from her.

On September 19, 2005, Patsy and Olin purportedly signed over the Parallel house to Kathleen.[11] A few months later, Kathleen's daughter, Blair Hadley, began living at the Parallel house with Olin and Patsy.[12]

In late February 2006, Kathleen called De Moss.[13] She told him that Patsy was in the hospital and wanted to see him. De Moss went to the hospital and spoke with Patsy. De Moss asked Patsy

---

[8] *Id.*
[9] *Id.*
[10] Expected testimony of Mr. De Moss.
[11] Ex. 4 at 210.
[12] *Id.* at 218-19.
[13] Expected testimony of Mr. De Moss.

why she had never signed the will and the power of attorney that she had asked him to draft in September 2004. Patsy told De Moss that Kathleen had pressured Patsy into telling De Moss that Patsy wanted that will and power of attorney. But Patsy didn't want Kathleen to get all of her property or have a power of attorney, so she never signed the documents De Moss had prepared. Patsy didn't trust Kathleen, Patsy told De Moss, because Patsy had been pulling fast ones on Patsy and Olin. A few days later, on March 6, 2006, Patsy died.[14]

On the same day Patsy died, Kathleen cashed a check — purportedly signed by Patsy and from her bank account — for $200, made out to Kathleen.[15] On the day after Patsy died, Olin withdrew $5,000 from his savings account.[16] Three days after Patsy died, a check from Olin's account was written to Kathleen for $3,000.[17] Five days after that, another check — this one for $500 — was

---

[14] Ex. 85.
[15] Ex. 10-A at 6.
[16] *Id.* at 10.
[17] *Id.* at 19.

written from Olin's account to Kathleen.[18] The KBI would later conclude that these checks were probably forgeries.[19] Kathleen would end up draining $30,000 from Olin's accounts.[20]

On April 20, 2006 — about 45 days after Patsy's death — the beneficiary of Olin's life insurance was changed from Pete to Kathleen.[21] The change was made by a computer over the internet. Olin did not own a computer or have internet service at his home.[22] Kathleen had both at hers.[23]

Pete had been living in Missouri and wasn't told that Patsy had died.[24] Or that Olin was suffering from Alzheimer's.[25] In late August 2006, Pete went to the Parallel house to see Olin.[26] When he arrived, Kathleen was there and wouldn't let Pete see his father.[27] On September 1, 2006, Pete contacted the Kansas

---

[18] *Id.* at 20.
[19] Ex. 11.
[20] Ex. 5 at 126.
[21] Exs 15, 16.
[22] Ex. 87.
[23] Ex. 67-A.
[24] *See* Ex. 86 at 2.
[25] *See id.*
[26] Ex. 8 at 3.
[27] *Id.*

Department of Social and Rehabilitative Services ("SRS") to file an

elder-abuse complaint.[28] SRS contacted the Kansas City Kansas

Police Department ("KCKPD"), which sent out Detective Bryan

Block to investigate.[29] During his investigation, Block collected over

100 checks that had purportedly been written by Olin to

Kathleen.[30] A handwriting analyst with the Kansas Bureau of

Investigation determined they were almost all probably forged.[31]

A woman who worked at Olin's bank became worried about

him.[32] Theresa Harding asked Olin to come meet her personally at

the bank. Kathleen arrived with Olin. Harding asked to speak to

Olin privately; Kathleen refused. Harding argued with Kathleen

and ultimately prevailed. It only took Harding a few minutes to

conclude Olin was mentally impaired. She immediately locked his

bank accounts. She would later describe it as the worst case of

elder abuse she'd ever seen.

[28] *Id.*
[29] *Id.*
[30] Exs 10, 10-A.
[31] Ex. 11.
[32] Expected testimony of Ms. Harding.

On September 12, 2006, Bonnie Keith — a former co-worker of Olin's — went to the house on Parallel to visit him.[33] Kathleen was not at the house but Blair — Kathleen's daughter — was. Blair refused to let Keith see Olin. Finally, Blair called Kathleen, who drove up to the house in Olin's truck. Keith had to negotiate with Kathleen to get Olin out of the house to visit Olin's brother. Keith told Kathleen she would bring Olin back later that day. Once she was finally able to lay eyes on him, Keith was shocked at Olin's condition. She called Pete. Together, they took Olin to a patrol station and notified a police officer that they were taking Olin to Keith's house in Missouri.[34] This was how Pete and Keith successfully got Olin away from Kathleen.[35]

Olin was in bad shape. Keith's husband had to give Olin a shower because he smelled so bad.[36] Olin's underwear was soaked in urine, and likely had been for days, but he did not seem to realize his underwear was soiled. He also had several bedsores and

---

[33] Exs 88, 118, 118-A.
[34] Ex. 88.
[35] Ex. 5 at 127.
[36] Exs 118, 118-A.

disturbingly long toenails.[37] Olin eventually came to live with Pete and his family.[38] Meanwhile, SRS concluded its investigation into Kathleen for elder abuse and found that she had exploited Olin.[39]

On September 26, a lawyer for Olin wrote a letter to John Duma — Kathleen's lawyer — asking for Kathleen to return property that Kathleen had taken from Olin's home.[40] The next day, Pete and the Wyandotte County Sheriff's Office went to Kathleen's home to retrieve Olin's property.[41] In October, the Sheriff's office helped Pete retake possession of the Parallel house from Kathleen.[42] On October 2, Kathleen's lawyer wrote a letter to the Wyandotte County District Attorney's Office offering to turn Kathleen in on pending charges of elder abuse.[43]

Three months later, Olin died.[44] Pete was the sole heir to the estate, which included thousands of dollars in credit-card debt that

---

[37] *See* Ex. 7.
[38] Ex. 5 at 127.
[39] Ex. 90.
[40] Ex. 21.
[41] Ex. 22.
[42] Ex. 7 at 4.
[43] Ex. 92.
[44] Ex. 12.

Kathleen had run up.[45] Charges had not yet been filed against

Kathleen.[46] Pete filed a claim for Olin's life insurance.[47] So did

Kathleen.[48] The insurance company didn't know which claim to

pay, so it deposited the money with the court and let Kathleen and

Pete litigate it.[49] On April 1, 2008, Pete turned over discovery to

Kathleen, which included a handwriting expert's conclusion that

Kathleen had forged Olin's signature on checks worth thousands of

dollars.[50] As of April 2008, the parties were heading to mediation,

scheduled for May 9.[51] Pete's most recent offer — also made on

April 1 — had been to give Kathleen 25 percent of the life-

insurance proceeds.[52] The value of the policy was around $46,000.[53]

[45] Exs 13, 14.
[46] Ex. 5 at 128.
[47] Ex. 4 at 193-94.
[48] *Id.*
[49] *Id.*
[50] Exs 17-20.
[51] Ex. 4 at 203.
[52] *Id.* at 196.
[53] *Id.*

### *Kathleen starts drowning in debt*

Kathleen worked as a systems administrator at Midwest Regional Credit Union ("MRCU") in Kansas City, Kansas.[54] Her husband, Carl Schroll ("Carl"), was not working. No longer getting money from Olin, Kathleen was now spending more than she was making. On April 30, 2007, she and Carl took out a second mortgage on their home, netting them $27,500 for "bill consolidation."[55] Kathleen also began using "payday" lenders that offered short-term loans at high interest rates. By 2008, she was repaying loans from six of these lenders, including:

- Esidelend

- World Wide Cash Debit

- GSFIL

- First Bank of Delaware

- CashNetUSA

- AuthPayDay

[54] Ex. 27 at 1.
[55] Ex. 25.

The payments on these loans consumed every dollar she earned

and more.[56]

| Month | Loan Payments | Income | Deficit |
|---|---|---|---|
| January 2008 | $1,459 | $1,167 | -$292 |
| February 2008 | $1,618 | $1,192 | -$426 |
| March 2008 | $2,133 | $1,529 | -$604 |

Around January 2008, Kathleen started bouncing checks.[57]

All of these checks were made out to the "VFW" and were for

round-dollar amounts, like "$100" or "$60."

| No. | Written | To | Amount | Returned |
|---|---|---|---|---|
| 1238 | 12/17/07 | VFW #4050 | $100 | 1/8/08 |
| 1239 | 12/17/07 | VFW #4050 | $100 | 1/8/08 |
| 1243 | 12/19/17 | VFW #4050 | $100 | 1/8/08 |
| 1244 | 12/26/07 | VFW #4050 | $100 | 1/8/08 |
| 1245 | 1/2/08 | VFW #4050 | $100 | 1/8/08 |
| 1246 | 1/2/08 | VFW #4050 | $60 | 1/8/08 |
| 1248 | 1/5/08 | VFW #4050 | $100 | 1/15/08 |

[56] Ex. 26.
[57] Ex. 93.

| No. | Written | To | Amount | Returned |
|---|---|---|---|---|
| 1242 | 1/8/08 | VFW #4050 | $100 | 1/15/08 |
| 1249 | 1/12/08 | VFW # 4050 | $100 | Unknown[58] |
| 1250 | 1/12/08 | VFW #4050 | $60 | Unknown |
| 1252 | 1/15/08 | VFW #4050 | $100 | Unknown |
| Total | | | $1,020 | |

Kathleen was hiding this debt from her family. A co-worker, Sandra Laymon, was present at times when Kathleen spoke about her financial troubles. She heard Kathleen say she couldn't let Carl find out how bad things were.

### Kathleen's scheme to steal the bank's money

In February 2008, Kathleen began embezzling money from MRCU.[59] She did this by depositing a check from an account at a different bank into her MRCU checking account, which would cause her MRCU account to have a credit for the check's amount.[60]

---

[58] Check numbers 1249, 1250, and 1252 were found in Kathleen's purse with handwritten notations of "NSF" or "Bad." While they were stamped for deposit, there's no indication that they — like the other checks — were submitted to MRCU and then returned for nonpayment.

[59] Ex. 27.

[60] Id.

She would then pull the physical check out of MRCU's queue, so it would never get sent to the other bank for repayment.[61] Kathleen would also alter MRCU's electronic check register, creating an artificial entry to hide the discrepancy.[62] She continued this scheme up until her last day of work on April 5, 2008.[63] In fewer than 60 days, she had stolen over $11,000.

| Date | Amount |
|---|---|
| 2/4/2008 | $250 |
| 2/5/2008 | $471 |
| 2/6/2008 | $450 |
| 2/12/2008 | $241.78 |
| 2/25/2008 | $551 |
| 2/28/2008 | $1,945 |
| **February 2008 Total** | **$3,908.78** |
| 3/1/2008 | $1,460 |
| 3/7/2008 | $1,303.41 |
| 3/19/2008 | $200 |
| 3/20/2008 | $1,500 |
| **March 2008 Total** | **$4,463.41** |
| 4/1/2008 | $1,075.21 |
| 4/5/2008 | $1,600 |
| **April 2008 Total** | **$2,675.21** |
| **Grand Total** | **$11,047.40** |

---

[61] *Id.*
[62] *Id.*
[63] *Id.*

No one at MRCU suspected Kathleen of theft until she didn't report to work on April 7.[64] But the embezzlement had thrown her ledger out of balance for months — something Kathleen couldn't hide from her boss, Thad Jones. Jones repeatedly pressed Kathleen about her out-of-balance ledger, and Kathleen told him she didn't know why it wouldn't balance. By April 4, 2008 — the Friday before the Monday-morning shootings — Jones lost his patience with Kathleen. The first quarter of 2008 was over, and MRCU's board would need to see its quarterly report. If Kathleen couldn't get her ledger balanced, Jones told her, then either he or Laymon would help her do it.

### Kathleen's scheme to steal Pete's life

On the next day, April 5, Kathleen worked the morning shift at the bank. Kathleen also deposited a check, ostensibly from a joint account held by her and her mother at a different bank, into her own checking account at MRCU.[65] But at some point during that Saturday, Kathleen removed this check from the bundle of

[64] Ex. 27.
[65] Ex. 26.

deposited checks that she would ordinarily process on the following Monday.[66] There was no reason for Kathleen to do this if she knew she would be at work on Monday.[67] Processing that bundle of checks was her responsibility; no one else would inspect them on Monday — if Kathleen were there. But if Kathleen was not there on Monday, someone else would process the check as usual, and the funds would be withdrawn from her mother's account. Kathleen apparently knew she wouldn't be at work on Monday, and she didn't want anyone to process the check. So she filched it.

Kathleen did something else significant on the morning of April 5. When she arrived at the bank, she told her coworkers that she had seen Pete that morning at a gas station. Pete had threatened her, she told them.[68] On the next day, April 6, Kathleen told her daughter the same story; but in that version, Pete had threatened her in the afternoon — *after* work — on April 5.[69] And before April 5, Kathleen had told the same story to her lawyer, this

---

[66] Ex. 27.
[67] Expected testimony of Ms. Laymon.
[68] Expected testimony of Ms. Laymon.
[69] Ex. 4 at 214, 216.

time changing the day that it happened. When the police later checked the surveillance video from that gas station for April 5, they did not see Pete or Kathleen.[70]

On April 7 at 2:28 a.m., Elizabeth Horton — Kathleen's mother — received a call from Kathleen. This is how Elizabeth described the call:

Elizabeth: Hello?

Kathleen: Mom?

Elizabeth: Yes, what's wrong?

Kathleen: Pete is here in the house and he said he stole the lawnmower out of the garage. He said he is going to kill Carl and he said he is going to kill me and he said he has got his tracks covered where no one will find out.

Elizabeth: What? Repeat that.

Kathleen: Pete is here in the house and he said he stole the lawnmower out of the garage. He said he is going

---

[70] Ex. 4 at 148.

to kill Carl and he said he is going to kill me and
he said he has got his tracks covered where no one
will find out.

Elizabeth: Did you call the police?

Kathleen: No.[71]

Then the phone went dead.[72] Telephone records show the call
lasted about 45 seconds.[73] Elizabeth did not hear gunshots or any
sounds of struggle in the background.[74] Kathleen was not
whispering or shouting, but spoke quickly and sounded afraid.[75]

It would turn out that this was not the first time Kathleen
deceived her family. Her family members would recount several
things during the investigation that Kathleen told them, and most
were false:

---

[71] Ex. 5 at 40-41.
[72] *Id.* at 41.
[73] Ex. 94.
[74] Ex. 5 at 41.
[75] *Id.*

| Kathleen told | That | But really |
|---|---|---|
| Elizabeth | Kathleen carried a gun because part of her job was taking money to the Federal Reserve.[76] | Kathleen was an accounting clerk. Her job did not require her to transport money.[77] |
| Elizabeth | Kathleen had made several police reports about Pete stalking her.[78] | Kathleen had made no reports to police about being stalked by Pete. |
| Blair | Kathleen's lawsuit with Pete was over $182,000.[79] | The lawsuit was over a $42,000 insurance policy.[80] |
| Blair | Kathleen had to call the police on Pete many times because he harassed her.[81] | Kathleen had made no reports to police about being harassed by Pete. |
| Randy | Kathleen had a restraining order against Pete.[82] | There was no restraining order. |
| Blair | Kathleen used to work at Medicalodge.[83] | Medicalodoge has no record of Kathleen working there.[84] |

[76] Ex. 110 at 2.
[77] Expected testimony of Thad Jones.
[78] Ex. 109 at 7.
[79] Ex. 111 at 2.
[80] Ex. 4 at 196.
[81] Ex. 111 at 3.
[82] Ex. 114 at 1.
[83] Ex. 112 at 114.
[84] Ex. 113.

| Kathleen told | That | But really |
|---|---|---|
| Blair | Pete threatened Kathleen at a QuikTrip when Kathleen was walking out and Pete was walking in.[85] | The surveillance video from QuikTrip did not show Pete or Kathleen.[86] |
| Blair | Patsy gave Kathleen a silver revolver.[87] | Patsy reported the silver revolver as stolen.[88] |

After the call ended, Elizabeth woke up her adult son, Randy Horton, who lived with her.[89] Randy called 911.[90]

The police arrived at the Schroll house 15 minutes later.[91] The front door was partially open and the lights were on.[92] Two cell phones were sitting on a table near the front door.[93] They found Kathleen's body in the living room, lying face-up.[94] She was dressed

---

[85] Ex. 4 at 214-15.
[86] Ex. 4 at 148.
[87] Ex. 112 at 116.
[88] Ex. 4 at 149.
[89] Ex. 5 at 41-42.
[90] *Id.*
[91] Ex. 4 at 35.
[92] *Id.* at 16, 36.
[93] Ex. 4 at 62.
[94] *Id.* at 17.

in nurse's scrubs, wearing jewelry and her glasses. Near her right foot was a cordless phone.[95] Near her left foot was a silver revolver.[96] Her daughter would later tell police that she had seen the gun in Kathleen's purse before.[97] And Kathleen had told her that Kathleen had gotten the gun from Patsy.[98] A trace on the revolver shows that it was the one Patsy reported stolen in 2000.[99] Kathleen's purse — where she normally kept the gun — was open, sitting on the back of the living-room couch.[100] Four bullets had been fired from the gun, one remained.[101]

The police found Carl Schroll's body in a bedroom.[102] He was sprawled across the bed, his legs dangling off it, wearing only a tee shirt.[103] He had three wounds: two gunshots to the torso and some kind of injury to his scalp.[104] One of the pillows on the bed had a

---

[95] *Id.* at 26.
[96] *Id.* at 18-19.
[97] *Id.* at 88-89.
[98] *Id.*
[99] Ex. 95.
[100] Ex. 4 at 49.
[101] Ex. 4 at 43-44.
[102] Ex. 4 at 18.
[103] Ex. 4 at 37.
[104] Ex. 4 at 171-72.

hole in it with stuffing coming from the hole.[105] There were no signs
of forced entry[106] into the home and no signs of a struggle within
it.[107] A sergeant went to the Schroll house and, after viewing the
crime scene, told dispatch it was "possibly" a "murder-suicide."[108]

---

[105] Exs 67-B, 67-C (Pete's original memorandum stated that a bullet went
through this pillow and exited from it. *See* Mem. in Supp. at 9, 28. As
explained below, the bullet remained lodged in the pillow until recently
discovered).
[106] Ex. 4 at 96-97.
[107] Ex. 4 at 36.
[108] Ex. 108 at 2.

# Exhibit 59: Diagram of Schroll House



But then the police talked to Elizabeth, who told them about the phone call.[109] She also told them that "Pete" was Pete Coones, Olin's son.[110] She told the police about the ongoing lawsuit over the life-insurance policy and friction between Pete and Kathleen. The police also spoke to Blair.[111] She told them the story Kathleen had told her, about Pete confronting her at a QuikTrip on the afternoon of April 5.[112]

### *The arrest*

At about 7:00 a.m., Pete was driving two of his children to school.[113] The police pulled their cars in front of his van, pointed their weapons at Pete and his children, and ordered them out of the car.[114] The police then took Pete and his two children to the police station.[115]

---

[109] *Id.* at 75-76.
[110] *Id.* at 77.
[111] *Id.* at 103-04.
[112] *Id.*
[113] Ex. 4 at 99.
[114] Ex. 4 at 123-24.
[115] *Id.*

Pete waived his *Miranda* rights and spoke to the detectives.[116] He answered questions about his history with Kathleen but denied any involvement in her murder.[117] He had been at home with his family, he told them. Pete was charged with two counts of first-degree murder. He was a 50-year-old retired mail carrier with no criminal history.

### The crime scene

While the detectives interrogated Pete, the police's crime-scene-investigation unit collected evidence from the Schroll house.[118] They collected multiple items, including a multi-colored pillow found lying near Carl's body.[119] The pillow had two holes in it.[120] One hole had a dark discoloration near the bottom.[121] The other hole had stuffing come out of it, and a dark shape within the stuffing.[122]

---

[116] Ex. 4 at 125.
[117] *Id.* at 125, 105.
[118] Ex. 4 at 42.
[119] Ex. 115 at 1 (Item 13).
[120] Ex. 67-C.
[121] Ex. 67-B.
[122] Ex. 67-D.

## <u>Photographs of dark object lodged in pillow's stuffing</u>

*Exhibits 67-D, 67-E*





The police put the items they collected, including the pillow, into evidence.[123] No one examined the pillow to determine what that dark object was. It would sit there in an evidence room, undetected, for more than 12 years.

### The investigation and autopsies

Dr. Erik Mitchell performed the autopsies on Carl's and Kathleen's bodies.[124] Carl died from two gunshots to his abdomen, and two bullets were found in his body.[125] Mitchell also noted a wound at the top of Carl's head, and determined that it came from some kind of edged-but-not-sharp weapon.[126] He called it a "crushing blow,"[127] but noted there was no damage to the skull or brain.[128] He concluded that Kathleen died from a contact gunshot wound to the back of the head.[129] The contact was "oblique," meaning that the barrel of the gun was angled against the skull —

---

[123] Ex. 4 at 42.
[124] Ex. 4 at 170 (Pete's original memorandum stated that Dr. Pojman performed the autopsy on Kathleen, *see* Mem. in Supp. at 9, but both autopsies were performed by Dr. Mitchell).
[125] *Id.* at 172, 177.
[126] *Id.* at 174.
[127] Ex. 4 at 181-82.
[128] Ex. 68 at 6.
[129] Ex. 4 at 175, 178.

instead of flush with it — when the bullet was fired.[130] He recovered the bullet[131] and classified both deaths as homicides.[132]

The police searched Pete's house but did not find any bloody clothing, firearms, or ammunition.[133] They looked for the lawnmower — the one Kathleen told Elizabeth that Pete had stolen during the 2:00 a.m. phone call — but didn't find it.[134] The clothing he wore when he was arrested had no blood on it. The police searched his van for fingerprints, bullets, and DNA; they found nothing linking Pete to the shootings.[135] They also searched the van for the presence of blood or tissue. An officer took swabs from all the places a bloody hand or foot might touch the van: the steering wheel, gear shift, emergency-brake pedal, accelerator pedal, and brake pedal.[136] None of them revealed any trace of blood or tissue.[137] They swabbed the steering wheel of his van for gunshot

[130] Ex. 4 at 175-76.
[131] *Id.* at 177.
[132] Ex. 68 at 4; Ex. 69 at 1.
[133] Ex. 4 at 135, 141.
[134] Ex. 4 at 107-108.
[135] Ex. 4 at 105, 131.
[136] *Id.* at 130-31.
[137] *Id.*

residue or GSR.[138] But the swabs were never sent to the KBI lab for confirmation. An officer also checked the hands of Carl's and Kathleen's bodies for GSR, but again, no one sent the swabs to the KBI.[139]

The police did a ballistics test, concluding the bullets found in the bodies were the same caliber as the silver revolver.[140] But the bullets were too damaged to match to any specific firearm.[141] The police took DNA swabs from the silver revolver.[142] Only Kathleen's DNA was found on the gun, including the trigger.[143] Pete's DNA wasn't on the cordless phone found lying next to Kathleen's body either.[144] Nor were his fingerprints found anywhere in the Schroll house. In other words, there was no evidence that Pete had ever been there.

The detectives began interviewing people. They went to the QuikTrip where Kathleen said Pete had threatened her and

[138] Ex. 98.
[139] Exs 96, 97.
[140] Ex. 4 at 105-06.
[141] *Id.*
[142] *Id.* at 90.
[143] Ex. 5 at 73-74.
[144] *Id.* at 90-91.

checked the surveillance video.[145] They did not find any evidence that Pete or Kathleen had been there that day.[146] They went to MRCU and talked to Kathleen's supervisor, Thad Jones.[147] He told them he knew Kathleen carried a gun in her purse but didn't know what it looked like.[148] They talked to John Duma, Kathleen's attorney. He told them that the federal case was going to mediation.[149] At the time of the shootings, Duma told the police, a tentative agreement was pending between Pete and Kathleen to settle.[150]

The prosecutor, Edmund Brancart, brought up the issue of the alleged QuikTrip confrontation in a pretrial motion.[151] The fact section of that motion contained new information — not found in any police report — that Kathleen had told Blair that Kathleen had not told Carl about the confrontation.[152] And the reason Kathleen

---

[145] Ex. 4 at 148.
[146] *Id.*
[147] Ex. 99 at 12.
[148] *Id.*
[149] Ex. 100 at 2.
[150] *Id.*
[151] Ex. 29 at 2-3.
[152] *Id.* at 3.

had not told Carl, she said, was that she and Carl had been experiencing "marital tension" that weekend.[153]

### The first trial

At the end of the first trial, the jury convicted Pete of Kathleen's murder but acquitted him of Carl's.[154] The court overturned Pete's conviction, granting him a new trial, because the State had failed to turn over evidence about a forensic examination of Pete's computer to the defense.[155] His acquittal of Carl's murder stood; Pete could be retried only for Kathleen's murder.

### MRCU files a claim against Kathleen's estate

Kathleen's estate remained in probate between Pete's first and second trial. On February 13, 2009, MRCU filed a claim against Kathleen's estate.[156] That claim listed the debts Kathleen owed to MRCU:

---

[153] *Id.*
[154] Ex. 102.
[155] Ex. 101 (In his original memorandum, Pete set out the results of the computer forensic examination that prompted this new trial. *See*, *e.g.*, Mem. in Supp. at 14, 20. Pete does not rely on that evidence for this merits hearing).
[156] Ex. 117.

- a second mortgage, with an original loan amount of $25,000 on April 30, 2007 and a balance of $27,341 as of Kathleen's death;

- a personal loan, with an original amount of $2,500 on September 11, 2007 and a balance of $1,902 as of Kathleen's death; and,

- money embezzled by Kathleen from MRCU, an amount totaling $11,695.[157]

### *Robert Rupert*

While Pete was waiting for his second trial, the Wyandotte County Jail transferred him to the Butler County Jail.[158] Among the other inmates at the jail was a man named Robert Rupert, who was facing a 47-month sentence in a Butler County probation-violation case.[159] Pete and Rupert had never met. Rupert first arrived at the jail on May 20, 2009.[160] Pete arrived at the jail on July 2, 2009, and was assigned to B pod.[161] At this time, Rupert

---

[157] *Id.* at 1-2.
[158] Ex. 2 at 19-20.
[159] Ex. 39.
[160] Ex. 56 at 3.
[161] *Id.* at 2.

was in C pod.[162] Pete was transferred *in* to C pod on July 23[163] and

Rupert was transferred *out* of C pod on August 1.[164] As of that date,

nine days had passed since they first saw each other.

That's when Rupert wrote a letter to the Wyandotte County

District Attorney's Office ("WYCODA"). Rupert titled the letter "Re:

Olin Coones – Double Murder – Wyandotte Co." In that letter,

Rupert said he didn't want to go into detail, but he'd spoken to Pete

about his case. Rupert then listed out a set of vague topics, e.g. "the

window," "the mother of the victims," and going "postal." Rupert

asked for an attorney to advise him. He had a lot of "concerns"

about his safety, Rupert wrote, and proposed a meeting at the

courthouse during his next court date. The WYCODA received the

letter on August 12.[165] The prosecution never disclosed it.

Thirteen days later, on August 25, Pete was sent back to the

Butler County Jail.[166] That night, he was assigned to C pod, cell

---

[162] *Id.* at 3.
[163] *Id.* at 2.
[164] *Id.* at 3.
[165] *Id.* at 3.
[166] Ex. 56 at 2.

number 121: Rupert's cell.[167] Pete was transferred back to the

Wyandotte County Jail on the morning of August 27, after less

than 36 hours as Rupert's cellmate.[168] He had been sent to Butler

County for fewer than 48 hours and was coincidentally assigned to

the same cell as Rupert.

On the same day Pete was transferred back to the Wyandotte

County Jail, Brancart, emailed a Butler County prosecutor.[169]

Brancart referenced the letter from Rupert and asked about him.

He received a response the same day: "[T]he persons here who have

handled his cases hate him . . . . The impression I get is that he's

not reliable at all." Brancart was referred to a different prosecutor

in the office who was handling Rupert's case.

Brancart immediately followed up with that prosecutor,

Amber Norris, and the Butler County Attorney, Jan Satterfield.[170]

In his email, Brancart told Norris and Satterfield about the letter

from Rupert and the case against Pete. Rupert's letter was "in

---

[167] *Id.* at 2, 3.
[168] *Id.* at 2.
[169] Ex. 35.
[170] Ex. 36.

many ways vague[,]" Brancart wrote, and while Rupert did "not make any requests for leniency . . . the implication is there nonetheless." Brancart planned to try to arrange an interview of Rupert. Norris responded to Brancart's email, inviting him to call her the following morning so she could tell Brancart "what kind of person Bob Rupert is."

Brancart took notes from that August 28 phone call.[171] Norris described Rupert as "a bit nutty." He had sent "strange letters" to his probation officer and ex-wife. And Rupert had an "extensive criminal history," including 15 crimes of dishonesty.

The following Monday, August 31, Brancart called Darren Patterson, Rupert's defense attorney in the Butler County probation-revocation case.[172] He left a message and then sent Patterson an email. Brancart told Patterson that Rupert had sent Brancart a letter, which claimed Rupert had talked to Pete. Brancart was under a time deadline, he explained, and would like to interview Rupert as early as the next day if Patterson agreed.

[171] Ex. 37.
[172] Ex. 38.

"Dealing with jailhouse informants is something that we do here frequently," Brancart wrote, and while Rupert's letter didn't "express any expectations in terms of his own" case, "[m]ost inmate informants want to improve their positions." While Brancart had little control over Rupert's Butler County case, Brancart could "signal" to the prosecutor or the court that Rupert had assisted in a criminal prosecution. Brancart would even testify on Rupert's behalf, if necessary. Brancart ended the email by repeating his request to interview Rupert.

On the next day, September 1, Brancart and Patterson spoke over the phone.[173] During that call, Patterson told Brancart that Patterson planned to meet with Rupert on September 3 to discuss Brancart's proposed interview. Brancart referenced that call in an email he sent to Norris on the next day.[174] On September 3, Norris spoke to Patterson about Rupert's "requirements for doing the right thing." She offered to reduce Rupert's sentence from 47 months to

---

[173] Ex. 39.
[174] *Id.*

27 months' imprisonment. "I do not know if he will take it or not," Norris told Brancart.

It did not seem so. After Patterson heard Norris's offer, he called Brancart.[175] Patterson told Brancart that Patterson planned to try to meet with Satterfield (Norris's boss) later that day to see if she was open to "evaluating the assistance" Rupert might give in Brancart's case against Pete. Patterson's phone call prompted Brancart to send an email to Satterfield, relaying his conversation with Patterson. "My sense from Patterson," he wrote to her, is that "he wants to know that if I report to you that Rupert would be a valuable witness that you will give that due and favorable consideration." Brancart also told Satterfield about his case against Pete and repeated his desire to interview Rupert.

Satterfield responded to Brancart the next day, September 4.[176] She told Brancart that she'd spoken to both Norris and Patterson and thought Norris's offer of a 20-month reduction was reasonable. Satterfield explained that her office had "safety

[175] Ex. 40.
[176] Ex. 40.

concerns" about Rupert. "I am going to continue to defer the matter to Amber," she concluded. Brancart then emailed Patterson, asking again to interview Rupert now that Patterson had spoken to Satterfield.[177]

Three days later, on September 7, Rupert wrote another letter to Brancart.[178] In that letter, Rupert told Brancart he'd discussed the interview with Patterson. Rupert explained that cooperating meant that he would become a target for violence throughout the Kansas Department of Corrections. Rupert elaborated on the information he claimed to have gained from Pete, e.g., how he "climbed out a window" and there were "3 projectiles – 4 casings." And about how Pete said he hadn't driven his van to the Schroll home, but used his mail jeep. "He was in my cell the last time he was here," Rupert wrote, "but he didn't talk as much as before."

Rupert then returned to his conversation with Patterson.[179] "Mr. Patterson agrees that I could be killed in a prison

---

[177] Ex. 41.
[178] Ex. 45.
[179] Ex. 45.

environment," Rupert wrote. If Brancart wanted to interview him, "[t]here must be safeguards in place." Rupert mailed this letter to the WYCODA on September 8.[180] He sent a letter to Patterson on the same day.[181] Brancart sat on this letter for three months, only turning it over to the defense on December 10.[182]

As Rupert was putting these letters in the mail, Brancart emailed Patterson, repeating his request to interview Rupert.[183] Patterson responded, telling Brancart that Rupert had agreed to an interview. Two days later, on September 10, Brancart sent an early-morning email to Patterson, telling him that Brancart and a detective were leaving for Butler County in less than an hour to interview Rupert.[184] In response, Patterson called Brancart.[185] Patterson told Brancart that Patterson had received a letter from Rupert (presumably the letter Rupert mailed to him on September 8). And in that letter, Rupert told Patterson that he refused to

---

[180] Ex. 56 at 30.
[181] *Id.*
[182] Ex. 55 at 7-8.
[183] Ex. 42.
[184] Ex. 43.
[185] Ex. 44.

cooperate or be interviewed by the prosecution. Rupert had "decided that the risks associated with becoming a witness outweighed the potential benefit he might merit for doing so."[186]

Brancart responded that he "may have a duty . . . to disclose Rupert's identity . . . ."[187] In other words, "Rupert may already have incurred some risk." Brancart memorialized this conversation in an email he sent to Patterson right after the call.[188] In that email, he warned that Rupert's "on-again, off-again posturing" was decreasing the value of his information. Brancart copied Norris on this email.

Brancart sent Patterson another email four days later.[189] In that email, Brancart repeated his warning about outing Rupert as a cooperator:

[186] *Id.*
[187] Ex. 44.
[188] *Id.*
[189] Ex. 46.

*Edmond Brancart*
Deputy District Attorney
Wyandotte County District Attorney's Office
710 N. 7th Street
Kansas City, KS 66101
Voice: 913-573-2851
Fax: 913-573-2948

The Wyandotte County District Attorney does not designate e-mail as official communication.  If you send an e-mail to the WYCO DA's Office, you should not assume that it was received.  Do not rely on computer generated auto-responses, as they may not be mean that the intended recipient actually read your submission.

This e-mail is protected by a variety of state and federal statutes, and is intended as confidential communication from an attorney.

Your E-mail and More On-the-Go. Get Windows Live Hotmail Free. Sign up now.

Brancart also added a new threat. If Rupert wouldn't talk to Brancart, he would send Rupert to jail.

Brancart waited another four days, until September 18, before sending Patterson another email.[190] Brancart told Patterson that they'd received another letter from Rupert.[191] Pete's case had been continued, Brancart wrote, and he had not yet disclosed Rupert's name to the defense. Brancart repeated his threat to throw Rupert in jail:

[190] Ex. 47.
[191] Likely Rupert's September 8 letter, Ex. 45.

My window of opportunity has opened up slightly. When the defense requested the continuance I had not yet disclosed Rupert's potential as a witness.

I will as soon as feasibly possible open an inquisition and compel Rupert's attendance for deposition – and thereafter I'll disclose his existence to the Coones defense. If you and Rupert have an alternative suggestion, you should make it.

*Edmond Brancart*
Deputy District Attorney
Wyandotte County District Attorney's Office
710 N. 7th Street
Kansas City, KS 66101
Voice: 913-573-2851
Fax: 913-573-2948

The Wyandotte County District Attorney does not designate e-mail as official communication. If you send an e-mail to the WYCO DA's Office, you should not assume that it was received. Do not rely on computer generated auto-responses, as they may not be mean that the intended recipient actually read your submission.

Patterson responded fifteen days later, on October 3.[192] He told Brancart that Rupert had caved; he would sit down for an interview with Brancart about Pete's case. But Brancart had apparently grown tired of Rupert's inconsistency, and he never took Patterson up on this offer.

Two weeks later, on October 17, Rupert wrote another letter to the WYCODA.[193] Rupert told Brancart that Rupert had a "rapport" with Pete. He speculated that his probation-revocation case would end on October 30 and there would be no more postponements. Rupert then returned to the topic of his previous

[192] Ex. 46
[193] Ex. 48.

letters: safeguards. Rupert told Brancart that if Rupert cooperated with the prosecution, *any* prison would be too dangerous for Rupert.



It's *not* as Simple as Puting me in a Seprate Prison.

Like the September 8 letter, Brancart did not turn this over to the defense until December 10.[194]

Rupert's probation-revocation hearing was held on October 30, where he received a sentence of 35 months in prison and 12 months in jail, for a total of 47 months.[195] About two weeks later, on November 14, Rupert wrote another letter to Brancart.[196] Rupert told Brancart that Rupert's case ended on October 30 but Rupert was still in the Butler County Jail. Pete's cell was a couple of doors down from Rupert's, and they spoke every day. Rupert was

---

[194] Ex. 55 at 7, 12.
[195] Ex. 58.
[196] Ex. 49 (Pete's original memorandum erroneously points to a November 2 letter written by Rupert. *See* Mem. in Supp. at 19. There does not appear to be a Rupert letter with that date, but there was a letter written from a different inmate with a similar name on November 2, 2011).

growing frustrated with Brancart: "I've asked you all along about safeguards — It appears I am being ignored."

Sensing that the prosecutor wasn't interested in information about Pete, Rupert tried to interest Brancart in C.W., another Wyandotte County defendant at the Butler County Jail.[197] C.W. was Rupert's roommate, Rupert wrote to Brancart. And like Pete, C.W. was charged with double murder. Rupert then switched back to Pete, telling Brancart that Pete had made comments about another murder that had been in the newspaper. "It's quite important," Rupert wrote, and "you need a heads up on it."

On November 25, Brancart made good on his inquisition threat to Rupert. Jerome Gorman, the Wyandotte County District Attorney, filed an application to open an inquisition in Pete's case.[198] The judge signed the order on the same day.[199] Also on that day, Gorman applied for — and received — an order for an

---

[197] Ex. 49.
[198] Ex. 50.
[199] Ex. 51.

inquisition subpoena to compel Rupert's attendance at a

deposition.[200]

> · YOU ARE HEREBY COMMANDED to appear in person and give testimony under oath at the Office of the District Attorney of Wyandotte County, Kansas, 710 N. 7[th] St., Kansas City, Kansas 66101, at ___9___ o'clock __a__ .m., __2nd__ , __December__, 2009.

The court also ordered the Wyandotte County Sheriff to transport

Rupert to the Wyandotte County Jail.[201] The sheriff was to keep

Rupert at the jail "until he is deposed by the District Attorney or

his designee pursuant to this inquisition."

On November 30, Rupert wrote Brancart another letter.[202] He

repeated his offer to give information about C.W., telling Brancart

that C.W. had assaulted another Wyandotte County defendant at

the jail. To demonstrate his access to C.W., Rupert enclosed a copy

of the disciplinary report C.W. had received for this incident — a

report Rupert could have only stolen from C.W.'s property. Turning

---

[200] Ex. 53.
[201] Ex. 52.
[202] Ex. 54 (The letter is erroneously dated 12/1/09; the postmark shows it was mailed on November 30, 2009).

back to Pete, Rupert wrote that he thought cooperating with Brancart was the right thing to do, but Rupert still wanted "safeguards."

The day after he sent this letter, Rupert arrived at Wyandotte County Jail.[203] On the next day, December 2, Rupert arrived for the scheduled deposition at the WYCODA conference room.[204] But there was no court reporter. He was not sworn in. The only other people in the room were the detectives and Brancart. They questioned Rupert for some amount of time, but it is impossible to tell how long because no one wrote a report about it.[205] Assuming the interview began as scheduled at 9:00, they questioned Rupert for about an hour and a half. At 10:30, Brancart left the room and Michael turned on an audio recorder.[206]

---

[203] Ex. 103.

[204] Exs. 65, 66.

[205] In Pete's original memorandum, he said that Michael or Garrison wrote a report about this interview but did not record it. Mem. in Supp. at 16, 18. The opposite is true. Neither detective wrote a report, but they did record a portion of the interview and turned it over to the defense.

[206] Ex. 65 (audio of interview); Ex. 66 (transcript of interview).

During the recorded portion of the interview, Rupert said that Pete had told him:[207]

- Pete climbed out his bedroom window at his house so no one would know that he left. Pete's wife, Dee, helped Pete get out of the window and closed it after he left.

- Pete didn't use the van to drive to the Schrolls'; he used his mail jeep. After the shootings, Pete had his wife sell the jeep to get rid of it.

- Pete killed both Kathleen and Carl in the same room. He left the bodies side-by-side, not far apart from each other, in a laundry room or utility room. This was not the front room or a bedroom, it was in the back part of the house.

Rupert also said, with the recorder on, that he never asked for anything in return for his cooperation. "I never asked anybody for leniency whatsoever. I never seeked (sic) anything from anybody." The recorded portion of the interview lasted 27 minutes.

[207] Exs 65, 66.

While the detectives began recording their interview with Rupert, Brancart left the conference room to send an email to Patricia Kalb, Pete's lawyer.[208] Brancart told Kalb that the police were taking a statement from Rupert and Brancart would send Kalb the audio recording once he had it. This was the first time the defense had ever heard about Rupert. Pete's trial was scheduled to begin in 12 days.

On the day after, December 3, Brancart emailed Rupert's prior convictions involving dishonesty or false statement to Kalb.[209] It included 12 confirmed convictions and two arrests that may have led to convictions. In reality, as Rupert's PSR would show, he had 28 convictions for conduct involving dishonesty or false statement.[210]

Rupert, now in the Wyandotte County Jail, wrote Brancart another letter on the next day, December 4.[211] Rupert began by saying that he'd had discussions, weeks apart, with Pete about

[208] Ex. 31.
[209] Ex. 32.
[210] Ex. 33.
[211] Ex. 57.

"shots fired v. shell casings." And that Pete had told Rupert about Pete's "safety practice" with semiautomatic pistols. According to Rupert, the reason that there were three shots fired but four shell casings was because Pete always carried an empty shell casing in the slide of his semiautomatic pistol.[212]

Rupert then wrote about Pete's statements about stealing the mail of Kathleen's family members.[213] According to Rupert, Pete told Rupert "he was stealing their mail at the post office where he worked." Specifically, Rupert claimed, Pete was stealing correspondence between the Social Security Administration and Blair (Kathleen's daughter) about Kathleen's death. The WYCODA received Rupert's letter on December 4 — 8 days before the trial. But it never turned the letter over to the defense.

On December 10 — six days after receiving that letter — Brancart emailed Kalb three (of the five) letters Rupert had sent him.[214] Brancart said he was still looking for Rupert's original

---

[212] The weapon used to kill the Schrolls was a revolver, not a semiautomatic.
[213] Ex. 57.
[214] Ex. 55.

letter to him but he may have lost it. He did not tell Kalb about Rupert's most recent letter or the one that included C.W.'s disciplinary report.

Brancart then described his attempt to interview Rupert.[215] "After several weeks of [Rupert's] lawyer trying to get something out of the Butler County Attorney for Rupert his lawyer gave me the green light to see Rupert." Brancart did not explain that Rupert had received an offer for leniency in return for his cooperation, found it insufficient, and rejected it. Brancart then told Kalb about another letter he'd received from Rupert on November 20. Once Brancart received this second letter, he told Kalb, he got an order to transport Rupert to Wyandotte County. Brancart did not tell Kalb about his threat to put Rupert in jail if he wouldn't talk.

The court had a hearing on Pete's case later that afternoon.[216] Brancart told the judge and Kalb about his interactions with Rupert.[217] Brancart said Rupert had written one letter, which

---

[215] Ex. 55.
[216] Ex. 1.
[217] *Id.* at 26.

prompted Brancart to reach out to Rupert's attorney. Rupert's attorney talked with Rupert, and they originally agreed to an interview but then Rupert backed out of it. "So that terminated it," Brancart said.[218] Once it became impossible to interview Rupert, Brancart told the court and Kalb, "we abandoned it."[219] Brancart did not tell the court or Kalb about the failed plea negotiations or his threat to jail Rupert if he wouldn't cooperate.

```
6    like that, when you brought to me a request for an
7    inquisition--
8              MR. BRANCART:  Yes, sir.
```

*Ex. 1 at 30.*

The court asked Brancart why he hadn't turned over Rupert's first letter to the defense. Brancart said he didn't know where it was, that he was looking for it.[220] Though it would be easily located in Brancart's file eleven years later, he never turned it over to the defense.

---

[218] *Id.* at 27.
[219] *Id.*
[220] Ex. 1 at 29.

The court held another hearing on the morning of December 14 — just before Pete's trial began.[221] It centered on Rupert. During that hearing, Brancart told the judge and Kalb that he had "no contact" with Rupert until December 2.[222] "I took an oath to tell you the truth when I was admitted to the bar," Brancart told the court, "and I have made representations to you."[223] He then listed those representations. "I know of no communication with Robert Rupert, *period*, until December 1st or 2nd, when he was brought here and interviewed."[224] When Rupert told Brancart that he would not be interviewed, "that was honored."[225] Once again, Brancart failed to tell the court or Kalb about the deal Rupert had rejected or Brancart's threat to imprison Rupert if he didn't do Brancart's bidding.

On the next day — December 15 — Brancart learned that something else he'd told the court and counsel was wrong. Brancart

---

[221] Ex. 2.
[222] *Id.* at 4.
[223] *Id.* at 40.
[224] *Id* (emphasis added).
[225] *Id.* at 41.

had emailed Norris, asking if Rupert had gotten any kind of leniency in his Butler County case.[226] Norris responded on December 15, telling Brancart that Rupert hadn't received any leniency, but that his case was not over. Rupert had a motion hearing next month, Norris told Brancart, to ask for a lower sentence through jail-time credit. Brancart never told the court or Kalb that his earlier statements — that Rupert's case was over — were wrong.

## *The second trial*

After selecting a jury,[227] the trial began in earnest on December 15.[228] During his opening statement, Brancart touched on the elder-abuse case against Kathleen: "Whether [Olin] was happy to provide a few extra gifts to Kathleen or whether she was taking them without permission was an issue that defied clear proof for police."[229] This was not true. The police had brought the case to Brancart for charging and he had declined to prosecute it.[230]

[226] Ex. 58.
[227] Ex. 3.
[228] Ex. 4.
[229] Ex. 4 at 10.
[230] Expected testimony of Mr. Matthews.

Brancart told the jury that, shortly before the killings, "a civil court date that would determine the passing of some of the estate approached . . . ."[231] This was wrong for three reasons: (1) there was a mediation — not a court date — approaching; (2) the mediation would not determine anything unless the parties agreed to it; and (3) the civil suit was not about the estate — which had passed to Pete because he was the will's beneficiary — but over a $46,000 benefits policy.[232]

The State first called KCKPD Officer Sophia Barajas to the stand.[233] Barajas had been the first officer to arrive at the Schroll house. She described arriving at the scene, the locations of the bodies, and the revolver lying next to Kathleen's body. Claude Harper, of the KCKPD's Crime Scene Investigation Unit, testified next.[234] He arrived at the Schroll house about an hour after Barajas. He noticed two cellular phones sitting on a table near the front door. Examining the silver revolver lying next to Kathleen's

---

[231] Ex. 4 at 10.
[232] *See* Ex. 4 at 192-211 (Duma testimony).
[233] Ex. 4 at 14-41.
[234] Ex. 4 at 41-73.

body, he saw that it had a five-bullet capacity, but only four bullets had been fired. And he saw that Kathleen's purse was open, sitting on a couch in the living room. Harper testified about the contents of that purse. Among other things, it contained a copy of a letter from Duma to the WYCODA offering to surrender Kathleen if it decided to charge her with elder abuse. Harper did not testify about collecting the multi-colored pillow from the bed.

Detective Bill Michael, one of the two lead detectives on the case, testified next.[235] He told the jury about arriving at the Schroll house in the early morning and speaking to Elizabeth about the phone call she'd received from Kathleen. Elizabeth also told Michael that Pete had animosity toward Kathleen because Olin had willed Pete's inheritance to Kathleen instead of Pete. And that there was ongoing civil litigation over the inheritance.

Michael testified about interviewing Blair, Kathleen's daughter, about the revolver belonging to Kathleen. Michael ran a trace on the gun, discovering that Patsy had bought it and —

---

[235] Ex. 4 at 73-161.

rather than giving it to Kathleen — had reported it stolen. Michael told the jury about the ballistics test that showed the bullets found in Carl's and Kathleen's bodies were the same caliber as the silver revolver. And, Michael testified, the police found a box of ammunition of the same caliber as the revolver in the Schroll house. A DNA test showed only Kathleen's DNA on the trigger; Pete's DNA was not on it. Nor was Pete's DNA found on the cordless phone lying next to Kathleen's body.

Michael described the other forensic tests performed in the case. The police searched Pete's van, looking for fingerprints, weapons, bullets, or DNA that would link Pete to the Schroll home. They didn't find any. The van had no trace of blood or tissue inside it, and it did not appear to have been cleaned before the police examined it. A search of Pete's house, performed the afternoon of his arrest, similarly turned up nothing connected to the shootings.

Michael talked about trying to confirm Kathleen's story — told to Blair — about Pete's threats at the QuikTrip on April 5. After hearing this story from Blair, Michael went to the QuikTrip and reviewed its surveillance video from April 5. He saw neither

Pete nor Kathleen at that gas station on that day. And Michael testified that the crime scene was not consistent with a burglary. There were no signs of forced entry or a struggle, and no property had been taken.

Mitchell, the medical examiner who performed the autopsies on the bodies of Carl and Kathleen, testified next.[236] He first described Carl's injuries, testifying that the wound on Carl's head was a tear of the scalp, consistent with an impact injury. A "crushing blow," Mitchell called it, requiring a tool of some kind and considerable force. Carl also had two gunshot wounds to his chest. These gunshots were the cause of Carl's death. Mitchell then testified about the examination of Kathleen's body. She died from a single gunshot wound to the back of her head. The wound was an oblique contact wound, meaning some — but not all — of the barrel of the gun was touching her head when the bullet was fired. The bullet traveled from the back of her head to the front, traveling

---

[236] Ex. 4 at 161-81.

right to left. This wound would've immediately immobilized her body, Mitchell testified.

John Duma, Kathleen's attorney, testified next.[237] He said that the civil case between Pete and Kathleen had been scheduled for mediation on May 9, 2008 — about a month after her death. About six days before her death, Pete had offered Kathleen a settlement of 25 percent of the life-insurance proceeds. Kathleen had not yet accepted or rejected the offer. Duma also examined Olin's will, which — contrary to what Brancart had told the jury in his opening statement — named Pete as his heir. Duma testified about a letter that the police found in Kathleen's purse. Duma had written to the WYCODA, asking if it planned to file charges against Kathleen for stealing from Olin and offering to surrender her to the police if it did. Duma had taken Kathleen in to give a statement, he testified, and did not know if WYCODA would file charges against her.[238]

---

[237] Ex. 4 at 192-211.
[238] There is no record of any statement Kathleen gave to the KCKPD or WYCODA.

Blair Hadley, Kathleen's daughter, testified next.[239] She talked about the conversation with Kathleen on April 6. She said that Kathleen told her about the confrontation with Pete at the QuikTrip on April 5. According to Blair, Kathleen said she'd gone to the QuikTrip after work — around 1:00 p.m. — to buy cigarettes and lottery tickets. When Kathleen was walking through the doors into the store, Pete was walking out of the store. And that's where Pete told her she wouldn't be spending any more of his father's money.

Rupert testified next.[240] Rupert said he'd been in the same jail as Pete while awaiting trial. After walking Rupert through some (but not all) of his previous convictions, Brancart asked about Rupert's Butler County case. Rupert testified that case was over and he was serving his sentence. Rupert testified that Pete talked to him about committing the murders. According to Rupert, Pete said that he didn't use his van to go to the Schroll house; he used

---

[239] Ex. 4 at 211-218.
[240] Ex. 5 at 3-30.

his mail jeep.[241] And Pete had his wife sell the jeep right after the murders.[242] Rupert testified that Pete claimed to have killed the Schrolls in a small room — either a laundry or utility room — and left their bodies side-by-side.[243] And, Pete said, he had left his house that night through a window, so that no one in his living room would see him leave.[244]

Rupert also testified about the letters he'd sent to Brancart. Rupert said that after he'd sent his first letter in August 2009, Brancart made no attempt to interview him.[245] Brancart elicited this testimony, and did not correct Rupert by reminding him of Rupert's quest for a better deal from the Butler County prosecutors.[246] Rupert admitted that "*we* got element admissions" from Pete — referring to the elements of the crime of murder.[247] And that getting those "element admissions" was what Rupert was

[241] *Id.* at 20.
[242] *Id.* at 21.
[243] *Id.* at 22.
[244] *Id.* at 19-20.
[245] Ex. 5 at 26.
[246] *Id.*
[247] *Id.* at 21 (emphasis added).

"trying to help out with."[248] When challenged about his motive for contacting the prosecutor about Pete's case, Rupert testified that the severity of the crime prompted him to do so.[249] He did not mention his attempts to get a reduced sentence or Brancart's threat to imprison him. Neither did Brancart.

James Rumley testified that he had bought Pete's mail jeep from Pete on or around April 6, 2007 — about a year before the shootings.[250] He identified a loan application, with that date, that he had completed to buy the jeep. Rumley had owned the jeep ever since, he testified, and used it every day. He never loaned it to Pete.

Elizabeth Horton, Kathleen's mother, testified.[251] She talked about the phone call she received from Kathleen at 2:21 on the morning of April 7. When the call ended, Elizabeth did not hear a buzzing sound or anything odd. During the call, Elizabeth said, she didn't hear the sound of a struggle or gunshots in the background. And Kathleen wasn't whispering or screaming, but she sounded

---

[248] *Id.* at 21-22.
[249] *Id.* at 24.
[250] Ex. 5 at 63-65.
[251] Ex. 5 at 34-42.

scared. Elizabeth also testified about Olin, Pete, and Kathleen. The only things she knew about Pete, Elizabeth said, were things Kathleen told her. She said Kathleen talked about Pete practically every day.

Barbara Crim-Swanson, a forensic scientist for the KBI, testified about the tests performed on the evidence.[252] She had tested Pete's clothes and shoes for the presence of blood or tissue and found none. Nor was there any on a ring he was wearing when the police arrested him. Pete's DNA was not on the silver revolver but Kathleen's was, notably on the trigger. The cordless phone didn't have Pete's DNA on it, either.

Detective Bryan Block testified about investigating Kathleen for stealing from Olin.[253] He said that when he tried to interview Olin at his home on Parallel Parkway, Kathleen was at the house.[254] And she would not allow Block to interview Olin. She told Block that he would have to meet Kathleen and Olin at an

---

[252] Ex. 5 at 66-79.
[253] Ex. 5 at 123-133.
[254] *Id.* at 126.

attorney's office the next day. When Block arrived at the attorney's office, the attorney and Kathleen again refused to let Olin speak with Block. Block's impression was that Olin was being manipulated. Stymied in his attempts to interview Olin, Block turned to his financial investigation and discovered that Olin's bank accounts had been drained.

Block testified about Pete and Bonnie Keith's efforts to get Olin out from under Kathleen's thumb. "When we were able to get him away from her," he said, "that was when the accounts were switched back over."[255] Block said he also helped get Olin's cars back from Kathleen, who had been keeping them at her house.

Tammy Kieffer, the registered nurse for the Wyandotte County Jail, testified that Pete was in terrible health when he arrived there after his arrest on April 7.[256] He was obese, had high blood pressure, shortness of breath, and an irregular heartbeat. He could not walk across a room without becoming red-faced and

[255] Ex. 5 at 127.
[256] Ex. 5 at 133-142.

winded. Pete's medical records showed that he'd suffered a heart attack in the past.

Several of Pete's family members testified.[257] They said that on the night of April 6, Ross Minks was staying at their house. Minks was the boyfriend of Mariah Coones, Pete's college-age daughter. On that night, Pete's van was parked behind the house and Minks's van in the driveway. Minks's van blocked Pete's van in; for Pete's van to leave, Minks's van would have to be moved first. Minks testified that the keys to his van were in his pocket that night. He didn't give them to Pete until the next morning so Pete could move Minks's van, get his own van onto the street, and take his children to school.

Minks and Mariah testified they were awake, in the living room, until around 2:30 or 3:00 in the morning on April 7.[258] They both testified that they saw Pete come out of his bedroom at around 2:00 or 2:30 in the morning to go to the bathroom. After he came

[257] Ex. 5 at 142-154 (Jeremiah Coones); 154-162 (Melody Coones); 162-172 (Olin "Ben" Coones); 186-200 (Mariah Minks).
[258] Ex. 5 at 186-211.

out of the bathroom, Pete asked them if they were still awake. When they said yes, he told them not to stay up too late. Then he returned to his bedroom. Minks was sleeping in a bedroom that adjoined Pete's. When he went to lay down in the bedroom at 2:30 or 3:00 that morning, he could hear Pete through the wall — typing on his computer and coughing.

During his closing argument, Brancart spent a long time arguing that Kathleen had no reason to commit suicide.[259] "No evidence suggests that she would have had any motivation other than to do anything to live and keep on living . . . ."[260] The facts didn't fit suicide either, Brancart argued. Kathleen hadn't put a gun in her mouth.[261] She didn't leave a suicide note.[262] She didn't call her mother and say goodbye.[263]

He then laid out the State's theory of the case: Pete had gone to the Schrolls' house in the middle of the night and told Kathleen

---

[259] Ex. 6 at 12-15.
[260] *Id.* at 13.
[261] *Id.*
[262] *Id.*
[263] *Id.*

what he planned to do. He clubbed Carl in the head with a blunt object and shot him twice. Then he returned to Kathleen, put a gun against the back of her head, and fired. Pete must've gotten the drop on them, Brancart claimed, perhaps somehow disarming Kathleen of her own gun. And he must've brought some kind of weapon with him — the one he used to hit Carl in the head — and then taken it with him when he left.

During its deliberations the jury asked for readbacks of Elizabeth's, Rupert's, and Dee's testimony.[264] It later convicted Pete of murdering Kathleen.[265]

### *What the jury never heard*

*The fourth bullet*

Kathleen's gun, found lying near her left hand, had fired four bullets. The police only recovered three. Recall that there was a dark object in the stuffing spilling out of the multi-colored pillow near Carl's body on the bed. In late September 2020 — more than

---

[264] Ex. 5 at 36.
[265] Ex. 5 at 39.

12 years after the police collected it — someone examined that dark

object.[266] And found the fourth bullet.[267]

---

[266] Ex. 116.
[267] Exs 116-A, 116-B, 116-C, 116-D.

# The Discovery of the Missing Bullet






*The medical examiner*

When the police asked Dr. Mitchell to determine Kathleen's and Carl's causes of death, they didn't tell him everything. They did not tell him about the lack of any sign of forced entry, struggle, or burglary inside the house. Nor did they tell him that the gun belonged to Kathleen, that it was discovered near her body, that the hand closest to it had GSR on it, and that only her DNA was found on the trigger. And they police did not tell Mitchell about the missing bullet. In fact, the police did not even give Mitchell photographs from the crime scene. So he couldn't have seen the two-holed pillow or its stuffing holding the bullet.

And of course, no one told Mitchell about Kathleen's dire financial situation, the imminent discovery of her embezzlement, or her animosity toward Pete.

Dr. Mitchell was recently given the opportunity to review all of this evidence and informed about the discovery of the fourth bullet. Based on all of this new evidence, he has changed his findings. Dr. Mitchell has now concluded that the injury to Carl's scalp was not from a blunt-force injury but from the graze of a bullet — the bullet in the pillow. Based on that finding, and all of

the other evidence, Dr. Mitchell has concluded that this was a murder-suicide.

*Kathleen's history of deceiving those closest to her*

The jury only heard a small portion of these facts. No one told the jury about Kathleen's scheme to change Patsy's will or Patsy's suspicion of Kathleen in her final days. It did not hear about the KBI's conclusion that Kathleen had likely forged Olin's signature on more than one hundred checks. It did not hear that Kathleen had lied to her family about working at Medicalodge, the value of the lawsuit with Pete, Pete's stalking her, or having a restraining order against him. No one told the jury about how dire Kathleen's finances had become, that she was spending more on high-interest loan payments than she earned at her job. And no one heard that she'd tricked her coworkers at her bank, embezzling thousands of dollars by abusing their trust. The jury didn't learn that Kathleen knew her embezzlement scheme would be discovered soon, and that it meant she would lose her job and go to prison.

*Pete had no motive*

Brian Levinson was Pete's attorney in the federal case with Kathleen.[268] Levinson would have told the jury that Pete was scared of the Schrolls; he thought they'd been following him and his family and vandalizing his property. And the parties were not far apart in the federal lawsuit.

*Rupert's motive, errors, and criminal history*

The jury didn't know everything about Rupert, either. It didn't hear about Rupert's true motive — a sentence reduction — in writing those letters to the prosecutor. Nor did it find out about how Brancart had to threaten Rupert with incarceration to get him to talk. The jury never heard that Rupert had twice as many dishonesty convictions than came out at trial. And no one told the jury that, when Rupert did testify, he knew he'd be appearing again in front of his judge to ask for a lower sentence. Or that he'd written a letter claiming Pete confessed to using a semi-automatic handgun, when the actual weapon was a revolver.

---

[268] Expected testimony of Mr. Levinson.

*Risk factors for suicide and murder-suicide*

Out of every 100 people who commit suicide, 42 of them are undergoing problems in a relationship.[269] On the day before her death, Kathleen told her daughter that she and Carl were having problems in their marriage.[270] Another 16 percent of people who commit suicide are struggling with financial problems.[271] The bounced checks, payday loans, and late bills reveal Kathleen's financial struggles. And nine percent of those who commit suicide are facing a criminal legal problem.[272] Kathleen knew that abuse claims had been confirmed against her and she was under criminal investigation for stealing from Olin.[273] 29 percent of people who commit suicide face a crisis in the next two weeks.[274] Kathleen knew her embezzlement scheme would be discovered soon. And

[269] Centers for Disease Control, *National Violent Death Reporting System* (2015) ("NVDR"); available at https://www.cdc.gov/vitalsigns/suicide/infographic.html
[270] Ex. 29 at 2-3.
[271] NVDR.
[272] *Id.*
[273] Exs 90, 92.
[274] NVDR.

that it would result in her firing, arrest, prosecution, and conviction.

Financial problems cause more than suicides. In a 2006 report on murder-suicides in the United States, the Violence Policy Center studied "family annihilators" — people who murder family members before committing suicide.[275] The study found that "[i]n many cases, a family annihilator is suffering from depression and has financial or other problems…."[276] This makes the person feel the "family is better off" dying with the person "than remaining alive to deal with the problems" they've caused.[277]

## PROCEDURAL HISTORY

Pete was convicted on December 17, 2009.[278] The Kansas Supreme Court affirmed his conviction on December 12, 2014, but remanded his case for resentencing.[279] After that resentencing, Pete sought review in a federal habeas motion.[280] That court denied

---

[275] Violence Policy Center, "American Roulette: Murder-Suicide in the United States" (2006), available at: https://www.vpc.org/studies/amroul2006.pdf.
[276] *Id.*
[277] *Id.*
[278] Ex. 6 at 38.
[279] *State v. Coones*, 301 Kan. 64 (2014).
[280] *Coones v. Shelton*, No. 16-3090-JWL (D.Kan).

his petition on October 24, 2016.[281] Pete appealed that decision to the United States Court of Appeals for the Tenth Circuit, which denied it on May 2, 2017.[282]

Pete filed his habeas motion in this court on September 22, 2019.[283] In that motion, Pete outlined why his actual-innocence claims met the manifest-injustice standard, entitling him to file the motion outside the one-year time limit.[284] The State responded, agreeing that Pete had shown "a claim of actual innocence . . . ."[285] So, the State continued, the court should hold a hearing to determine whether that actual-innocence claim was enough to bypass the one-year time limit on habeas motions.[286] The court held that hearing on February 6, 2020. After hearing the evidence and argument of counsel, the court found Pete had presented a colorable claim of actual innocence under K.S.A. § 60-1507(f).[287] The court certified Pete's petition for a hearing on the merits.

---

[281] *Coones v. Shelton*, No. 16-3090-JWL, Doc. 15 (D.Kan. Oct. 24, 2016).
[282] *Coones v. Shelton*, No. 16-3329, Doc. 0109803395 (10th Cir. May 2, 2017).
[283] Mem. in Supp. of K.S.A. 60-1507 Mot. (Sep. 22, 2019).
[284] *Id.*
[285] St's Resp. to Def.'s Mem. at 5 (Jan. 23, 2020).
[286] *Id.* at 5.
[287] D.E. Feb. 7, 2020.

## ARGUMENTS & AUTHORITIES

Habeas corpus is a "bulwark against convictions that violate fundamental fairness."[288] Innocence is the ultimate equity; courts have long recognized that once a colorable claim of innocence is made, a petitioner may be heard on the merits despite any procedural default. Pete is innocent and because of the exceptional circumstances of this case, he has a right to have all of his claims considered on the merits.[289]

In the argument section below, Pete will first address the "gateway" issues of "manifest injustice" and "exceptional circumstances" which permit full consideration on the merits for each of his constitutional claims that follow. He will then address each of his constitutional claims, including violations of the right to due process, a fair trial, to effective assistance of counsel, all in violation of the Fifth, Sixth, and Fourteenth Amendments of the

---

[288] *Engle v. Isaac*, 465 U.S. 107, 126 (1982).
[289] *See* D.E. Feb. 7, 2020. This legal discussion is largely academic because the Court has already determined that Mr. Coones has made a colorable showing of actual innocence. Respondent agrees and has waived all procedural defenses.

United States Constitution and § 5 and §10 of the Kansas Bill of
Rights.

**Claim 1:   Pete Coones is innocent and the failure to
consider his claims on the merits would constitute
a manifest injustice under K.S.A. § 60-1507(f).**

Pete Coones is innocent. New and overwhelming evidence
supports his innocence claim, allowing him to clear the procedural
hurdles of K.S.A. 60-1507 based on "manifest injustice" and
"extraordinary circumstances." The failure to consider his
innocence would constitute a manifest injustice under K.S.A. § 60-
1507 and *Beauclair v. State.*[290] And the evidence of his innocence
satisfies the exceptional-circumstances standard in K.S.A. § 60-
1507.

Recognizing that innocence is the most compelling "manifest
injustice," the Kansas legislature amended K.S.A. § 60-1507(f) in
2016 to create "a colorable claim of actual innocence" as a basis for
a prisoner to file a habeas motion outside the one-year limitation
period.[291] A claim of "actual innocence" can either be a

---

[290] 308 Kan. 284 (2018).
[291] K.S.A. § 60-1507(f)2(A).

"substantive" or "freestanding" claim of actual innocence or a "gateway" claim of innocence. Under the amended statute, "actual innocence requires the prisoner to show it is more likely than not that no reasonable juror would have convicted the prisoner in light of the new evidence."[292] This language mirrors the gateway actual-innocence standard established by the United States Supreme Court in *Schlup v. Delo*.[293] A "gateway" actual-innocence claim is a component of the "manifest injustice" analysis set out in *Schulp* and adopted by the Kansas legislature in its 2016 amendment to § 60-1507. The Kansas Supreme Court also explained and adopted the *Schlup* actual-innocence gateway claim in *Beauclair*.[294]

Under this analysis, a petitioner establishes "manifest injustice" by showing that "a constitutional violation has probably

---

[292] *Id.*

[293] 513 U.S. 298 (1995); s*ee also Beauclair*, 308 Kan. 284 (2018) (Comparing K.S.A 2017 Supp. 60-1507(f)(2)(A) ("more likely than not that no reasonable juror would have convicted the prisoner in light of the new evidence") with *Schlup*, 513 U.S. at 327 ("more likely than not that no reasonable juror would have convicted him in light of the new evidence")).

[294] 308 Kan. 284 (2018) (A petitioner establishes innocence as a gateway by showing it is more likely than not that no reasonable juror would have convicted him given the new evidence. If the showing is made, petitioner may raise otherwise procedurally defaulted claims.)

resulted in the conviction of one who is actually innocent . . . ."[295] A petitioner makes that showing by establishing "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence of innocence."[296] Innocence evidence is "a gateway through which a habeas petitioner must pass to have his otherwise procedurally barred constitutional claims considered on the merits."[297] Indeed, the "interest in avoiding injustice is most compelling in the context of actual innocence."[298] The evidence of innocence "must establish sufficient doubt about [] guilt" and "undermine confidence" in the verdict.[299]

The evidence now available, as described below, clears that hurdle. It shows that no credible evidence supporting the verdict remains. A fully informed, reasonable juror would not have voted to convict Pete given all the evidence. His continued incarceration

---

[295] *Schlup*, 513 U.S. at 327 (quoting *Murray v. Carrier*, 477 U.S. 477, 496 (1986)).
[296] *Schlup*, 513 U.S. at 327 (quoting *Murray v. Carrier*, 477 U.S. 477, 496 (1986)).
[297] *Beauclair,* 308 Kan. at 289-99, (quoting *Schlup,* 513 U.S. at 315).
[298] *Beauclair,* 308 Kan. at 289-99, (quoting *Schlup,* 513 U.S. at 315).
[299] *Beauclair*, 308 Kan. At 303, (quoting *Schlup*, 513 U.S. at 317).

violates the laws of both the United States and the State of Kansas, and is manifestly unjust.

Pete put the original bases for this claim in his original petition and its accompanying memorandum. Since then, the evidence of his innocence has only grown. That evidence includes:

- the discovery of the fourth bullet;[300]

- the original medical examiner's conclusion that the manners of death were murder-suicide;[301]

- Kathleen knew that the discovery of her embezzlement was imminent;[302]

- Kathleen told different versions of the QuikTrip confrontation to different people at different times;[303]

- Kathleen's attempt to get Patsy to change her will to leave everything to Kathleen and sign a power of attorney giving over control to Kathleen;[304] and,

---

[300] Exs 116, 116-A – 116-D.
[301] Expected testimony of Dr. Erik Mitchell.
[302] Expected testimony of Ms. Laymon and Mr. Jones.
[303] Expected testimony of Ms. Laymon.
[304] Expected testimony of Mr. De Moss.

- Brancart's coercion of Rupert's testimony by threatening him with imprisonment.[305]

Pete begins by restating the evidence of his innocence referenced in his original petition, before moving on to the evidence uncovered after its filing.

## A.  *Evidence presented in the first memorandum*

### 1.  *Kathleen's embezzlement scheme*

Over three months, Kathleen concocted and executed a scheme to steal more than $11,000 from the credit union where she worked. This scheme had several features that mirrored her subsequent scheme to frame Pete for her murder.

First, both schemes depended on Kathleen's ability to deceive those closest to her. Her scheme to frame Pete relied on her ability to convince her mother that Pete was in the house when he really wasn't. She had to convince her superiors at MRCU that her ledger wasn't out of balance because she was embezzling but because of some innocent mistakes. Second, both schemes relied on Kathleen's

[305] Exs 46, 47.

ability to exploit the trust of others. Just as she relied on her mother's trust when she called her and said Pete was in the house, Kathleen relied on the trust of her supervisors to carry out her embezzlement. Third, both schemes relied on red herrings. Kathleen's call to her mother was a false signal about who was to blame for the shootings. Kathleen's theft from the bank required her to create false accounting entries to mask what she was doing — to make it seem like something it wasn't. Fourth, both schemes were complex. Kathleen's scheme to frame Pete required advanced planning; for instance, fabricating threats that Pete had made against her. Her embezzlement required similar planning. Kathleen had to pull checks out of batches, alter paperwork, and manufacture accounting entries.

This evidence illustrates two points. First, it shows that Kathleen was practiced at sophisticated deceptions against those who trusted her. That would have made it easier for the jury to conclude that Kathleen's call to her mother was just another one of these deceptions. Second, it shows that Kathleen did have a motive to commit suicide. Kathleen knew her embezzlement scheme

couldn't last forever. The first financial quarter of 2008 was over, and that meant other people would start scrutinizing her ledger and discover what she'd done. That would not only result in her termination, arrest, and prosecution — it would also shatter the image of herself she had carefully constructed in the eyes of her family.

## 2.    *Kathleen's forgery scheme*

Kathleen's embezzlement scheme wasn't her first. The KBI concluded that Kathleen had likely forged more than 100 of Olin's checks to herself.[306] This evidence would've shown the jury that Kathleen's deception at the bank was not some isolated, out-of-character dishonesty. The forged checks would have showed that Kathleen was a practiced hand at deception. And that her deception extended to her mother and daughter, both of whom believed Kathleen when she told them that she hadn't stolen anything from Olin.

[306] Ex. 11.

*3.    The GSR on Kathleen's left hand*

But as complex as Kathleen's plan to frame Pete was, it wasn't flawless. The shots she fired that night left GSR on only one of her hands — the hand that the gun fell out of after she shot herself.[307] The GSR on Kathleen's left hand fits with her firing a gun with her left hand. The lack of GSR on her right hand is the most telling; it suggests that either a gun was not fired near it or some object (e.g., her body) stood between the gun and her right hand. If the GSR on Kathleen's body came from a defensive gesture, one would expect to see it on both of her hands. That it is only on one of her hands — the hand closest to the gun on the floor next to her body — suggests she fired the gun with her left hand.

*4.    The lack of GSR on Pete's steering wheel*

Kathleen also couldn't make GSR appear anywhere on Pete or his van. When confronted with the fact that Pete's DNA was not on the gun, Brancart insinuated it was because Pete had been wearing gloves at the time.[308] While no evidence supported that implication,

---

[307] Ex. 80.
[308] Ex. 5 at 78.

the lack of GSR on the steering wheel would have negated it. While gloves might stop a person from leaving their DNA on a gun, GSR would still coat a pair of gloves, and then stay behind on a steering wheel when the glove-wearer touched it.

## B.    *Evidence uncovered since the first memorandum*

### 1.    *The missing bullet*

The discovery of the fourth bullet is perhaps the most compelling evidence of Pete's innocence. First, it contradicts Mitchell's testimony that Carl's head wound came from a blunt-force injury. A bullet embedded in a pillow inches from Carl's head makes it more likely (as Mitchell now concedes) that the wound came from being grazed by that bullet, instead of by some mysterious object that no one ever discovered.

Second, it makes it less likely that Pete could have committed the crime at all. During the trial, Brancart tried to explain how Pete could have subdued both Kathleen and Carl in their home without a weapon; the gun belonged to Kathleen and was presumably sitting in her purse whenever Pete entered the home. Brancart speculated that Pete could have brought the unidentified weapon that bludgeoned Carl in the head with him to the house

and used that weapon to get the drop on them.[309] The discovery of the fourth bullet would've destroyed that argument. Its presence means there's no evidence that a weapon — other than Kathleen's gun — was ever brought into the Schroll house.

Third, and relatedly, the presence of the fourth bullet makes a murder-suicide almost certain. Recall that there were no signs of forced entry into the home and no evidence of a struggle inside it. If the only weapon that caused the injuries belongs to one of the house's occupants, and it is found lying next to that occupant, then there is a greater probability that the crime was a murder-suicide. Because there is less evidence that anyone else was inside the home at all.

Fourth, it makes Kathleen's telephone call to Elizabeth that much more far-fetched. To leave the injury it did, Carl must have been lying in bed, on his stomach or his side, when the bullet grazed him.[310] And it would have been the first injury he suffered. But Kathleen tells Elizabeth that Pete's *going to kill* Carl. Future

[309] Ex. 6 at 30-31.
[310] Expected testimony of Drs Mitchell, Roe.

tense, meaning that Pete hadn't done so yet. And Elizabeth didn't hear any gunshots or other sounds of a struggle. So to believe Kathleen's statement, a person must believe that — at the time of her phone call — Carl was lying down in bed, apparently oblivious to what was happening.

Fifth, the discovery of the fourth bullet shatters Rupert's testimony. Recall that Rupert testified that Pete told him about the missing bullet:[311]

```
6    that he wasn't worried about them having any forensic
     evidence on his van, because he didn't use his van.
7        Q.   Did he indicate that he was, I mean, did he
8    talk about anything he did at these victims' place?
9        A.   He talked about, he talked about some shell
10   casings at two different points with me.  There was
1    three shots, four shell casings, and I ...
```

That the missing bullet *was* fired at the scene puts the final nail in Rupert's testimony. Other than that two people were shot, he got every other fact about the offense wrong.

[311] Ex. 5 at 11.

2.      *The medical examiner changes his conclusions.*

The discovery of the fourth bullet began a domino effect, prompting Erik Mitchell — the medical examiner — to conclude that his trial testimony that Carl and Kathleen were victims of a homicide was wrong. After reviewing the new evidence, he has now concluded that the injury to Carl's scalp was most likely caused by a bullet graze and not a blunt object. And based on the discovery of that bullet, as well as the crime scene photographs, the ownership of the gun, and other forensic evidence, Dr. Mitchell now concludes the most likely explanation is a murder-suicide.

3.      *Another medical examiner concludes murder-suicide.*

Dr. Mitchell is not the only forensic pathologist to reach these conclusions after reviewing all of the evidence. His conclusions track with Dr. Susan Roe's. Dr. Roe concluded that the wound to Carl's head was a graze wound, and not a "crushing blow" from some unidentified weapon as the jury was told. A blunt-force blow, like Mitchell found, would have damaged the skull or the brain, yet Carl's were undamaged. And the track of the laceration itself matches a bullet graze — a conclusion that prompted the next discovery of the fourth bullet.

Like Dr. Mitchell, Dr. Roe has concluded that Kathleen's likely manner of death is suicide. It is a myth, Dr. Roe will testify, that people do not commit suicide by shooting themselves in the back of the head; she has had several cases in which people have committed suicide that way. The wound to Kathleen's head was a contact gunshot wound — meaning that the barrel of the gun touched her head when it fired. Unless a person is incapacitated, few contact gunshot wounds to the head are homicides. This is because a person will reflexively move when they feel the barrel against their skull. Yet Kathleen's skull was stationary — something rare in homicides yet common in suicides.[312] And if someone had shot Kathleen from behind, the pressure of the barrel of the gun against her head would've pushed her body to fall forward or sideways. But her body fell backwards, which conflicts with someone shooting her from behind. Even if someone had shot her from behind and her body somehow fell backward, it would

---

[312] Expected testimony of Dr. Roe.

have fallen back onto the shooter. But there's no evidence that Kathleen's body collided with anything before falling to the ground.

Third, like Dr. Mitchell, Dr. Roe concluded that Kathleen likely killed Carl. Photographs taken at the scene show blood smears and biological material on Kathleen's right hand — likely from the bullet-graze injury to Carl's head. This means Kathleen was within a few feet of Carl when the bullet lacerated his scalp. And Kathleen's glasses had blood on the *front* of the lenses; that blood could've come from the shots to Carl.[313] The gun used to kill Carl belonged to Kathleen. The home had no signs of forced entry or a struggle. Had Dr. Roe been asked, as a medical examiner, to certify the manners of death she would have certified Carl's death as a homicide and Kathleen's death as a suicide.

*4.     Kathleen was drowning in debt.*

Examining Kathleen's financial peril makes a murder-suicide more likely. A review of her financial accounts show that she owed

---

[313] Unfortunately, the glasses were dropped on the floor and then washed during the autopsy of Kathleen's body, so the source of blood cannot be confirmed.

money to several short-term, high-interest lenders.[314] Her

payments on these loans, as well as a second mortgage on her

house, were costing more money than Kathleen earned.[315] Her

accounts were often overdrawn and she often bounced checks.[316]

Combined with the impending discovery of her embezzlement and

the later loss of her job, her financial turmoil would have given her

a motive to take her own life. And that would've countered the

State's theory that Kathleen had no reason to do so.

5.   *Kathleen pressured Patsy to leave everything to Kathleen in
     Patsy's will.*

Kathleen had not just perpetrated a fraud against Olin to get

his money and another fraud against MRCU to get its money, she

also attempted a third fraud against Patsy. As Chip De Moss will

testify, Kathleen pressured Patsy to sign a new will leaving

Kathleen everything.[317] Kathleen also tried to coerce Patsy into

signing a power of attorney, one that would give Kathleen power

over Patsy's finances. Kathleen partially succeeded in this effort,

---

[314] Ex. 25.
[315] Exs 25, 26.
[316] Ex. 26, 106.
[317] Expected testimony of Mr. De Moss.

coercing Patsy into calling De Moss and having him draft the will and power of attorney that Kathleen wanted. But Patsy never signed them, confiding to De Moss on her deathbed that she never wanted either of them in the first place. And that she didn't trust Kathleen because she'd been exploiting her and Olin.

6.   *Jones told Michael and Garrison about Kathleen's embezzlement.*

Thad Jones, Kathleen's supervisor at MRCU, does not recall his interview by Michael and Garrison.[318] But he does know what he would have done during that interview. If he had known about Kathleen's embezzlement at the time of the interview, Jones will testify, he would've told Michael and Garrison about it. And he did. Jones discovered Kathleen's embezzlement on April 7, 2008 — the day she died.[319] Michael and Garrison interviewed him seven days later, on April 14.[320] Jones will also testify that, if he had written his SAR — documenting Kathleen's embezzlement — by the interview, he would've given it to Michael and Garrison during that

---

[318] Expected testimony of Mr. Jones.
[319] Ex. 27.
[320] Ex. 99 at 12.

interview. He had. Jones's SAR is dated April 9, 2008 — five days
before Michael and Garrison interviewed him.[321]

### 7.    *The police knew about Kathleen's embezzlement.*

Detective Bryan Block knows that he knew about Kathleen's
embezzlement, but he cannot recall exactly how he discovered the
information.[322] Block agrees that, if it was not in the newspaper
and the KCKPD did not investigate it, the only way he could've
learned about the embezzlement is through Michael or Garrison, or
through Brancart during a pretrial interview before Pete's trial.

### 8.    *The life insurance*

Both Carl and Kathleen had life-insurance policies that
named each other as beneficiaries.[323] Carl's was worth about
$6,000.[324] Kathleen's was worth more than $20,000.[325] But if the
insurance company decided Kathleen committed suicide, it
wouldn't pay her policy.[326] Similarly, if the company decided

---

[321] Ex. 27.
[322] Expected testimony of Bryan Block.
[323] Exs 23, 24, 119.
[324] Exs 23, 119.
[325] Exs 24, 119.
[326] Ex. 119.

Kathleen had killed Carl, it wouldn't pay her (or her heirs) the amount of his policy.[327] *How* she and Carl died was not the only important thing; *when* they died would also affect the policies. If the insurance company decided she had died first, then her policy would only pay Carl's heirs — not Kathleen's. But if the company concluded that Carl died first — for instance, because of a phone call Kathleen made to her mother — then her policy and part of Carl's policy would go to Kathleen's heirs.

*9.    Rupert's history, motives, and coercion*

Pete's original petition discussed the other letters Rupert sent to Brancart and the fact that they went undisclosed. Now we know that Rupert wasn't just promised something in return for his cooperation, he was threatened with jail time if he didn't provide it.[328] And that Brancart was less than candid about the threats and promises made to Rupert to secure his testimony.[329] Added to that is evidence of Rupert's unreliability and psychological problems,

---

[327] *Id.*
[328] Exs 44, 46, 47.
[329] Exs 66, 67.

accompanied by twice as many dishonesty convictions as were disclosed to the defense and the jury.[330]

## C.    *Pete's conviction is a manifest injustice because he is actually innocent.*

The State's case against Pete was already thin; the newly discovered evidence makes it nonexistent. Already evidence showed that this was a murder-suicide. The jury heard about the lack of any sign of forced entry into the Schroll house and any evidence of a struggle within it. The gun used in the shootings belonged to Kathleen. Nothing was taken from the house. Add to those facts the following newly discovered evidence:

• Kathleen knew the discovery of her embezzlement was imminent, leading to her termination, arrest, prosecution, and incarceration.

• Kathleen's financial problems were so severe that she was spending more on loan payments than she earned at her job.

• Kathleen had just learned that a handwriting expert concluded that she had forged Olin's signature on more than 100 checks.

---

[330] Exs 32, 33.

- Kathleen knew she wouldn't be able to hide her financial problems from Carl anymore.

- Kathleen knew her family would discover that she had lied to them about stealing from Olin.

- An independent forensic pathologist looked at the evidence and concluded it was a murder-suicide.

- The original forensic pathologist now concludes the evidence best fits a murder-suicide.

- Kathleen had GSR on her left hand, the same hand closest to her gun on the floor next to her body.

Once you accept the conclusion that Kathleen had reasons to commit suicide, the question becomes why she had to kill Carl. The new evidence shows:

- Kathleen and Carl both had life-insurance policies.

- If Kathleen just committed suicide, her life-insurance policy would not pay anyone because of the suicide exclusion, leaving her family left to clean up the financial mess she'd created.

- Kathleen and Carl were fighting less than 12 hours before the shootings.

- Kathleen was afraid that Carl would find out about their financial problems.

- If the police decided that Carl died before she did, her daughter and granddaughter would get money from Carl's life-insurance policy. But if the police determined that she killed Carl, then they would get nothing because of the forfeiture-by-wrongdoing exclusion.

Kathleen had a financial motive to kill Carl and make her own death look like a murder rather than a suicide. That means that there had to be a third person in the equation. She had to make the police believe that someone else killed her and Carl. Pete was the obvious choice for this role. While the jury heard about the animosity between Pete and Kathleen over her mistreatment of Olin, it did not hear:

- Pete's arrest and prosecution ensured that Kathleen's daughter and granddaughter received Olin's life-insurance money and Olin's house on Parallel Parkway.

- If Pete had not been arrested and prosecuted, Blair would be left to fight the federal lawsuit against Pete — and discover that Kathleen had forged over 100 checks from Olin's account.

- If the police concluded that Kathleen killed Carl before killing herself, then Kathleen's daughter and granddaughter wouldn't get anything from Carl's life-insurance policy because of the forfeiture-by-wrongdoing provision. And they wouldn't get anything from Kathleen's life-insurance policy because of the suicide exclusion.

It was a perfect solution. In one fell swoop, Kathleen would reverse her family's financial fortune. Her daughter and granddaughter would get the life-insurance money from hers and Carl's policies, the life-insurance money from Olin's policy, and Olin's house. And Pete — the man who'd exposed her mistreatment of Olin, the man who'd caused her to start stealing from the bank because he cut off the spigot of Olin's money — would go to prison.

1.    *What couldn't have happened*

And it is not as if the evidence against Pete was particularly strong to begin with. Even if one ignores every piece of defense

evidence and every defense witness's testimony, based on the new evidence, a reasonable juror would have to conclude:

- Pete went to the Schroll house at 2:30 a.m., intending to kill them both but unarmed.

- Pete got into the Schroll house without leaving any sign of forced entry.

- Pete, still unarmed, managed to subdue Carl and Kathleen.

- Pete just happened to find Kathleen's gun in her purse.

- Before killing Carl or Kathleen, Pete announced his plan to do so and confessed that he'd stolen a lawnmower.

- Pete then allowed Kathleen, in the living room and six feet from the front door, to make a 40-second phone call to her mother.

- Pete allowed Kathleen to name him as the killer during the call.

- Pete did not stop the call after the first time Kathleen named him, but allowed her to repeat his name.

- Carl and Pete said nothing, and made no noise, during this phone call.

- Carl remained in bed, presumably asleep, while all of this happened.

- Pete took the cordless phone away from Kathleen in the living room and dropped it on the floor next to her. Kathleen stood still.

- Pete walked back to the bedroom where Carl was still sleeping and shot him three times.

- Kathleen, six feet away from the front door, remained motionless while Pete walked into the bedroom, shot Carl three times, and then returned to the living room.

- Pete walked back into the living room where Kathleen remained motionless, stood behind her, and put the gun against the back of her head.

- Kathleen did not flinch or react when she felt the barrel of the gun against her head or when Pete pulled the trigger.

- Though the most likely thing to happen to Kathleen's body after the gunshot was to fall forward or sideways, her body fell backwards.

- Kathleen's body fell backwards without hitting Pete, who was standing behind her.

- The GSR on Kathleen's hand nearest the gun is a coincidence.

- The blood and tissue on Kathleen's hand is a coincidence.

- Kathleen's DNA on the trigger of the gun is a coincidence.

- Pete did all these things without leaving any sign of a struggle in the house.

- Pete did all these things without leaving any fingerprints in the house.

- Pete did all these things without leaving any DNA in the house.

- Pete did all these things without leaving his DNA on the gun.

- Though the back spatter from Kathleen's wound traveled far enough to leave blood on the ceiling, Pete left no trace of blood, tissue, DNA, or GSR anywhere in his van.

- Two board-certified forensic pathologists are wrong to conclude that Kathleen died by committing suicide.

- A gunshot-residue expert is wrong to conclude that the most likely scenario is that Kathleen died by committing suicide.

No reasonable juror could reach this conclusion. This theory leaves too many unanswered questions and relies on far too many coincidences. And recall, this rendition only considers the State's evidence — it does not include the defense's evidence about Pete's poor health, the alibis supplied by his family and his daughter's

boyfriend, Kathleen's history of deception or the impending discovery of her federal offense.

2.     *What really happened*

The only theory that accounts for all the evidence is that Kathleen murdered Carl before taking her own life. Around Friday, April 4, Kathleen knew that her embezzlement from the bank would be discovered and soon. She knew this because her boss told her on April 4 that if she couldn't balance her books by then, someone else would help her do it. Kathleen knew she couldn't balance her books; it was her embezzlement that was causing the books to be out of balance. And she also knew that anyone else who looked at her books would figure out what she had done. The jig was up.

So now the clock was ticking. She couldn't just commit suicide because that would mean her daughter and granddaughter wouldn't get any life-insurance money. So she had to make it look like a murder. But how could she do it? For a murder, she needed a murder*er*. Not Carl; if the police thought Carl had done it, then her life-insurance wouldn't pay anyone because of the forfeiture-by-

wrongdoing exclusion.[331] Plus, that was not fair to Carl. She had ruined them financially, she knew. After she was gone, they would lose the house, the cars, everything. Carl had retired and wasn't working anymore — he'd be homeless and penniless. No, Carl would be better off, she concluded, going with her.

Of course, Pete would be the perfect villain in the story Kathleen was about to create. She'd already been telling her family for months about how Pete was stalking her, how she'd called the police on Pete, how she had a restraining order against him. None of it was true, of course, but her family didn't know that. And she had told Duma, her lawyer, about Pete threatening her at a gas station. She would need to repeat that story, she decided.

And she did. When she arrived to work on Saturday, April 5, she told her co-workers that she had seen Pete at a gas station on her way to work that morning. And that Pete had threatened her. Then, on Sunday, April 6, she told her daughter the same story, but said it happened *after* work on Saturday. Did Kathleen realize then

---

[331] *See* Ex. 119.

that the police would review the surveillance footage and conclude that neither Pete nor Kathleen had been at that QuikTrip that day? Probably not.

But she was smart enough to know that she needed more than the gas-station story to point the finger at Pete. She would need to blame Pete for the murders somehow. How? She could call 911. But she'd couldn't do that before she shot Carl. He might wake up. Or the police might show up before she could finish things. And the 911 operator wouldn't know who "Pete" was. Her family would, but how long would it take for them to hear what she said on the 911 call?

No, 911 was out. That left her family. They would know who Pete was — especially the Pete who had stolen the lawnmower (he hadn't, but they didn't know that). Then they would call the police and tell them who Pete was. And then the police would arrest Pete. He would be in the place he'd tried to send her: behind bars. It was perfect.

Of course, some things went wrong. She aimed for Carl's head while he was sleeping but she missed. The bullet grazed his scalp

and lodged into the pillow. Carl woke up, rolling away from her and over onto his back, smearing blood along the pillows from his injury. He began to sit up. She fired again, hitting him in the torso. He fell backward onto the bed, on his back. He raised his hands, as if to ward off the next shot, when Kathleen fired again, depositing GSR onto his hands. The bullet struck him and he stopped moving.

Had a neighbor heard the shots and called the police? Kathleen hoped not. She walked down the hallway, through the living room, and opened the front door. Then she walked back to the entryway and picked up the cordless phone. She couldn't use her cellular phone. She knew her mother had caller ID, and probably wouldn't answer a call at 2:30 a.m. from a strange phone number. And her mother had to answer the phone for this to work.

And she did. Kathleen said the words she'd scripted. She had practiced them enough that she could repeat them — verbatim — when her mother asked her to. Then Kathleen made sure to tell her she hadn't called the police, so that her mother would know to do so. And to tell them who was to blame.

Two things were responsible for Pete's conviction: (1) the phone call from Kathleen to Elizabeth, and (2) the testimony of Rupert. Both that call and that testimony contained factual assertions that have now been proven demonstrably false. No credible evidence to support the verdict remains. Pete has amply satisfied the requirement that he raise a "colorable claim of actual innocence" under K.S.A. 60-1507(f)(2)(A). Indeed, after review of all the evidence now available, "it is more likely than not that no reasonable juror would have convicted in light of the new evidence." Pete satisfies the innocence standard in K.S.A. § 60-1507, *Beauclair*, and *Schlup*. Because Pete has established his innocence, he has satisfied the "manifest injustice" and "extraordinary circumstance" tests, permitting his petition to pass through the innocence "gateway" and obtain a full hearing on the merits of his Claims 2-7.

**Claim 2:**   **The State suppressed material, exculpatory, and impeaching evidence about Kathleen's dishonesty and motive to commit suicide that prejudiced Pete in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section Ten of the Kansas Constitution.**

Brancart and the KCKPD concealed material evidence of Kathleen's financial crimes, including evidence that she had forged checks drafted from Olin Coones' bank account and had been embezzling from the bank where she worked. Suppressing this evidence violated Pete's right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and under §10 of the Kansas Bill of Rights.

The *Brady* doctrine protects an accused's due-process right to a fair trial.[332] Under *Brady*, the State must disclose to the defense evidence favorable to the accused — whether that evidence is directly exculpatory or impeaches a prosecution witness.[333] The individual prosecutor also has an "inescapable" responsibility to learn about and disclose any evidence, favorable to the accused,

---

[332] *Brady v. Maryland*, 373 US 83, 87 (1963).
[333] *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972).

that is known by others acting on the government's behalf in the case.[334] The State's duty does not decay with time; it remains obliged to disclose *Brady* evidence to Pete to this day. "When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight."[335] Misconduct under *Brady* and its successors violates a defendant's right to due process under the Fifth and Fourteenth amendments to the United States Constitution and §10 of the Kansas Bill of Rights.

A successful *Brady* claim contains three elements. First, the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching of an adverse witness.[336] Second, the State must have suppressed that evidence, either willfully or inadvertently.[337] Third, the withheld evidence must be "material" to establish prejudice.[338]

---

[334] *Kyles v. Whitley*, 514 U.S. 419, 437-438 (1995).
[335] *Banks v. Dretke* 540 U.S. 668, 675-676 (2004).
[336] *See Wilkins v. State*, 286 Kan. 971 (2008) (citing *Banks*, 540 U.S. at 691 (2004)); s*ee also Strickler v. Greene,* 527 U.S. 263, 281–82 (1999).
[337] *Wilkins* at 971.
[338] *Id.*

The Kansas cases following *Brady* reiterate the same principles. Prosecutors "have a positive duty" to disclose "evidence favorable to the accused when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[339] Because law enforcement's knowledge is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement.[340]

The Kansas Supreme Court addressed the *Brady* "materiality" requirement in 2012. Consistent with *Bagley*, it held that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[341] A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."[342] Significantly, the assessment of "materiality" requires that the withheld evidence be considered "collectively, not

[339] *State v. Warrior*, 294 Kan. 484, 505-06 (2012).
[340] *Id.* at 506.
[341] *Id.* at 507 (citing *Bagley*, 473 U.S. at 682).
[342] *Id.* at 507 (citing *Bagley*, 473 U.S. at 682).

item by item."[343] Nor does a petitioner have to show that the evidence would have led to a not-guilty verdict. Instead, it is enough that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[344] All of the following *Brady* evidence may be considered by this court under Pete's showing of "manifest injustice" arising from his actual innocence of the crimes.[345]

### A.  *The State failed to disclose evidence that Kathleen had forged checks from Olin's account.*

The KCKPD was investigating Kathleen for forging Olin's signature on checks.[346] As part of that investigation, it identified 120 checks that it suspected Kathleen had forged. It then submitted copies of them to the KBI for a handwriting analyst to compare the checks' signatures to Olin's.[347] The KBI found "strong indications" that Olin had not signed 115 of these checks, but the poor quality of the photocopies made a definitive conclusion

---

[343] *Kyles*, 514 U.S. at 436-37.
[344] *Warrior* at 508 (quoting *Youngblood* at 870) (internal quotation marks omitted).
[345] *See* Claim 1, *supra*, incorporated here by reference.
[346] Ex. 11.
[347] *Id.*

impossible.[348] Yet, the KBI's analysis and conclusions were never turned over to the defense.

This evidence was material and the State's failure to turn it over prejudiced Pete's trial. Evidence that impeaches a prosecution witness is material if that witness is "the *only* evidence linking [the defendant] to the crime."[349] As in *Smith,* Kathleen's prior statements were critical because she was the only person at the scene who directly implicated Pete in the crime.[350] "[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."[351]

Here, evidence that Kathleen was dishonest and that her statements could not be trusted was critical to the defense, particularly as she was the sole eyewitness connecting Pete to the crime. As a hearsay declarant (Kathleen's phone call to Elizabeth

---

[348] *Id.*

[349] *Smith v. Cain,* 565 U.S. 73, 76 (2006).

[350] *See also Wearry v. Cain,* 136 S. Ct. 1002, 1006 (2016).

[351] *United States* v. *Agurs,* 427 U.S. 97, 113 (1976); *see also Strickland v. Washington,* 466 U.S. 668, 696 (1984) ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support").

was admissible through a hearsay exception), Kathleen's credibility could be impeached just as a testifying witness's[352]: Evidence "tending to impair or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness."[353] This means that Kathleen's character for truthfulness was admissible.[354] And, under K.S.A. § 60-455(b), evidence that a person committed a crime or civil wrong on some other occasion is relevant to prove things such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Here, the evidence that Kathleen forged Olin's signature on 150 checks, without ever being detected, would have gone to show her ability to prepare and plan the type of deception that pointed the police toward Pete, as well as her character for truthfulness.

This was significant evidence that could've changed the result of Pete's trial. Kathleen's credibility was essential to the

---

[352] *See* K.S.A. §§ 60-462, 60-455(b).
[353] K.S.A. § 60-462.
[354] *See* K.S.A. §§ 60-420, 60-422.

prosecution's case. And if Kathleen had a history of deceiving people, then the jury would put less weight on the phone call to her mother. And that she had forged over 100 of Olin's checks would have only made the jury more suspicious of Kathleen's credibility.

## B.   *The State failed to disclose evidence that Kathleen embezzled from MRCU.*

Besides Kathleen's forged checks, the State also possessed crucial evidence about Kathleen's embezzlement, which confirmed her motive to deceive as well as her lack of credibility. None of this was turned over to the defense. This violated Pete's constitutional rights to a fair trial. "When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight."[355]

At the time of her death, Kathleen worked at Midwest Regional Credit Union as a systems administrator and accounting clerk.[356] Part of her job was to process checks from other banks.[357] When Kathleen didn't show up for work at the bank on Monday,

---

[355] *Banks*, 540 U.S. at 675-676.
[356] Ex. 27.
[357] *Id.*

April 7, another employee — Laymon — took over her duties.[358] Unsurprisingly, Laymon could not get Kathy's deposit entries to balance and notified Thad Jones, her supervisor.[359]

Jones discovered that Kathy had been embezzling from the bank.[360] She would deposit checks from another bank into her account, but then remove the check before it could be presented to the other bank for payment.[361] In effect, her account would get the credit but the other bank account would never be debited.[362] To conceal the theft, Kathy took several steps.[363] First, she created false journal entries in the general ledger. Second, she stopped creating a report that would have revealed her theft. Third, she created at least two "piggyback occurrences" in the ledgers to make it appear that the books balanced.

Jones discovered that Kathy's scheme began at least as early as February 4, 2008 — more than two months earlier — and

---

[358] *Id.*
[359] *Id.*
[360] Ex. 27.
[361] *Id.*
[362] *See id.*
[363] *Id.*

continued up to April 5.[364] All told, Kathy had stolen $11,695 from MRCU in two months. Jones wrote his conclusions in a Suspicious Activity Report dated April 9.[365] Detectives Michael and Garrison interviewed Jones five days after he wrote the report.[366] Jones is expected to testify that he does not specifically remember this interview, but he would have told the detectives about Kathleen's embezzlement if he had known about it and given them a copy of his SAR if it had been written.

He did know and it was written. Jones discovered Kathleen's embezzlement on April 7.[367] He wrote his SAR two days later, on April 9.[368] Michael and Garrison interviewed him five days later, on April 14.[369] Yet Michael's report, describing his interview with Jones, contains nothing about Kathleen's theft from the bank.[370]

Detective Block, who was working in the Major Crimes Unit with Michael and Garrison in 2008, recalls that he knew about

---

[364] Ex. 27.
[365] *Id.*
[366] Ex. 99.
[367] Ex. 27.
[368] *Id.*
[369] Ex. 99 at 12.
[370] Ex. 99.

Kathleen's embezzlement.[371] He's unsure how he found out about it, but he does remember having a pretrial interview with Brancart before he testified at Pete's trial. Unless it was in the newspaper (it wasn't) or the KCKPD investigated the embezzlement (it didn't), the only way Block says he could have learned about the embezzlement was through Brancart at the pretrial meeting or through Michael or Garrison.

In other words, Jones does not remember telling Michael and Garrison about Kathleen's embezzlement, but knows that he would have. And Block doesn't remember how he found out about the embezzlement, but knows the only way he could have is from Michael, Garrison, or Brancart.

## C.   Evidence of Kathleen's forgery and embezzlement was exculpatory because it would have impeached Kathleen's hearsay statements.

All of this was critical, material evidence that should have been turned over to the defense. Evidence that Kathleen had embezzled from the bank would have cast doubt on her

---

[371] Expected testimony of Bryan Block.

truthfulness, as well as showing that she had a motive to commit suicide. It would have changed the outcome of the trial. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within the general [*Brady]* rule."[372] To believe that Kathleen had lied to Elizabeth on the phone about Pete's presence, a reasonable juror would have to believe that Kathleen had orchestrated a complex deception to frame Pete for the murder she'd just committed and the suicide she was about to commit. This would be a hard pill to swallow — unless you could show the jury that Kathleen had a history of deceiving those close to her. Evidence that she had engineered a scheme at her own workplace — and that she had successfully hidden that scheme for months — would have made the jury more likely to believe that she had crafted a similar scheme to ensnare Pete.

Yet this evidence would have done more than impair Kathleen's credibility; it also would have given her a motive to

---

[372] *Giglio,* 405 U.S. at 154 (quoting *Napue v. Illinois,* 360 U.S. 264, 269 (1959)).

commit suicide. When Kathleen put the gun to her head, she knew her crimes were days away from detection. Her boss had warned her that someone else would help her balance her ledger — the ledger that wouldn't balance because of Kathleen's embezzlement. And that person would realize what Kathleen had done. She would be fired, arrested, and likely referred to the United States Attorney's Office for federal prosecution. Title 18, United States Code Section 656 punishes bank embezzlers with up to 30 years in prison. Kathleen's knowledge that her path would end in prison would have given her a motive to commit suicide.

### D.   *Evidence of Kathleen's forgeries and embezzlement was material because it made it more likely she committed suicide.*

Kathleen's motive to commit suicide was also important to the case. So important, in fact, that in closing argument, the prosecutor argued: "No evidence suggests that she would have any motivation other than trying to do anything to live and keep on living . . . There is no actual evidence in this case that would undermine your finding that Kathleen Schroll was killed at the

hand of another. There is absolutely no evidence before you."[373] But the State had such evidence. And its suppression of such material evidence violated Pete's constitutional right to a fair trial.

In reality, Kathleen knew that time was almost up on her embezzlement scheme. And that knowledge gave her a motive to commit suicide. This evidence would have put the whole trial in a sufficiently different light that that it undermines any confidence in the jury's verdict. Indeed, had the jury known about that evidence, there is a reasonable probability that the result would have been different.

In sum, the State's failure to disclose powerful, material evidence trampled Pete's right to due process and destroyed his right to a fair trial, violating his rights under the Fifth, Sixth, and Fourteenth Amendments and §10 of the Kansas Bill of Rights.

**Claim 3:**   **The State suppressed material, exculpatory, and impeaching evidence about Rupert's testimony that prejudiced Pete in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section Ten of the Kansas Constitution.**

---

[373] Ex. 6 at 14.

Evidence that establishes a *Brady* violation has three components: (1) favorable to the accused; (2) undisclosed; and (3) material.[374] Favorable evidence includes "both exculpatory and impeachment evidence[]"[375] and evidence that tends "to discredit a key prosecution witness . . . ."[376] Here, the State offered testimony from only two witnesses to connect Pete to the crime: Kathleen and Rupert. Just as it did with Kathleen,[377] the State also suppressed critical, material evidence about Rupert that would have changed the outcome at trial. Indeed, the State had a stack of evidence that would have decimated Rupert's credibility, including evidence that:

- Rupert was known by the State to be unreliable and mentally unstable,

- Rupert originally wanted a deal to cooperate,

- Brancart threatened Rupert with jail time to obtain his testimony, and

---

[374] *State v. Moore*, 302 Kan. 685, 700 (2015); *Wilkins*, 286 Kan. 971 (2008) (citing *Banks*, 540 U.S. at 691 (2004)); s*ee also Strickler,* 527 U.S. at 281–82.
[375] *Moore*, 302 Kan. at 700; *Bagley,* 473 U.S. at 676.
[376] *Wilkins*, 286 Kan. at 990 (2008) (citing *State v. Kelly*, 216 Kan. 31, 36-37 (1975)).
[377] *See* Claim I, *supra*.

- Rupert received a deal in exchange for his testimony.

And Brancart failed to turn over all the letters Rupert had sent and the full extent of Rupert's criminal history. All of this evidence was material because it would have completely undermined Rupert's testimony.

Evidence qualifies as material when there is "'any reasonable likelihood'" it could have "'affected the judgment of the jury.'"[378] In considering *Brady* claims, a court must "evaluate the tendency and force of the undisclosed evidence item by item... and evaluate its *cumulative effect* for purposes of materiality separately and at the end of the discussion."[379] Here, the cumulative effect of the amount of information suppressed about Rupert would have caused a jury to discredit him and would have caused the jury to question the credibility of the other State's witness, whose impeachment and motive evidence was also suppressed by the State.

---

[378] *Giglio,* 405 U.S. at 154 (quoting *Napue,* 360 U.S. at 271).
[379] *Kyles,* 514 U.S. at 436, n. 10 (emphasis added).

The United States Supreme Court defines impeachment evidence as "evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest."[380] Kansas courts consistently recognize that a witness's bias or motive for testifying is a crucial factor for the jury to consider: "Bias, interest, or improper motives of a witness may always be shown in order to place the witness's testimony in proper perspective."[381] Because of its importance, "[t]he cross-examiner should have wide latitude in establishing partiality, bias, motive, or interest."[382]

This evidence would have shown Rupert's true motive for contacting the WYCODA. He didn't do it because he felt it was the right thing to do; he did it because he wanted something in return. Had the State turned over this critical impeachment evidence, there's a reasonable probability that the outcome of Pete's trial would've been different.

## A. *The State knew Rupert had a reputation as being unreliable and mentally unstable.*

---

[380] *Bagley*, 473 U.S. at 676.
[381] *State v. Bowman*, 252 Kan. 883, Syl. ¶ 1 (1993).
[382] *State v. Scott*, 39 Kan. App.2d 46, 56 (2008) (quotation omitted).

From the beginning, the State knew Rupert was unreliable. After Brancart received Rupert's first letter, he contacted his fellow prosecutors in the Butler County Attorney's Office to ask about Rupert's credibility. Their responses were:

- "[T]he persons here who have handled his cases hate him . . . [N]ot reliable at all."[383]

- "A bit nutty."[384]

- Sends "strange letters" to his probation officer and ex-wife.[385]

Brancart disclosed none of this to the defense.

## B.    *Rupert wanted a deal before he would cooperate with the State.*

Before he would speak to the police, Rupert wanted a deal. Indeed, Brancart recognized Rupert's motive as soon as he read Rupert's first letter, noting that the "implication" of Rupert's first letter was a "request for leniency… ."[386] And to aid him in that effort, Rupert sent his attorney to negotiate for something less in

---

[383] Ex. 35.
[384] Ex. 37.
[385] Ex. 37.
[386] Ex. 39.

return for cooperating with the police. Rupert would not assist Brancart until he had an acceptable deal.

Rupert's attorney negotiated with both Norris, the assistant prosecutor handling Rupert's case, and then Norris's boss, the elected county attorney.[387] Rupert had his attorney do this to try to obtain a benefit in exchange for telling the police what he allegedly knew. This was not just Rupert's idea; Brancart actively inserted himself into the negotiations.[388] And he enticed Rupert by offering to make sentencing recommendations in his case and testify on Rupert's behalf at any sentencing hearing.[389] The Butler County Attorney's Office offered Rupert a deal if he would talk to Brancart — a 27-month sentence instead of a 47-month one.[390] That wasn't good enough for Rupert, who called off the planned interview.[391]

Rupert's subsequent refusal to cooperate when they didn't meet his asking price was also favorable evidence. It would have

[387] Exs 39, 40.
[388] *See id.*
[389] Ex. 38.
[390] Ex. 39.
[391] Ex. 44.

done more than just showing Rupert's true motive for coming forward, but plumbed the *depth* of that self-interested motive. Obtaining a reduction of his sentence wasn't some incidental benefit Rupert wanted — it was the whole thing. So much so that when he found the 20-month reduction he was offered too little, he tried to call the whole thing off. In other words, Rupert began cooperating to get something for himself and he stopped cooperating when he didn't get enough for himself. That Rupert's voluntary cooperation turned on his receipt of an expected benefit was favorable evidence because it showed just how much Rupert was motived by self-interest and how little he was motived by altruism.

## C.   *Brancart obtained Rupert's testimony by threatening him with jail time.*

After Rupert held out for a better carrot, the prosecutor turned to the stick. Throughout all his letters, Rupert voiced his fear of being labeled a snitch while in custody and thought disclosing him as a witness would have that result.[392] Brancart

---

[392] *See* Exs 34, 45, 48, 49.

knew this. He told Rupert's lawyer that Rupert was already at risk because the prosecutor might have to disclose Rupert's name to the defense.[393] When that gambit failed, the prosecutor threatened to open an inquisition, use it to compel Rupert's testimony, and then turn his name over to the defense.[394] And when that did not prompt Rupert's cooperation, the prosecutor told Rupert's lawyer that he would immediately follow through on his inquisition threat unless Rupert or his lawyer had an alternative suggestion.[395]

### D.   *The State failed to turn over all of the Rupert's letters.*

Further, between August 1 and December 4, 2009, Rupert wrote six letters to the WYCODA.[396] Though Brancart received and kept each letter, he failed to disclose them all to the defense. Out of six letters he received, the WYCODA only turned over three of them.[397] Trial counsel discovered Rupert's mail log from Butler County Jail, reflecting five letters to the WYCODA.[398] When

[393] Ex. 44, 46.
[394] *Id.*
[395] Ex. 47.
[396] Exs 34, 45, 48, 49, 54, 57.
[397] Ex. 55.
[398] Ex. 56.

confronted with it, the prosecutor told the court he was looking for the letters he hadn't turned over and they might be lost.[399] He was not and they were not.

| Letter postmarked | Letter received | Disclosed or Suppressed? |
|---|---|---|
| 8/10/09 (Ex. 34) | 8/12/09 | Suppressed |
| 9/7/09[400] (Ex. 45) | 9/9/10 | Disclosed |
| 10/19/09 (Ex. 48) | 10/22/09 | Disclosed |
| 11/16/09 (Ex. 49) | 11/20/09 | Disclosed |
| 11/30/09 (Ex. 54) | 12/3/09 | Suppressed |
| 12/4/09[401] (Ex. 57) | 12/4/09 | Suppressed |

Rupert's undisclosed letters contained favorable evidence. For instance, the August 10 letter contained exculpatory information both on its own and combined with his other letters and testimony. First, Rupert asks for an attorney to advise him on potentially cooperating.[402] This request implies that Rupert wants a deal and he needs an attorney to help him secure that deal — an implication that was immediately apparent to Brancart.[403] This would have

---

[399] Ex. 1 at 29.
[400] This letter is dated 9/7/09, but its accompanying envelope is missing.
[401] This letter is dated 12/4/09 but it has no postmark because it was written by Rupert while he was in the Wyandotte County Jail.
[402] Ex. 34.
[403] Ex. 36.

blown another hole in Rupert's claimed altruistic motive for testifying. Second, Rupert mentions that he is concerned with safety and wants "safeguards" in place.[404] As reflected by the other letters, this is a recurring theme in Rupert's letters. In later letters, he defines what he means by "safeguards" — not going to any prison at all.[405] That Rupert made this request in his first letter to the WYCODA would have further undermined his claim that he only came forward to do the right thing and demonstrated his motive — coded as "safety" — was to escape incarceration altogether.

The November 30 letter contained even more exculpatory evidence. First, Rupert offered information on another Wyandotte County defendant who had been transferred to the Butler County Jail.[406] This would've gone to show the level of Rupert's interest in making a deal; sensing that cooperating against Pete wasn't getting him anywhere, Rupert was now fishing for another way to reduce

---

[404] Ex. 34.
[405] *See* Ex. 48 at 3 ("It's <u>not</u> as simple as putting me in a separate prison.").
[406] Ex. 54 at 1.

his own sentence. Second, Rupert attached a copy of a Butler County Jail disciplinary report citing that inmate.[407] There is one way Rupert could have gotten his hands on that inmate's report — by stealing it from that inmate's cell. Evidence of this theft would have shown Rupert's propensity for reviewing and pilfering the documents of other inmates. And explain how Rupert learned some details about Pete's case — by going through files in Pete's cell when Pete wasn't there. Third, Rupert repeats his request for safeguards, which is Rupert's way to say he doesn't want to go to prison.

But the December 4 letter would have been the most devastating. Writing from the Wyandotte County jail after his December 2 meeting with the prosecutor and detectives, Rupert claimed to recount multiple discussions he had with Pete about a missing shell casing and the type of firearm used at the Schroll home.[408] And that Pete told him that he used a semi-automatic pistol. And that the police had found an extra shell casing at the

---

[407] *Id.* at 2.
[408] Ex. 57.

scene. But, Rupert wrote, "[t]he 4th casing found was not fired there. [The gun] was transported with an empty casing and that casing was ejected when the auto slide was pulled back."[409]

This letter is favorable evidence because it contains major flaws that run contrary to the objective facts of the case. First, the weapon used to kill the Schrolls was a revolver, not a semi-automatic. This was undisputed. So there could not have been any "manual ejection" from the "slide" being "pulled back." That leaves two explanations for Rupert's claims: either (1) Rupert is honest and Pete did not know what kind of gun he used to kill the Schrolls, or (2) Rupert is dishonest and has guessed wrong about which kind of details to fabricate. The latter explanation makes the most sense, especially given the other erroneous fabrications Rupert made.

[409] *Id.* at 1.

The December 4 letter's second flaw was its stolen-mail claim.
Rupert wrote that Pete had told Rupert that Pete had been stealing
the mail of Kathleen's daughter after Kathleen died.[410]



This blew another hole in Rupert's testimony. Pete could not have
"intercepted" any mail about the death of Kathleen because  Pete
was in jail five hours after it occurred. The letters from Rupert
constitute material evidence that the State had to disclose.

**E.    *The State made a promise to Rupert in exchange for his testimony.***

---

[410] Ex. 57 at 4-5.

At some point, the prosecutor made a promise to Rupert in exchange for his testimony. The prosecutor told Rupert that he would intercede on Rupert's behalf with the Kansas Department of Corrections.[411] This promise held value for Rupert: the constant refrain in all his letters is his purported fear for his safety in KDOC.

Brancart's promise to Rupert is material, favorable evidence, and its suppression violated Pete's constitutional rights. When a prosecutor promises something to a witness in exchange for that witness's testimony, due process requires the prosecutor to disclose that promise to the defense.[412] This rule extends beyond formal agreements to include tacit ones as well.[413] But this promise was never disclosed to the defense. It was only mentioned in a letter

---

[411] Ex. 104.

[412] *Giglio*, 405 U.S. at 154-55; *see also Douglas v. Workman*, 560 F.3d 1156, 1186 (10th Cir. 2009) ("Like the majority of our sister circuits, we conclude that *Brady* requires disclosure of tacit agreements between the prosecutor and a witness.").

[413] *E.g.*, *Douglas* at 1186.

Rupert wrote to Brancart almost a year after the trial — asking

why Brancart had broken his promise.[414]

## F.   *The State failed to disclose all Rupert's criminal history to the defense.*

Rupert had about 28 convictions involving dishonesty.[415]

Brancart only disclosed half of these.[416] He failed to disclose the

following dishonesty convictions:[417]

(1)      Burglary, February 18, 1982, Montgomery County.

(2)      Theft, February 18, 1982, Montgomery County.

(3)      Theft, March 15, 1982, Montgomery County.

(4)      Theft, February 17, 1984, Grant County, Oklahoma.

(5)      Arson, February 14, 1989, Reno County.[418]

(6)      Theft, February 9, 1998, Umatilla County, Oregon.

---

[414] *See* Ex. 104.
[415] Ex. 33.
[416] Ex. 32.
[417] Ex. 33.
[418] Arson is considered a dishonesty crime depending on the circumstances. *See State v. Brown*, 6 Kan. App.2d 556, 558 (Kan. App. 1981).

(7)      Failure to Appear, January 26, 1999, Cowley County.[419]

(8)       Failure to Appear, January 26, 1999, Cowley County,

(9)      Theft, June 11, 2002, Cowley County.

(10)     Failure to Appear, September 10, 2002, Cowley County.

(11)     Failure to Appear, September 10, 2002, Cowley County.

(12)     Failure to Appear, September 10, 2002, Cowley County.

(13)     Failure to Appear, September 10, 2002, Cowley County.

(14)     Failure to Appear, September 10, 2002, Cowley County.

None of this information was turned over to the defense. That Rupert had not just 14, but 28 separate convictions for dishonesty crimes constitutes favorable evidence because it would have impeached Rupert's credibility.[420] The United States Court of Appeals for the Seventh Circuit has found, for example, that the State's failure to disclose the criminal record of a witness whose testimony formed the "heart" of its case violates *Brady*.[421] As in

---

[419] Failure to appear may involve dishonesty, depending on the circumstances. *State v. Marble*, 21 Kan. App.2d 509, 516 (Kan. App. 1995).
[420] *See State v. Lewis*, 252 Kan. 535, 536 (1993).
[421] *Crivens v. Roth*, 172 F.3d 991, 996-99 (7th Cir. 1999).

that case, Rupert's full criminal history was material evidence and the State's failure to disclose all of it prejudiced Pete.

### G.   Had this evidence about Rupert been disclosed, there's a reasonable probability the result of Pete's trial would've been different.

The evidence of Rupert's unreliability and mental instability, his self-interested motive to cooperate, the coercion that eventually secured that cooperation, his nearly unbroken history of criminal dishonesty, and the letters that would've proven his dishonesty in Pete's case — the State hid all of it from Pete and the jury. Had it been turned over, this evidence would have demolished Rupert's credibility in front of the jury. Indeed, along with the other suppressed evidence, this information was not only material, but dispositive: there would have been no evidence left to convict Pete.

Had the jury known all of this evidence about Rupert's history, character, motive, and lies, there's a reasonable probability

the trial would have ended differently.[422] Rupert was the most important witness against Pete at trial. Apart from Kathleen's phone call, no other evidence put Pete at the scene of the crime — not blood, not DNA, not fingerprints, not gunshot residue. Rupert testified that Pete freely admitted his guilt to him: "We got element admissions from Mr. Coones," Rupert testified, "quite a few element admissions."[423] Rupert told the jury that Pete had admitted killing the Schrolls, why he had done it, and how he had done it. No other witness's testimony damaged Pete's case more than Rupert's.

That made his motive for inserting himself into the case critical. A witness who offers information without seeking anything in return has a certain amount of credibility. One who is seeking to sell his information for a lower prison sentence has less. Had the defense known about Rupert's motive, it would have brought that out to the jury. Instead, when cross-examined on his motive, this

---

[422] *See Haddock v. State*, 282 Kan. 475, 507 (2006).
[423] Ex. 5 at 21.

happened:

```
13          Q.   Okay.  Your statement is also that Mr.
14    Coones was telling you all of these things and you
15    wrote the Assistant District Attorney just out of the
16    goodness of your heart?
17          A.   You know, I'm sorry, I don't know how you
18    perceive it or you accept it or take it, but when two
19    people wind up murdered, it is a pretty horrific
20    situation and something needs to be done about it.  I
21    wouldn't want that to just continually happen if
22    there was no repercussions.
```

The jury never heard about Rupert's true motive in writing those letters. And the reason it didn't learn about that motive was that the prosecution concealed it.

Evidence that Rupert refused to help the prosecution would have damaged Rupert's credibility even further in front of any rational juror. And the reason for that refusal — that Rupert wanted more than he was being offered — would have multiplied that damage. A witness's bias or motive for testifying is always

relevant and always material.[424] Here, Rupert did not contact the WYCODA because it was the right thing to do; he did it because he wanted something in return. And when he did not get what he wanted in return, he refused to cooperate with the prosecution. That forced Brancart to coerce Rupert's cooperation by threatening him with jail time.

Rupert's secret letters would have also changed the outcome at trial. They showed that Rupert was looking for other inmates to sacrifice to get the deal he wanted. And that Rupert was so desperate to get that deal that he would risk searching and stealing the documents of those other inmates to get it. Indeed, Rupert not only had motive, but also the means and opportunity to get his hands on the documents of other inmates — which would have explained how Rupert knew (some) details about Pete's case.

The December 4 letter particularly would have devastated Rupert's testimony. It would have objectively proven that he fabricated his claims against Coones. Had the prosecution disclosed

---

[424] *See Bagley*, 473 U.S. at 676; *see also Bowman*, 252 Kan. at Syl. ¶ 1.

these three letters, there is a reasonable probability that the trial would've come out differently.

Other courts have reached this conclusion under similar facts. For instance, the United States Court of Appeals for the Fourth Circuit found that the government violated its *Brady* obligations when it failed to turn over a key witness's pretrial statement containing crucial impeachment material.[425] Either in isolation or combined with all the other evidence, the suppressed letters would have proven that Rupert fabricated his testimony about Pete to save his own skin. But the jury never got to hear about the depths of Rupert's deceit because the prosecution buried the letters containing them.

That Brancart had to promise something to Rupert, in addition to not incarcerating him, to get Rupert to testify reinforces the conclusion that Rupert was only concerned with Rupert. He portrayed himself in front of the jury as someone who had simply come forward to do the right thing. He did this successfully, and

---

[425] *Chavis v. North Carolina*, 637 F.2d 213, 223 (4th Cir. 1980).

untruthfully, because the State never disclosed its secret deal with him. Had it done so, along with the other evidence it suppressed, the jury would have realized that the only thing that motivated Rupert was self-interest. Evaluated collectively,[426] had the State disclosed the unconstitutionally suppressed material evidence about Rupert, there is a reasonable probability that the jury would have reached a different result.

**Claim 4:   The State's failure to disclose the missing bullet violated Pete's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section Ten of the Kansas Constitution.**

The gun found next to Kathleen's body had a five-round capacity. When the police found it, only one bullet remained in the cylinder, meaning four bullets had been fired.[427] But the State reported it only recovered three bullets: one from Kathleen's body and two from Carl's. Yet the police also collected the pillows from the bed Carl's body was lying on. One of those pillows had two holes in it: the first hole dark discoloration around it; the second had

---

[426] *Kyles,* 514 U.S. at 436, n. 10.
[427] *See* Ex. 4 at 41-73.

stuffing coming out of it.[428] Inside one of the pillows they had taken

from the bed was the fourth bullet.[429] And that evidence went

undisclosed for more than 12 years.

A due-process violation occurs when prosecutors or police

deprive the defense of evidence that impeaches the quality of the

investigation implicating the defendant.[430] Here, the State deprived

the defense of a critical fourth bullet by failing to appropriately

examine and disclose the evidence in its possession and control.

Had it been delivered promptly to the defense, this withheld

evidence would have impeached the State's investigative

techniques because of its failure to consider all of the evidence

showing that Kathleen Schroll had committed this crime. In

addition, disclosing the bullet would have allowed the defense to

more effectively prepare for the cross-examination of the medical

examiner while also retaining a more educated expert of its own.

Indeed, the bullet evidence was so critical that the State's own

---

[428] Exs. 67-B, 67-C, 67-D.
[429] Exs 67, 67-A – 67-D.
[430] *See Kyles*, 514 U.S. at 453-54.

medical examiner has changed his testimony now that the evidence has been turned over.[431]

As stated previously, to prove a *Brady* violation, a petitioner must show that the evidence is: (1) favorable to the accused; (2) undisclosed; and (3) material.[432]

## A.   *The fourth bullet was favorable evidence.*

The fourth bullet fits all three of the requirements for a *Brady* claim. It was favorable to Pete's case[433] because it proved that Carl's head wound was from a bullet graze, not blunt-force trauma. That meant that all the injuries to the Schrolls came from one weapon — Kathleen's gun — which made it more likely to be a murder-suicide. And it disproved the State's theory — that Pete went to the Schroll home with the weapon that he used to club Carl over the head — because Carl wasn't clubbed over the head. And, as explained in Claim 4, it contradicted Rupert's testimony that Pete said he'd fired the fourth bullet somewhere outside the Schroll

---

[431] *See* Claim 1, *supra.*
[432] *Moore*, 302 Kan. at 700; *Wilkins*, 286 Kan. 971 (2008) (citing *Banks*, 540 U.S. at 691); s*ee also Strickler,* 527 U.S. at 281–82.
[433] *See Warrior*, 294 Kan. at 506.

house. In fact, the fourth bullet had been fired in the Schroll house
— just not by Pete.

### B.   *The State suppressed the fourth bullet.*

The fourth bullet was "suppressed by the State, either
willfully or inadvertently…."[434] Here, giving the State the benefit of
the doubt, its suppression was inadvertent. But that does not bear
on the merits of a *Brady* claim. The State was in possession of this
evidence the entire time and it was never turned over to the
defense.

### C.   *The fourth bullet was material evidence and its suppression prejudiced Pete's trial.*

The fourth bullet was material because, had it been disclosed,
there's a "reasonable probability that the result of the [trial] would
have been different."[435] Here, the fourth bullet would've made a
murder-suicide more likely, undercut the State's theory of the case,
and contradicted Rupert's testimony. That would have been enough
to put the entire proceeding in a whole new light, one sufficient to
undermine any confidence in the trial's outcome. Had the defense

---

[434] *See Warrior*, 294 Kan. at 506 (citations omitted).
[435] *See Warrior*, 294 Kan. at 507 (quoting *Bagley*, 473 U.S. at 682).

had this evidence, it could have presented it to the State's testifying medical expert. That expert, Erik Mitchell, has now concluded — based on this evidence — that his trial testimony about Carl's and Kathleen's manners of death was wrong. Given the bullet, he has now determined that the injury to Carl's scalp was most likely caused by a bullet graze and not a blunt object, finding their deaths a murder-suicide and not a double-homicide. Had the jury heard this evidence, particularly when evaluated cumulatively with the evidence in Claims 2 and 3, it would have reasonably concluded that Kathleen, not Pete, was the perpetrator here, resulting in a different outcome at trial.

Further, with the fourth bullet in its possession, the defense could have retained its own expert to reach the same conclusion. For example, Dr. Susan Roe has concluded that Kathleen's likely manner of death is suicide and that Kathleen likely killed Carl. Photographs taken at the scene show blood smears and biological material on Kathleen's right hand — likely from the bullet-graze injury to Carl's head. This means Kathleen was within a few feet of Carl when the bullet lacerated his scalp.

In short, the bullet was key, material evidence in the possession of the State but not disclosed to the defense. Had this evidence not been suppressed, there is a reasonable probability that the jury would have found Pete not guilty.

**Claim 5:** **The State suborned perjury from Rupert in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section Ten of the Kansas Constitution.**

Using perjury to convict a defendant is a specific type of misconduct that violates a defendant's due-process rights. A defendant convicted because of perjured testimony is entitled to a new trial if: "(1) the prosecution knowingly solicited the perjured testimony, or (2) the prosecution failed to correct testimony it knew was perjured."[436]

## A.   *Brancart suborned perjury from Rupert about their communications.*

Both happened here. Brancart suborned Rupert's perjury in front of the jury.[437]

---

[436] *State v. McKinney*, 272 Kan. 331, 339 (2001) (citing *Napue*, 360 U.S. at 269).
[437] Ex. 5 at 26.

```
 6          Q.   Back in August of 2009, when you first
 7    wrote to the District Attorney, in general, if you
 8    know, was there any effort made to interview you back
 9    then?
10          A.   No, sir.
```

Brancart knew this was false. He received Rupert's first letter on August 12.[438] Rupert's second letter arrived on September 10 at 2:15 p.m.[439] Between those two dates, e.g., after Rupert sent his first letter but before sending his second, the prosecutor made the next efforts to interview Rupert: (1) called Rupert's attorney on August 31;[440] (2) emailed Rupert's attorney on August 31;[441] (3) emailed Rupert's attorney on September 4;[442] (4) emailed Rupert's attorney on September 8;[443] (5) notified a detective that he had approval to interview Rupert on September 8;[444] (6) emailed Rupert's attorney on the morning of September 10;[445] (7) spoke

---

[438] Ex. 34.
[439] Ex. 45.
[440] *See* Ex. 38.
[441] *Id.*
[442] Ex. 41.
[443] Ex. 42
[444] Ex. 105.
[445] Ex. 43.

with Rupert's attorney over the phone on the morning of September 10;[446] and (8) sent another email to Rupert's attorney on the morning of September 10.[447]

## B.   *Brancart failed to correct Rupert's perjured testimony about their communications.*

Rupert knew his answer was false, too. Both he and the prosecutor knew, as early as September 8, that Rupert's case in Butler County had been continued specifically so that the prosecution team could interview Rupert.[448] Rupert also knew about Brancart's efforts to interview him because his lawyer had negotiated a deal with the Butler County Attorney's Office based on Rupert's cooperation and Rupert had rejected that deal — all after his first letter but before the second.[449]

---

[446] Ex. 44.
[447] *Id.*
[448] Ex. 42.
[449] *See* Ex. 44.

## C.   *Brancart solicited perjury from Rupert about the status of Rupert's criminal case.*

When Brancart questioned Rupert at trial — the day *after*

learning Rupert's case was not over — Brancart asked:[450]

```
 3         Q.   Rupert, the sentence you are serving now is
 4    from Butler County, Kansas; is that correct?
 5         A.   Yes, sir.
 6         Q.   What's the, let's see, are you serving a
 7    jail sentence and scheduled after it to go then to
 8    the Department of Corrections?
 9         A.   Yes, sir.
10         Q.   Okay.  You say in about July of this year
```

While not explicitly false, this line of questioning was misleading

because it suggests that Rupert's case was over and his sentence

fixed when neither were true. The explicit falsehood came later:[451]

---

[450] Ex. 5 at 7.
[451] *Id.* at 26.

```
14          A.   Yes, sir.
15          Q.   And then after your case was concluded
16   there in El Dorado, did you reinitiate a letter to
17   say there is more information?
18          A.   Yes, sir.
```

Here Brancart is assuming a factual predicate to the question: that Rupert's case had concluded. But Brancart knew this was not true. But he never corrected it.

Kansas Rule of Professional Conduct 3.3(a)(3) prohibits a lawyer from "knowingly offer[ing] evidence that the lawyer knows to be false." Rule 3.4(b) likewise forbids a lawyer from assisting "a witness to testify falsely . . . ." And it is "professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice."[452] Here, the prosecutor's procurement of false testimony, while knowing both that the testimony is false and the witness knows it to be false, violates all three of these rules.

---

[452] Kan. R. Prof'l Con. 8.4(d).

### D.   *The perjury deprived Pete of a fair trial.*

Apart from being unethical, this deprived Pete of his right to a fair trial. "A conviction obtained by the introduction of perjured testimony violates a defendant's due process rights if (1) the prosecution knowingly solicited the perjured testimony, or (2) the prosecution failed to correct testimony it knew was perjured."[453] Both occurred here. The prosecutor knew he had tried to interview Rupert after he sent his first letter. And he knew that Rupert knew about those attempts. And Brancart knew that Rupert's criminal case wasn't over, but he asked a question with a built-in assumption that it was. Even giving Brancart an enormous benefit of the doubt and assuming he thought Rupert would answer these questions differently, he knew Rupert's answers were false the moment they left his lips. Yet he took no steps to correct them.

This perjury affected the outcome of Pete's trial. Rupert's testimony was critical to the prosecution's case, Rupert's credibility was crucial to his testimony, and his motive for coming forward

---

[453] *McKinney*, 272 Kan. at 339 (citing *Napue*, 360 U.S. at 269)).

was essential to his credibility. An honest answer to the prosecution's question would have revealed that Brancart *had* tried to interview Rupert, that Brancart had arranged a deal in return for Rupert's cooperation, and that Rupert had rejected that deal because it was not good enough. It also would have shown that Brancart responded to Rupert's rejection by threatening him with imprisonment. What's more, an honest answer to the questions about the status of Rupert's criminal case would have explained that Rupert still had a chance to argue for a lower sentence.

Having established prosecutorial misconduct that affected Pete's right to a fair trial, the State must "demonstrate beyond a reasonable doubt that the error . . . did not affect the outcome of the trial in light of the entire record . . . ."[454] Here, Pete has shown that the prosecutor knowingly suborned Rupert's perjury and that it affected his right to a fair trial. The burden now shifts to the State to prove — beyond a reasonable doubt — that it did not.

[454] *State v. Sherman*, 305 Kan. 88, 109 (2016) (citation omitted).

**Claim 6:** **The State committed prosecutorial error and misconduct that violated Pete's due-process rights in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section Ten of the Kansas Constitution.**

## A. *The State abused the inquisition statutes.*

The State deprived Pete of a fair trial by abusing the Kansas inquisition statutes. Prosecutorial error occurs when "prosecutorial acts . . . fall outside the wide latitude afforded to prosecutors to conduct the State's case and attempt to obtain a conviction" in a way that violates "the defendant's constitutional right to a fair trial."[455] Misusing the inquisition statutes constitutes an abuse of the judicial process.[456] And "conduct that is prejudicial to the administration of justice" is professional misconduct.[457]

A witness who appears through an inquisition subpoena must testify under oath and the prosecution must produce a transcript of it. Once a prosecutor opens an inquisition, Kansas law allows the district court to issue a subpoena to a witness "commanding them

---

[455] *Sherman*, 305 Kan at 109.
[456] *See State v. Cathey*, 241 Kan. 715, 744-45 (1987) (District judge can refuse to issue inquisition subpoenas "to avoid abuse of judicial process...."), overruled on other grounds by *State v. Schoonover*, 281 Kan. 453 (2006).
[457] Kan. R. Prof'l Con. 8.4(d).

to appear and *testify* . . . ."[458] When the witnesses appear, they "shall be sworn to make true answers to all questions" and their "testimony  . . . shall be reduced to writing and signed by" them.[459] Any person who refuses to answer questions faces contempt of court, a fine, and imprisonment.[460]

The court's orders followed the statutory requirements. After granting the prosecutor's inquisition application, the court ordered the Wyandotte County Sheriff to transport Rupert to its jail and hold him "until he is deposed by the District Attorney or his designee pursuant to this inquisition."[461] The court also signed an "Inquisition Subpoena Ad Testificandum," commanding Rupert to appear and testify under oath at the WYCODA on December 2, 2009 at 9:00 a.m.[462]

---

[458] K.S.A. § 22-3101(1) (emphasis added).
[459] K.S.A. § 22-3101(3).
[460] *Id.*
[461] Ex. 52.
[462] Ex. 53.

> YOU ARE HEREBY COMMANDED to appear in person and give testimony under oath at the Office of the District Attorney of Wyandotte County, Kansas, 710 N. 7th St., Kansas City, Kansas 66101, at ___9___ o'clock _a_.m., _2nd_ , _December_ , 2009.

The prosecution ignored the statutes and the court's orders. The Wyandotte County Sheriff did transport Rupert to its jail, and Rupert did appear at the WYCODA on December 2. But he was never asked to swear to the truth of his statements, so he never gave any testimony.[463] There was no court reporter in the room, meaning he was not deposed. The prosecution never transcribed his statement and Rupert never signed his testimony. To be sure, the prosecution did eventually record the audio of *some* of Rupert's statement. According to the subpoena, Rupert was to start answering questions at 9:00.[464] The recording does not start until 10:30.[465] And the parties on the recording acknowledge that, before starting the recording, they had discussed Pete's case.

[463] *See* Exs 65, 66.
[464] Ex. 53.
[465] Exs 65, 66.

**B.** **The State's abuse of the inquisition statutes was prosecutorial misconduct that deprived Pete of his right to a fair trial.**

Because Brancart ignored the requirements of the inquisition statutes and the court's orders, the defense will never know what Rupert said for the 90 minutes before the recorder was turned on. Given Rupert's known inconsistencies, detailed elsewhere, this 90-minute statement likely contained even more. What is more certain is that the prosecutor made a promise to Rupert during those 90 minutes — a promise to intercede with the Kansas Department of Corrections on Rupert's behalf.[466]

The prosecutor's end run around Kansas law and court orders constitute not only prosecutorial error, but misconduct that deprived Pete of a fair trial.[467] The 90-minute gap contained an

---

[466] Ex. 104, detailed in Claim 8, *infra*.

[467] This behavior also likely violated the Kansas Rules of Professional Conduct. "In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person." While Rupert's letters had repeatedly asked for a lawyer to advise him, and the inquisition statutes require such a lawyer to be appointed upon request, no lawyer was ever appointed to counsel him.

explicit promise from Brancart to Rupert in exchange for his testimony — something that should have been disclosed to the defense. It almost certainly contained more inconsistencies on Rupert's part, which could have been exploited on cross-examination. And it likely had an explanation from Brancart about his use of an inquisition subpoena — with its threat of contempt and imprisonment — rather than a typical subpoena. That explanation would have contradicted Rupert's effort to portray himself as someone coming forward of his own free will, rather than someone coming forward after being threatened by the prosecution.

Once a person shows that prosecutorial error or misconduct implicated his right to a fair trial, the burden shifts to the State. It must "demonstrate beyond a reasonable doubt that the error . . . did not affect the outcome of the trial in light of the entire record . . . ."[468] It cannot show that here. Rupert provided crucial testimony and the prosecution made sure it was one-sided,

---

[468] *Sherman*, 305 Kan. at 109 (citation omitted).

stymying the defense from showing the jury that Rupert was a reluctant witness, coerced into testifying and expecting a reward, and whose testimony was full of contradictions.

## C.   *The State's lack of candor about its communications with Rupert was prosecutorial misconduct that violated Pete's right to a fair trial.*

1.   *Brancart misled the court and the defense about his communications with Rupert.*

Brancart was not candid with the court or defense counsel about the extent of his contacts with Rupert. When Rupert appeared, seemingly out of thin air, as a prosecution witness 12 days before trial, defense counsel was naturally suspicious. During a December 10, 2009 pretrial hearing, Brancart told the court about two letters from Rupert — his first letter (August 10) and his November 14 letter.[469] He did not mention the other letters until defense counsel confronted him with Rupert's mail log from the Butler County Jail.

Brancart then went into his communications with Rupert through counsel. He assured the court and defense counsel that

---

[469] Ex. 1 at 26-27.

"[a]fter his lawyer told me there would be no talking to [Rupert],
that ended it, Judge."[470] Brancart told neither party about Rupert's
rejected plea deal or his own jail-time threat. Brancart continued to
mislead the court and counsel at a December 14 hearing: "[T]here
was no contact with Robert Rupert, period, until December 2 of this
year."[471] Later at this same hearing, the prosecutor invoked his
ethical duties as a member of the bar to lend credence to his
assertions:[472]

```
13          MR. BRANCART: Judge, I don't have
14   additional witnesses.  I took an oath to tell you the
15   truth when I was admitted to the bar, and I have made
16   representations to you.  I think it is important at
17   this moment that I highlight those.  I know of no
18   communication with Robert Rupert, period, until
19   December 1st or 2nd, when he was brought here and
20   interviewed.  His name was known.  His potential
```

[470] Ex. 1 at 30.
[471] Ex. 2 at 4.
[472] Ex. 2 at 40.

These assertions were not true. As explained above, Rupert's refusal to interview did not "end it." Instead, Brancart threatened Rupert, through his attorney, with an inquisition subpoena and disclosing his name to the defense. For instance, on September 11 — the morning Brancart learned that Rupert refused to cooperate — Brancart wrote: "I may have a duty, and if not a duty then at least a desire to err on the side of caution, to disclose Rupert's identity . . . . The defense here may find it necessary to interview him to learn what if any exculpatory evidence he might have."[473]

When those threats didn't produce an immediate result, Brancart repeated them three days later: "I'm evaluating the issue of disclosing Rupert to the defense in my pending case."[474] And he explicitly threatened Rupert with jail time if he persisted in his silence: "Once he's here for an inquisition, he either answers questions or he risks contempt of court. I imagine the sentence for a contempt finding in Wyandotte County would be ordered

---

[473] Ex. 44 (The prosecutor apparently decided he had no such duty, as he did not disclose Rupert for nearly 90 days following this email.)
[474] Ex. 46 at 2.

consecutive to any pending sentence in Butler County."[475] Having

shown the stick, the prosecutor then offered the carrot: "Before I

start drafting [the] application for inquisition . . . could you tell me

whether Rupert modified his position when he talked with you last

week?"[476] Four days later, the prosecutor again wrote to Rupert's

lawyer.[477]

> I will as soon as feasibly possible open an inquisition and compel Rupert's attendance for deposition – and thereafter I'll disclose his existence to the Coones defense.  If you and Rupert have an alternative suggestion, you should make it.
>
> Edmond Brancart

Brancart not only knew of contact with Rupert before

December 2, he initiated it. In each of these communications,

Brancart directs Rupert's attorney to convey messages to Rupert

and asks the attorney to convey Rupert's responses back to him.

And far from "ending it," as Brancart assured the court and defense

counsel, Rupert's refusal to be interviewed prompted Brancart to

threaten him with more jail time and disclosure of his identity to

[475] *Id.*
[476] *Id.*
[477] Ex. 47.

the defense — two things the prosecutor knew Rupert wished to

avoid.

2.    *Brancart's misleading claims about his communications with
      Rupert were prosecutorial misconduct that violated Pete's
      right to a fair trial.*

The prosecutor's dishonesty with the court and counsel broke

the Kansas Rules of Professional Conduct. Rule 3.3(a)(1) prohibits

a lawyer from "mak[ing] a false statement of fact or law to a

tribunal . . . ." That dishonesty also prejudiced the administration

of justice, violating Rule 8.4(d), because it gave the court and

defense counsel a less-than-accurate picture of Rupert's motives.

And it was even worse for Brancart to invoke his ethical obligation

and break it in the same breath.

The prosecutor's dishonesty constitutes prosecutorial

misconduct because it falls outside "the wide latitude afforded

prosecutors" to obtain a conviction.[478] Kansas courts have never

held that a prosecutor's deceit was anything less than misconduct.

And this deceit implicated Pete's right to a fair trial. Had the

---

[478] *Sherman*, 305 Kan. at 109.

defense known about the prosecution's threats to Rupert, it would have cross-examined Rupert on those threats. And that cross-examination would have affected Rupert's credibility — a key component of the prosecution's case.

Having established that the prosecutor's error affected Pete's right to a fair trial, the burden now shifts to the State. It must "demonstrate beyond a reasonable doubt that the error...did not affect the outcome of the trial in light of the entire record . . . ."[479] Pete does not anticipate it making that demonstration here.

### D. The State was not candid with the court or opposing counsel when he said Rupert's criminal case was over.

1. *Brancart failed to correct his misstatement to the court and counsel about the status of Rupert's criminal case.*

When the defense first confronted Brancart about Rupert, during a December 10 hearing, Brancart explained why he had not disclosed Rupert's existence earlier.[480] He told the court that Rupert was represented by counsel and that representation

---

[479] *Sherman*, 305 Kan. at 109.
[480] Ex. 1 at 26.

prevented Brancart from directly contacting him.[481] That changed,
Brancart continued, when Rupert sent another letter saying his
case was over.[482] From that letter, Brancart inferred that Rupert
was "no longer represented by counsel."[483]

Brancart learned shortly after this hearing that his inference
was incorrect. On December 15, he discovered that Rupert's case
was not over: Rupert had a hearing scheduled in January to ask for
a sentence modification.[484] This meant that Rupert was still
represented by counsel. And that Brancart had questioned Rupert
without counsel present — the very thing that he had just told the
court he was ethically forbidden from doing. Yet Brancart did not
share this discovery with the court or defense counsel.

---

[481] *Id.*
[482] *Id.* at 27.
[483] *Id.* at 27-28.
[484] Ex. 58.

2.    *Brancart's failure to correct his own misstatement constituted prosecutorial misconduct that violated Pete's right to a fair trial.*

The Kansas Rules of Professional Conduct require a lawyer to correct a false statement of fact previously made to the court.[485] Here, Brancart told the court that Rupert's case was over. Five days later, Brancart discovered that Rupert's case was not over. Yet he never told the court or defense counsel that Rupert's case was still pending. This lack of candor prejudiced the administration of justice by denying Pete a fair trial.[486]

Because Brancart led everyone to believe that Rupert's case was over, no one could argue that Rupert was testifying in exchange for the hope of a lower sentence. This made his testimony more credible. Had Brancart disclosed the truth — that Rupert had a hearing on the horizon where he would ask for a lower sentence — Rupert's credibility would have suffered, so much so that it would have cast the whole trial in a different light.

[485] Kan. R. Prof'l Con. 3.3(a)(1).
[486] *See* Kan. R. Prof'l Con. 8.4(d).

Having established prosecutorial misconduct that affected Pete's right to a fair trial, the burden now shifts to the State to prove, beyond a reasonable doubt, this perjury did not affect the trial.[487]

**Claim 7:   Pete received ineffective assistance of counsel because his attorney failed to investigate in violation of the Fifth and Sixth Amendments to the United States Constitution.**

Trial counsel proceeded to trial without conducting a reasonable investigation and that failure deprived the jury of the critical facts proving that Pete was innocent. The Constitutions of both Kansas and the United States guarantee all defendants the right to effective assistance of counsel.[488]

Trial counsel's performance is governed by *Strickland's* familiar standard. "First, a defendant must show that counsel's performance was deficient…Second, the defendant must show that the deficient performance prejudiced the defense."[489] In assessing counsel's performance, "prevailing norms of practice as reflected in

---

[487] *Sherman*, 305 Kan. at 109 (citation omitted).
[488] *State v. Brown*, 300 Kan. 565, 574-75 (2014).
[489] *Strickland*, 466 U.S. at 687.

American Bar Association standards and the like . . . are guides to determining what is reasonable."[490]

## A. *Trial counsel's failure to investigate was deficient performance.*

The first part of the *Strickland* test requires Pete to show that trial counsel's performance fell below an objective standard of reasonableness. The duty to conduct a diligent investigation of the State's case and potential defenses is a basic one.[491] Included in the duties of trial counsel is the duty to investigate or to conclude that a particular line of investigation is unnecessary. In assessing the reasonableness of an attorney's investigation, a court considers "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."[492] When facts known to counsel suggest further investigation would be fruitful, the failure to investigate

---

[490] *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (citing *Strickland,* 466 U.S. at 688-89).
[491] *Flynn v. State*, 281 Kan. 1154, 1163 (2004*); see also Wilson v. State* 51 Kan. App. 2d 1, 14 (2014).
[492] *Wiggins*, 539 U.S. at 527.

results from "inattention, not reasoned strategic judgement."[493]

Indeed, defense counsel "cannot make a strategic decision against

pursuing a line of investigation when he or she has not yet obtained

facts upon which that decision should be made."[494] When counsel

"lacks the information to make an informed decision due to

inadequacies of his or her investigation, any argument of 'trial

strategy' is inappropriate."[495]

To succeed on an ineffective-assistance-of-counsel claim, Pete

"must identify the acts or omissions" of his counsel that were "not

the result of reasonable professional judgement." This is because

"choices made after less than complete investigation" are

reasonable only if "reasonable professional judgement supports the

limit on investigation."[496]

Defense counsel's effective-assistance obligation does not stop

outside the courtroom. Counsel also has a duty to investigate — "to

---

[493] *Id*. at 526.
[494] *Mullins v. State*, 30 Kan. App.2d 711, 716-17 (2002).
[495] *Id*.
[496] *Strickland*, 466 U.S. 690-91.

make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary."[497] The American Bar Association's standards for criminal-defense attorneys similarly advise defense attorneys to "determine whether the client's interests would be served by engaging fact investigators" and "regularly re-evaluate the need for such services throughout the representation."[498]

Here, trial counsel was appointed by the court. Kansas law allows court-appointed lawyers to hire experts, like investigators, with court approval.[499] Yet trial counsel never sought approval to hire an investigator. Under these facts, that decision was unreasonable.[500] The history of Kathleen's involvement with the Coones family, first with Olin, then with Pete, spanned years and

---

[497] *Strickland* at 691.
[498] American Bar Association, "Criminal Justice Standards for the Defense Function," Standard 4.41(d). Available at https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition/
[499] K.S.A. § 22-4508.
[500] *See Hinton v. Alabama*, 134 S. Ct. 1081, 1088-89 (2014) (ineffective assistance of counsel where defense counsel failed to ask for investigative or expert funds).

was scattered among different witnesses. Moreover, in a murder case like this one, one of the potential defenses was that Kathleen committed suicide. And that defense would have required an investigation into the circumstances of Kathleen's life at the time of her death — especially her financial situation. Attempting a suicide defense without an investigation into the possible reasons for a suicide was unreasonable.

1.   *A reasonable investigation would have uncovered Kathleen's embezzlement in a public probate filing.*

Apart from a hired investigator, trial counsel had her own duty to investigate. Because Kathleen's suicide was a viable defense theory, and financial stressors play a role in many suicides, a reasonable investigation would have included reviewing the public filings in Kathleen's probate case. Reasonable counsel would understand that those probate filings would contain evidence of Kathleen's financial status at the time of her death; that evidence would be important to any potential suicide defense. Had counsel undertaken that reasonable investigation, she would have

discovered MRCU's February 13, 2009 filing, which contained the details of Kathleen's embezzlement.[501]

2.   *A reasonable investigation would have uncovered evidence of Kathleen's embezzlement and financial distress within Kathleen's purse.*

A reasonable investigation of the contents of Kathleen's purse would have also uncovered the embezzlement. When the police discovered Kathleen's body, they also found her purse — open and sitting on the back of a nearby chair. The police seized the purse but did not make a written inventory of its contents. Nor did defense counsel, who told the court that she had not examined all of the purse's contents.[502]

Trial counsel's failure to fully examine the purse's contents was objectively unreasonable.[503] As argued above, a suicide defense required a full investigation of the circumstances of Kathleen's life.

---

[501] Ex. 117.
[502] Ex. 4 at 54. Interestingly, trial counsel told the court that the purse contained "gambling cards." Undersigned counsel has examined the purse and it does not have gambling cards, which means either (1) trial counsel was mistaken about its contents or (2) the gambling cards were removed.
[503] *See Strickland*, 466 U.S. at 688.

A reasonably diligent defense attorney would have realized that the purse likely contained substantial evidence of those circumstances.

And it did. The purse contained evidence of Kathleen's embezzlement scheme.[504] Inside it was one check, written from a joint account held by Kathleen and Elizabeth, at a different bank.[505] But Kathleen's name had been crossed off the top of the check. It was for $1,075.21. This was not a copy of a check, but an actual check. And it was the check Kathleen used to pull off one of her last parts of her embezzlement scheme.[506] Again, this scheme required Kathleen to pull the check from her own bank after her account had been credited for it, but before it was sent for processing.[507] The check in Kathleen's purse stemmed from that scheme — a check that she had deposited, then filched, on April 1 — seven days before the murder-suicide.

[504] Ex. 93.
[505] *Id.* at 1.
[506] *See* Ex. 27 at 3 (identifying a check deposited on April 1, 2008 for $1075.21, the same amount of the check in Kathleen's purse).
[507] *Id.* at 1-2.

Within the purse were also copies of 11 checks, written by Kathleen, that had been returned for insufficient funds.[508] These checks were written between December 17, 2007 and January 15, 2008, all to "VFW," and they total $1,020. It also contained receipts of her payments to payday-loan companies and past-due bills.[509] Within the purse was evidence of at least two payday loans: one to "Check n Go" and one to "E Care."[510] Kathleen paid the latter $283, along with a $8.50 processing fee, on February 28, 2008.[511] The purse also contained a handwritten payment stub, dated December 15, 2017, for a partial payment of $142.50.[512] Apart from these high-interest loans, the purse held other evidence that Kathleen struggled to pay her bills. Both the gas and water at the Parallel Parkway home were in danger of being disconnected for nonpayment.[513]

[508] Ex. 93 at 2-9.
[509] Ex. 106.
[510] *Id.* at 1, 3.
[511] *Id.* at 3.
[512] *Id.* at 2.
[513] *Id.* at 5-6.

3.    *A reasonable investigation would have uncovered evidence of Kathleen's financial distress in her bank records.*

Trial counsel failed to subpoena Kathleen's bank records from MRCU. Those records painted a comprehensive picture of the black hole that was her financial status.[514] In January 2008, her account made payments to:[515]

- Esidelend

- World Wide Cash Debit

- GSFIL

- First Bank of Delaware

- CashNetUSA

- AuthPayDay

These payments totaled $1,459.[516] Kathleen only made $1,167 that month.[517] In other words, the payments on her loans consumed every dollar she earned and then some, leaving no money for food, the mortgage, or utilities. The chasm got bigger as the months went

---

[514] Ex. 26.
[515] *Id.* at 3, 5-6, 6.
[516] *Id.*
[517] *Id.* at 3, 5.

on. In February, her loan payments totaled $1,618[518] and her income was $1,192,[519] leaving her more than $400 underwater. In March, loan payments were $2,133[520] compared against her income of $1,529[521] — $600 deficient.

Apart from her payday loans, Kathleen also had taken out a second mortgage on her home.[522] On April 30, 2007, Kathleen took out a $27,500 second mortgage from MRCU at an annual interest rate of 11.75 percent.[523] The stated purpose of the loan was "debt consolidation."[524] Kathleen had to repay the loan by paying $325.90 per month over the next 15 years. And seven months after taking out that second mortgage, Kathleen had to get a personal loan from MRCU for $2,500.[525]

---

[518] *Id.* at 8, 10, 11, 14.
[519] *Id.* at 10, 14.
[520] *Id.* at 17, 17-18, 18, 19, 20, 21, 22, 23, 25.
[521] *Id.* at 20, 25.
[522] Ex. 25.
[523] *Id.* at 1.
[524] *Id.*
[525] Ex. 117 at 2.

4.    *A reasonable investigation would have uncovered Kathleen's embezzlement, financial distress, and plot to frame Pete by interviewing witnesses.*

Interviewing people who might possess relevant information is part of counsel's duty to investigate.[526] In the murder-suicide defense attempted in Pete's case, relevant witnesses include Kathleen's co-workers and supervisors. And to show that Kathleen was attempting to deceive people with her phone call to Elizabeth, the people with relevant information would include the people with information about Kathleen's past schemes against Patsy and Olin.

Trial counsel failed to either interview or call to the witness stand any of these people:

- **Chip De Moss**: An attorney for Olin and Patsy, who remembers Kathleen's attempt to pressure Patsy to leave everything to Kathleen in Patsy's will.

---

[526] *McHenry v. State,* Kan. App. 2d 117, 123 (2008) (failure to investigate issues surrounding State's witnesses fell below minimum standards in case that turned on credibility); *State v. James*, 31 Kan. App. 2d 548, 553-55 (2003) (finding trial counsel ineffective when he failed to contact or subpoena witnesses)).

- **Therisa Harding**: An employee of Security Bank who determined that Kathleen was exploiting Olin for his money and froze his accounts, prompting an angry outburst and threats from Kathleen.

- **Bonnie Keith**: A former coworker and friend of Olin's, who rescued him from Kathleen and saw firsthand how Kathleen had neglected him.

- **Brian Levinson**: Pete's attorney in the civil suit with Kathleen, who knew Pete was scared of the Schrolls and thought the civil case would be resolved shortly.

- **Sandra Laymon**: Kathleen's co-worker, who discovered Kathleen's embezzlement, heard one version of the QuikTrip story, and knew Kathleen was hiding her financial desperation from Carl.

- **Thad Jones**: Kathleen's supervisor, who discovered Kathleen's embezzlement, wrote a report about it, and likely told Michael and Garrison about it.

- **Medicalodge**: The place that Kathleen claimed to have worked at, giving her experience taking care of elderly people, would have confirmed that Kathleen never worked there.

5.   *A reasonable investigation would have uncovered the fourth bullet.*

Trial counsel's "obligation to evaluate and investigate…the physical evidence supporting the case is a basic tenant of providing effective assistance of counsel."[527]   An investigation into the State's case includes, at a minimum, the witnesses, and evidence the State will present to establish guilt. "Apart from any formal process of discovery that are available, prosecutors and law enforcement have in their possession facts that defense counsel must know."[528] Here, that evidence included the pillow, seized by the police, lying near Carl's head. An inspection would have revealed the presence of the bullet in the pillow. A mere visual inspection of the pillow — and

---

[527] *Fotenot v. Allbaugh* 402 F. Supp. 3d 1110, 1203-04 (E.D. Okla. Aug. 21, 2019); see also *State v. Robinson*, 56 Kan. App. 2d 211, 227 (2018) (finding deficient performance for, among other errors, failure to investigate the physical evidence underlying the State's expert opinions).
[528] ABA Standards for Criminal Justice 4-4.1 Commentary (2d ed. 1982 Supp.)

the dark shape within the stuffing protruding from it — would have revealed the existence of the fourth bullet.[529]

## B.   *Trial counsel's failure to retain necessary experts was deficient performance.*

Trial counsel's failure to seek out a necessary experts "fell below an objective standard of reasonableness."[530] The United States Supreme Court recognizes that some prosecutions require a reasonable defense attorney to consult with an expert: "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence . . . ."[531] Indeed, when important forensic evidence comes from a prosecution expert witness, "counsel ha[s] a duty to make a diligent investigation of the forensic evidence and its potential weaknesses."[532]

---

[529] Ex. 116; *see also* Exs 116-A – 116-D.
[530] *Strickland*, 466 U.S. at 688.
[531] *Harrington v. Richter*, 562 U.S. 86, 106 (2011).
[532] *Dees v. Caspiri*, 904 F.2d 452, 454 (8th Cir. 1990).

1.   *Trial counsel's failure to consult with or retain a forensic pathologist was deficient performance.*

Mitchell performed the autopsies on Carl's and Kathleen's

bodies, concluding that the manner of death for each was

homicide.[533] Kathleen had a single gunshot wound to her head.[534]

Carl had three injuries — two gunshot wounds to the torso, and a

laceration at the top of the skull.[535] Mitchell concluded that the

injury to Carl's scalp came from a "crushing blow" with some kind

of angular weapon, too dull to be a blade.[536] Yet Mitchell also noted

that this "crushing blow" to the head did not damage the skull.[537]

The police never located the type of weapon Mitchell described.

While the police only found three of the four fired bullets, Mitchell

does not appear to have considered that Carl's scalp wound might

have been caused by a bullet graze.

Mitchell's conclusions were important forensic evidence,

triggering counsel's "duty to make a diligent investigation" of the

---

[533] Exs 68, 69.
[534] Ex. 69.
[535] Ex. 68.
[536] *See* Ex. 4 at 181-82.
[537] Ex. 68 at 6.

"evidence and its weaknesses."[538] The Schroll home bore no signs of forced entry. There was no sign of a struggle within the home and no property was taken. The gun used in the shootings belonged to Kathleen. This evidence fits more with a murder-suicide; so much so that one of the first police officers at the scene guessed that's what it was. Defense counsel recognized as much, dabbling with but never committing to a murder-suicide defense. That defense would have prompted reasonable counsel to consult with a forensic pathologist to evaluate Mitchell's conclusion of a double murder. But trial counsel never did so here.

2.    *Trial counsel's failure to consult with or retain an expert on gunshot residue was deficient performance.*

During the autopsies, the police swabbed the hands of Carl's and Kathleen's bodies for GSR. They also swabbed the steering wheel of Pete's van. But the police did not send these swabs to the KBI for analysis as part of its investigation. Nor did defense counsel seek to have them tested before Pete's trial.

[538] *Dees*, 904 F.2d at 454.

She should have. This was one of those cases in which "the only reasonable and available defense strategy requires consultation" with an expert.[539] Again, the defense theory involved, at least partially, the idea that Kathleen took her own life. If Kathleen had GSR on one hand but not the other (as she did), that would make it more likely she committed suicide, representing evidence that would support the defense theory and undercut the prosecution's. The lack of GSR on the steering wheel of Pete's van would have performed a similar task. If Pete had driven his van to the Schroll house, shot them, and then gotten back into his van to drive home, he would've left GSR on the steering wheel. If there was no GSR on the steering wheel, then it was less likely that Pete fired a gun and got into his van, which made the prosecution's theory less likely.

## C.  *Trial counsel's failure to investigate or consult with necessary experts prejudiced Pete's trial.*

If trial counsel would have performed the necessary investigation and consulted with the necessary experts, Pete's trial

---

[539] *Harrington*, 562 U.S. at 106.

would have looked very different. To prove prejudice, Pete must show a reasonable probability that the result of the trial would have been different but for counsel's errors.[540] Prejudice can be established "by demonstrating that an accumulation of errors" creates the probability of a different outcome at trial.[541]

Here, the evidence at trial was weak and circumstantial. Indeed, no physical evidence tied Pete to the scene. If Pete's jury would have had the benefit of the competent investigation that has since been undertaken, "there is a reasonable probability" that the jury "would have had a reasonable doubt respecting guilt."[542] From either the purse, probate records, Laymon, or Jones, the jury would have learned about Kathleen's embezzlement, revealing that she was capable of a long-running, complex scheme that required her to deceive those who knew her best — the exact kind of fraud she was perpetrating against Pete. From Harding, it would have heard about how sophisticated her prior fraud of Olin had been, requiring

---

[540] *Id.*
[541] *In re Ontiberos*, 295 Kan. 10, 40-41 (2012).
[542] *Strickland*, 466 U.S. at 695.

her to forge over 100 checks. And from De Moss, it would have heard about Kathleen's attempted fraud of Patsy. Between all of this evidence, the jury could have concluded that these schemes were not isolated incidents but how Kathleen survived for years.

The embezzlement evidence, as well as the evidence about her financial situation, would have also informed the jury about Kathleen's motive to take her own life. Rather than have no reason to do so, as Brancart argued during closing argument, the jury would have known from Kathleen's purse and bank records that she was in debt to multiple payday lenders, so much so that she couldn't afford to pay any of her other bills. The bank records and the probate filings would have shown the jury that Kathleen had leveraged all of her assets: a second mortgage on the house had made its debt exceed its value. While her embezzlement had plugged the hole in her finances for the last few months, the string on that scheme had run out, too. Olin's life-insurance money was still tied up in court, and mediation wouldn't happen until May. She couldn't wait that long; her embezzlement would be discovered by then. And she couldn't keep fighting that suit from a jail cell.

The jury would have also heard about how Kathleen knew she wouldn't be at work on April 7 and planted the seeds of pointing the finger at Pete for what she was about to do. Laymon would've told the jury about the missing check, and how Kathleen would've had no reason to remove that check on April 5 unless she knew she wouldn't be at work on April 7. Laymon would have also told the jury about Kathleen's QuikTrip story, revealing that Kathleen told the same story about Pete threatening her, but changed the details each time she told it.

Apart from the motives Kathleen had to take her own life, the jury would have heard about the physical evidence that supported a murder-suicide. Discovering the fourth bullet would have prompted Mitchell to reclassify the deaths as a murder-suicide, a conclusion reaffirmed by the defense's own forensic pathologist. And the jury would have heard the results of the GSR testing:[543]

- GSR from the swab of Kathleen's left hand, but no GSR from the swab of her right hand;

[543] Ex. 80 at 1-2.

- GSR from the swabs of Carl's left and right hands;

The jury would have heard that this evidence is more consistent with Kathleen shooting Carl and then herself, rather than someone shooting her from behind.[544]

The jury would have also heard that the same physical evidence exonerated Pete. While the jury did hear that there was no physical evidence tying Pete to the shootings, it did not hear that there was no GSR on the steering wheel of his van.[545] That lack of GSR would've nullified the State's explanation as to why only Kathleen's DNA was on the trigger of the gun — that Pete had worn gloves. Had that been true, his gloves still would've left GSR on the van's steering wheel. But there was no GSR there, so the State would have had to scramble for some other explanation for the lack of any physical evidence connecting Pete to the shootings.

---

[544] Trevor Christensen, the KBI forensic scientist who completed this testing, is expected to testify as to these conclusions and there's no reason to think a GSR expert at Pete's trial would have testified any differently.
[545] Ex. 80.

The jury would have discovered that Pete had no motive to kill Kathleen or Carl. Levinson would have told the jury that Pete seemed more scared of the Schrolls than angry with them. And that a settlement of the civil case was imminent. If Pete planned to murder the Schrolls, the jury would have wondered, why would he be negotiating a settlement with them that was close to resolving the case?

At bottom, the trial that should have happened bears little resemblance to the one that did. At that trial, the jury heard Kathleen had no reason to commit suicide; it should have heard that she had several reasons to do so. At that trial, the jury didn't hear any forensic evidence supporting a murder-suicide; it should have heard from two forensic pathologists and a GSR expert that murder-suicide was the most likely explanation. At that trial, the jury didn't have any reason to think Kathleen was being dishonest with Elizabeth during the phone call; it should have heard that Kathleen was an experienced deceiver of those closest to her, and she'd been doing it for years.

Had Pete's jury sat through the trial that should have happened — the one that the Constitution guarantees him — there's a reasonable probability that it would have reached a different result.[546] A "reasonable probability" is one that is "sufficient to undermine the confidence in the outcome."[547] Taken together, trial counsel's many errors satisfy the prejudice prong of the *Strickland* test: there is a reasonable probability that the result of Pete's trial would have been different if trial counsel would have conducted the constitutionally competent investigation that has now been undertaken. The Court should issue the writ of habeas corpus granting Pete relief from his conviction and sentence.

## CONCLUSION

Time is the most valuable thing a person has. Money can be recouped. Property can be reclaimed. But everyone has a finite number of heartbeats. While modern medicine might be able to cajole a few more years, the curtain eventually comes down on us

---

[546] *State v. Gleason*, 277 Kan..624, 644 (2004), quoting *Chamberlain v. State*, 236 Kan. 650, 656-57 (1985).
[547] *Id.*

all. And that knowledge — that this cannot go on forever —gives meaning to the chain of moments we call life.

Kathleen stole more than 12 years of Pete's. And life has moved on without him. His children have grown up and gotten married, yet he couldn't walk his daughters down the aisle. His children now have their own children, but he's never met them; he doesn't want their only memory of him to be in a prison. These things are irreplaceable. No matter how this Court or any other court rules on Pete's case in the future, he can never get those moments back. They are gone.

It did not have to be this way. If Pete hadn't gotten saddled with an incompetent detective, a dishonest prosecutor, and an ineffective defense attorney, maybe Kathleen's scheme would have failed. If the medical examiner had been given all the evidence, maybe he would have told the prosecution that Kathleen had really committed suicide. If the police or defense counsel had found the fourth bullet, maybe the prosecution would have admitted its mistake and dismissed the charges.

But the jury certainly would not have convicted Pete if it had known everything. Most of this evidence was available when Pete went to trial, but remained buried by either lack of diligence or outright deception. Now that it has surfaced, it shows what a farce Pete's trial was and how flimsy his conviction is.

Pete Coones is an innocent man. This Court should vacate his conviction and sentence, discharge him from custody, and send him home to his grandchildren.

Respectfully Submitted,

**MORGAN PILATE LLC**

/s/ Branden A. Bell
Branden A. Bell, KS #22618
926 Cherry Street
Kansas City, Missouri 64106
p 816.471.6694
e bbell@morganpilate.com

**MIDWEST INNOCENCE PROJECT**

/s/ Tricia Bushnell
Tricia Bushnell, Pro Hac Vice
3619 Broadway Boulevard, Ste. 2
Kansas City, Missouri 64111
p 816.221.2166
e tbushnell@themip.com

/s/ Lindsay J. Runnels
Lindsay J. Runnels, Pro Hac Vice
926 Cherry Street
Kansas City, Missouri 64106
p 816.471.6694
e lrunnels@morganpilate.com

*Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I certify that a copy of this Amended Petition was emailed to counsel for the Respondent, J. Antwone Floyd, at jfloyd@wycokck.org, on October 20, 2020.

/s/ Branden A. Bell