## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| DEIRDRE COONES, as executor of the estate of Olin Coones, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:22-CV-2447-JAR-TJJ |
| | ) | |
| v. | ) | Hon. Julie A. Robinson |
| | ) | |
| BOARD OF COUNTY COMMISSIONERS OF THE UNIFIED GOVERNMENT OF WYANDOTTE COUNTY AND KANSAS CITY KANSAS; UNIFIED GOVERNMENT OF WYANDOTTE COUNTY AND KANSAS CITY KANSAS; WILLIAM MICHAEL; ANGELA GARRISON; SERGEANT G. DORSETT; BRYAN BLOCK; SUSAN BROWN; DETECTIVE SANCHEZ; AND UNKNOWN OFFICERS OF THE KANSAS CITY, KANSAS POLICE DEPARTMENT, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Magistrate: Hon. Teresa J. James

JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Deirdre Coones, as executor of the estate of Olin Coones, by her attorneys, Loevy & Loevy and Morgan Pilate, LLC, files this Complaint against Defendants Board Of County Commissioners of The Unified Government of Wyandotte County and Kansas City Kansas; Unified Government of Wyandotte County and Kansas City Kansas; William Michael; Angela Garrison; Sergeant G. Dorsett; Bryan Block; Susan Brown; Detective Sanchez; and Unknown Officers of the Kansas City, Kansas Police Department, and states as follows:

### INTRODUCTION

1.      In April 2008, Olin L. Coones ("Mr. Coones") was a gentle and loving father of five. He was grieving the loss of the man who raised him, Olin F. Coones ("Senior").

2.      Mr. Coones had recently rescued Senior from the neglect and control of an abusive caretaker, Kathleen Schroll ("Kathleen"). Kathleen had robbed Senior of huge sums of money while neglecting his physical and medical needs.

3.      Kathleen was living a fraudulent life. Outwardly, even to her family, she appeared functional. But she was desperately in debt and had resorted to criminal frauds—including embezzling more than $11,000 from the credit union where she worked—to hide her financial condition.

4.      Kathleen had run out of rope, as her employer was about to discover her theft. Faced with the prospect of bankruptcy, prison, and social disgrace, she designed a bizarre and desperate scheme that would end her suffering and financially benefit her daughter. She plotted to kill herself and her husband Carl Schroll and to frame Mr. Coones for the crime.

5.      In the early morning of April 7, 2008, Kathleen killed herself and Carl to carry out her plot.

6.      Even though no physical, forensic, or eyewitness evidence linked Mr. Coones to the murder-suicide, Kansas City, Kansas police officers decided that Mr. Coones must have committed what they decided had been a double murder. They conspired together to manufacture evidence against Mr. Coones and fabricated and suppressed evidence to secure his conviction. Those officers, named as Defendants in this case, became in effect willing accomplices to Kathleen's plot.

7.      The Defendants withheld evidence that Kathleen was embezzling money from her bank, thereby allowing the prosecution to claim that Kathleen had no motive to commit suicide. And the Defendants fabricated a demonstrably false statement from an incarcerated man accusing Mr. Coones of confessing to murder.

8.      The plot eventually unraveled. Forensic evidence demonstrated that the Defendants' theory was a lie, and the incarcerated accuser admitted his statement against Mr. Coones was fabricated. But Mr. Coones was nevertheless robbed of the final years of his life, which he spent in prison, separated from his wife, children, and grandchildren. He was exonerated and released in November 2020, but died only 108 days after coming home. This lawsuit seeks redress for his injuries.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

10.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper under 28 U.S.C. § 1391(b). The majority of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

12.     Plaintiff Deirdre Coones is Mr. Coones's widow and the executor of Mr. Coones's estate. She and Mr. Coones were married for 41 years until his death.

13.     Defendants William Michael and Angela Garrison were detectives with the Kansas City, Kansas Police Department ("KCKPD") assigned to investigate the deaths of Kathleen and Carl Schroll.

14.     Defendants Bryan Block and Susan Brown were detectives with the KCKPD who had investigated Kathleen's abuse and financial exploitation of Senior and were also involved in the investigation of Kathleen and Carl's deaths.

15.     Sergeant G. Dorsett was a KCKPD sergeant who responded to the scene of Kathleen's murder-suicide and was involved in arresting Mr. Coones.

16.     Defendant Detective Sanchez was a detective with the KCKPD who attempted to develop evidence from an unreliable incentivized accuser to convict Mr. Coones of murder.

17.     Defendants Unknown Officers of the Kansas City, Kansas Police Department are officers who, on information and belief, joined the above Defendants in a scheme to use unlawful and improper means to secure Mr. Coones's conviction.

18.     Together, the above Defendants, all law enforcement officers employed by the KCKPD, are referred to as the "Defendant Officers."

19.     Defendants Board of County Commissioners of the Unified Government of Wyandotte County and Kansas City Kansas and the Unified Government of Wyandotte County and Kansas City Kansas (together, the "Municipal Defendants") are municipal entities that employed the Defendant Officers and enacted policies and practices that caused the violation of Mr. Coones's constitutional rights.

**FACTS**

20.     In April 2008, Mr. Coones was a 50-year-old retired mail carrier who lived with his wife, Deirdre "Dee" Coones, and his children in Kansas City, Kansas.

21.     Mr. Coones was a devoted father to his five children. He had never before been convicted of any crime.

22.     Olin F. Coones ("Senior"), who had raised Mr. Coones from childhood, had recently died in January 2007.

23.    Mr. Coones had helped Senior to escape the custody of Kathleen Schroll ("Kathleen"), a woman who had entered Senior's life as a purported caretaker but ultimately neglected, abused, and financially exploited him.

### KATHLEEN SCHROLL EXPLOITS SENIOR AND HIS STEPDAUGHTER PATSY

24.    In 2000, Senior and his stepdaughter Patsy Van Vleck ("Patsy") lived together in a house they owned in Kansas City, Kansas. Both were in poor physical health, which continued to decline over the ensuing years.

25.    At some point before 2004, Kathleen began working as a housekeeper for Senior and Patsy.

26.    Kathleen schemed to acquire Senior and Patsy's assets.

27.    In 2004, Kathleen pressured Patsy to execute a will and power-of-attorney that would leave everything she had to Kathleen and give Kathleen legal authority over her.

28.    Patsy called a lawyer to draft those documents, but never signed them.

29.    Around September 2005, Patsy and Senior purportedly signed over the house they owned to Kathleen. Shortly thereafter, Kathleen's daughter Blair Hadley moved into the house.

30.    On March 6, 2006, Patsy died.

31.    On the day Patsy died, Kathleen cashed a check, purportedly signed by Patsy and from her bank account, for $200.

32.    The next day, $5,000 was withdrawn from Senior's savings account, purportedly by Senior.

33.    Three days after Patsy died, a check from Senior's account was written to Kathleen for $3,000.

34.    All told, Kathleen stole more than $30,000 from Senior's accounts.

35.    Around April 20, 2006, the beneficiary of Senior's life insurance was changed from Mr. Coones to Kathleen.

36.    That beneficiary information was changed via computer over the internet. Senior did not have a computer or internet service at his home, but Kathleen had both.

37.    Kathleen prevented Senior's family members, including Mr. Coones, from seeing him.

38.    Mr. Coones filed an elder abuse complaint against Kathleen with the Kansas Department of Social and Rehabilitative Services.

39.    Around September 12, 2006, Bonnie Keith, a former co-worker of Senior's, went to visit him. She realized that Senior was being mistreated—his underwear was soaked in urine and likely had been for days and he had several bedsores.

40.    Keith worked with Mr. Coones's family to get Senior away from Kathleen, and Senior eventually moved in with Mr. Coones and his family.

41.    A few months later, Senior died.

## KATHLEEN SCHROLL COMMITS FURTHER FINANCIAL CRIMES

42.    After Senior died, Kathleen's debts rapidly outpaced her income.

43.    On April 30, 2007, Kathleen and her husband Carl Schroll ("Carl") took out a second mortgage on their home of $27,500 for "bill consolidation."

44.    By 2008, Kathleen was repaying short-term loans from six high-interest payday lenders.

45.    Around January 2008, Kathleen started bouncing checks.

46.    Kathleen hid her financial problems from her family.

47.     In February 2008, Kathleen began embezzling money from her employer, the Midwest Regional Credit Union. In fewer than 60 days, she stole over $11,000.

48.     Because of Kathleen's embezzlement, the ledger she maintained was out of balance. By early April 2008, she knew that her crime would soon be discovered.

## KATHLEEN PLOTS TO FRAME MR. COONES FOR MURDER

49.     Drowning in debt, and with her employer about to discover her embezzlement, Kathleen made a plan to escape her problems—permanently.

50.     Kathleen wanted to leave money for Blair Hadley, her daughter. She and Carl had life insurance policies, but those policies would not pay out for a suicide.

51.     Kathleen plotted to kill herself and Carl and to frame Mr. Coones for murder, allowing her life insurance to pay out to her daughter.

52.     The first step was casting suspicion on Mr. Coones.

53.     On Saturday, April 5, 2008, during her shift at the Midwest Regional Credit Union, Kathleen told coworkers that Mr. Coones had threatened her that morning before work at a gas station. This statement was false.

54.     Around April 6, 2008, Kathleen told her daughter that Mr. Coones had threatened her in the afternoon after work on April 5, 2008 at a gas station. This statement was also false.

55.     Kathleen told many lies to her family about Mr. Coones. She told her mother, Elizabeth Horton, that she had made several police reports about Mr. Coones stalking her, even though she never made any such reports.

56.     Kathleen also told Hadley that she had called the police on Mr. Coones many times for harassing her, even though she made no such reports, and no such harassment had occurred.

57.     Kathleen told her brother Randy Horton that she had a restraining order against Mr. Coones, even though she did not.

**KATHLEEN SCHROLL AND HER HUSBAND ARE FOUND DEAD IN THEIR HOME**

58.     Early in the morning of Monday, April 7, 2008, KCKPD officers Sophia Barajas and J. McCallop arrived at Kathleen's home.

59.     When Barajas and McCallop entered the home, the front door was partially open and the lights were on.

60.     Barajas and McCallop found Kathleen's dead body lying face-up in the living room. She was dressed in nurse's scrubs and was wearing jewelry and her glasses.

61.     There was a revolver next to Kathleen's left foot.

62.     Barajas and McCallop found Carl's dead body in a bedroom. Carl was sprawled across the bed with his legs dangling off it, wearing only a tee shirt.

63.     Carl had two gunshot wounds to his torso and a bullet graze to his scalp.

**POLICE ARREST MR. COONES DESPITE OVERWHELMING EVIDENCE THAT HE WAS NOT INVOLVED**

64.     A tremendous volume of evidence proved that Mr. Coones had nothing to do with Kathleen and Carl Schroll's deaths.

65.     There were no signs of forced entry into Kathleen and Carl's home.

66.     There were no signs of a struggle within the home.

67.     Police officers initially concluded that the crime was a murder-suicide due to the lack of any evidence that a third person was involved in Kathleen and Carl's deaths.

68.     No murder weapon, getaway car, DNA evidence, fingerprints, or other physical or forensic evidence was ever found connecting Mr. Coones to Kathleen and Carl's deaths.

69.     Kathleen's DNA, but not Mr. Coones's DNA, was found on the murder weapon.

70.    No blood, gunshot residue, or other evidence connecting Mr. Coones to the crime was found in Mr. Coones's car.

71.    No blood, gunshot residue, or other evidence connecting Mr. Coones to the crime was found in Mr. Coones's home.

72.    Mr. Coones was 5' 9", weighed over 250 pounds at the time of his arrest, and was in extremely poor health and medically unstable. Mr. Coones had suffered a heart attack and two strokes which significantly restricted his ability to move. His health had forced him to leave his job delivering mail. It was highly unlikely that Mr. Coones could have overpowered and killed Kathleen and Carl.

73.    The murder weapon belonged to Kathleen, meaning that the killer used a weapon that was already present in Kathleen's home.

74.    Despite evidence showing that no third party played any role in Kathleen and Carl's deaths, Defendants Garrison and Michael set out to arrest Mr. Coones.

75.    Defendants Garrison and Michael arrested Mr. Coones and two of his teenage children, Melody and Ben, while Mr. Coones was driving them to school.

76.    Mr. Coones, Melody, and Ben were taken to a detective bureau to be interviewed. They were separated and placed into different rooms.

77.    During their interviews, fourteen-year-old Melody and seventeen-year-old Ben were handcuffed to their chairs.

78.    There never was any basis to believe Melody or Ben had anything to do with Kathleen or Carl's deaths, let alone probable cause to arrest them.

**DEFENDANTS FABRICATE EVIDENCE REGARDING THEIR INTERROGATIONS OF MR. COONES AND HIS CHILDREN AND THEIR CONVERSATIONS WITH HIS FAMILY**

79.    To inculpate Mr. Coones, Defendants Michael, Garrison, and other Defendant Officers fabricated evidence regarding their interrogations of Mr. Coones, Melody, and Ben.

80.    Michael and Garrison wrote in their investigative report that Ben and Melody were never handcuffed, placed in restraining devices, or arrested. This was a lie; Ben and Melody were handcuffed and detained.

81.    Michael and Garrison fabricated statements by Mr. Coones to make him appear guilty of the crime.

82.    Michael and Garrison willfully failed to record Mr. Coones's interview or, in the alternative, suppressed evidence of the recording that was made.

83.    Michael and Garrison later spoke with Mr. Coones's wife Deirdre, and fabricated information regarding their conversation to make Mr. Coones appear guilty of the crime.

84.    Michael, Garrison, and other Defendant Officers also suppressed a subsequent written statement regarding Mr. Coones's alibi provided by Ross Minks (his daughter Mariah's boyfriend).

**DEFENDANTS SUPPRESS EVIDENCE THAT KATHLEEN LIED ABOUT HER INTERACTIONS WITH MR. COONES**

85.    Kathleen had told many lies to her friends and family about her financial situation, her reasons for carrying a gun, and the amount of money in dispute between her and Mr. Coones.

86.    Defendants Michael and Garrison learned that Kathleen had told her family and coworkers that Mr. Coones had confronted her on April 5 at a QuikTrip gas station.

87.    Defendants Michael and Garrison retrieved the QuikTrip's surveillance video and reviewed the footage.

88.    Defendants Michael and Garrison discovered that neither Kathleen nor Mr. Coones were shown in any surveillance video from the QuikTrip at the times Kathleen had claimed that Mr. Coones confronted her.

89.    Defendants Michael, Garrison, and other Defendant Officers chose to suppress the QuikTrip videos, which were exculpatory for Mr. Coones because they showed that Kathleen was lying about their supposed confrontation.

90.    Defendants Michael, Garrison, and other Defendant Officers, on information and belief, suppressed other evidence showing that Kathleen was hiding her financial distress from family and friends and had told countless lies about her financial situation.

**DEFENDANTS SUPPRESS AN EXCULPATORY REPORT FROM THE KBI**

91.    Defendants Susan Brown, Brian Block, and other Defendant Officers had investigated Kathleen for financially exploiting Senior.

92.    Defendants Brown, Block, Garrison, and Michael knew that the Kansas Bureau of Investigation had analyzed a set of checks supposedly signed by Senior that indicated that Kathleen had forged his signature.

93.    This evidence was exculpatory for Mr. Coones because it revealed that Kathleen was in a desperate state of financial distress and had committed many deceitful and fraudulent acts.

94.    Defendants Brown, Block, Michael, and Garrison knew about the existence of the report and knew that it was exculpatory for Mr. Coones.

95.     Nevertheless, Defendants Brown, Block, Michael, Garrison, and, on information and belief, other Defendant Officers chose to exclude the report from the materials provided to prosecutors, thereby suppressing it to secure Mr. Coones's conviction.

## DEFENDANTS SUPPRESS EVIDENCE THAT KATHLEEN'S EMBEZZLEMENT WAS ABOUT TO BE DISCOVERED BY HER EMPLOYER

96.     On or around Monday April 7, 2008, the day Kathleen killed her husband and herself, Thaddeus Jones, Kathleen's supervisor, discovered that Kathleen had embezzled more than $11,000 from the Midwest Regional Credit Union.

97.     Jones then wrote a report documenting the embezzlement.

98.     Defendants Michael and Garrison interviewed Jones several days later.

99.     Jones told Defendants Michael and Garrison about Kathleen's embezzlement and gave them a copy of his report.

100.     Defendants Michael, Garrison, Block, and Brown all knew about Kathleen's embezzlement and Jones's report.

101.      Jones's report was exculpatory for Mr. Coones because it revealed that Kathleen was in a desperate state of financial distress, faced the imminent discovery of her embezzlement from her employer, and was likely to soon lose her job, go bankrupt, and go to prison.

102.     Defendants Michael, Garrison, Block, Brown, and, on information and belief, other Defendant Officers suppressed Jones's report and additional evidence of Kathleen's embezzlement to secure Mr. Coones's conviction.

## DEFENDANTS FABRICATE EVIDENCE FROM AN UNRELIABLE INCENTIVIZED ACCUSER

103.     Defendants Michael and Garrison interviewed Robert Rupert, a prisoner who had been confined with Mr. Coones and whom they knew to be unreliable.

104.    Michael and Garrison knew that Rupert had sought leniency in exchange for providing inculpatory testimony against Mr. Coones and that Rupert had reason to expect he would receive consideration for his testimony against Mr. Coones.

105.    Nevertheless, Michael and Garrison coached Rupert to state that he had not asked for, and did not expect to receive, anything for his cooperation.

106.    Michael and Garrison fabricated Rupert's testimony by coaching him to give recorded testimony they knew to be false.

107.    Michael and Garrison suppressed evidence that would have shown that Rupert had asked for, and expected to receive, consideration for his testimony.

108.    Michael and Garrison fed information about the crime to Rupert in order to inculpate Mr. Coones; they then suppressed evidence that they had done so.

109.    Michael and Garrison knew that Rupert's false account of what Mr. Coones had told him was initially inconsistent with known facts about the crime; they shaped Rupert's testimony to fit the facts by asking questions to hide those inconsistencies and to emphasize information that they had fed him.

110.    Rupert's account has been proven false in many ways. For example, Rupert gave a purported explanation for why only three bullets were recovered from the scene but the murder weapon had four bullets missing. He claimed that Mr. Coones told him that only three shots were fired at the scene and that the fourth bullet was manually ejected, not fired. But it was later proven that the fourth bullet was at the scene, embedded in a pillow on the bed where Carl Schroll was shot.

## DEFENDANTS CONSPIRED TO FABRICATE INCULPATORY EVIDENCE AND SUPPRESS EXCULPATORY EVIDENCE REGARDING MR. COONES

111.    Defendants Michael and Garrison agreed to take any means necessary—including suppressing exculpatory evidence and fabricating inculpatory evidence—to secure Mr. Coones's conviction.

112.    Defendants Dorsett, Block, Brown, and Sanchez joined their conspiracy.

113.    Defendant Dorsett agreed to suppress evidence that Mr. Coones's children had been arrested at gunpoint and handcuffed. He wrote a police report excluding these details, allowing the Defendant Officers to perpetrate the lie that the children had not been handcuffed, arrested, or coercively interrogated.

114.    Defendants Block and Brown agreed to suppress evidence of Kathleen's history of fraud and deception, thereby hiding evidence of her motive to commit a murder-suicide.

115.    Defendant Sanchez agreed to fabricate additional evidence against Mr. Coones using fabricated jailhouse testimony. Sanchez interviewed Phillip Stewart, another incentivized accuser who had been confined in the same facility as Mr. Coones. Sanchez fed Stewart information that he did not know about the shooting in order to inculpate Mr. Coones. Even though Sanchez knew that Stewart did not actually have knowledge about Kathleen and Carl's deaths, he developed a fabricated statement from Stewart to convict Mr. Coones.

## MR. COONES IS PROSECUTED, CONVICTED, AND IMPRISONED BECAUSE OF THE DEFENDANT OFFICERS' MISCONDUCT

116.    Because of the Defendant Officers' misconduct, Mr. Coones was charged with murder.

117.    There was no probable cause to believe that Mr. Coones was involved in Kathleen and Carl Schroll's deaths, either before or after the Defendant Officers' misconduct.

118.    Nonetheless, the Defendant Officers' misconduct caused Mr. Coones to be prosecuted.

119.    In an initial jury trial, Mr. Coones was acquitted of murdering Carl Schroll but convicted of murdering Kathleen. That conviction was subsequently reversed and Mr. Coones was retried.

120.    In a second jury trial, Mr. Coones was convicted of murdering Kathleen and was sentenced to serve at least fifty years in prison before becoming eligible for parole. For Mr. Coones, who was fifty-two years old, this was a life sentence. Mr. Coones thus faced the prospect of spending the rest of his life in prison for a crime he did not commit.

121.    Mr. Coones's conviction was caused by the Defendant Officers' misconduct described in this complaint.

122.    Without the Defendant Officers' misconduct, Mr. Coones would not have been prosecuted or convicted.

## MR. COONES'S CONVICTION IS OVERTURNED

123.    On November 5, 2020, Mr. Coones's conviction was vacated by the Wyandotte County District Court of Kansas and all charges against him were dismissed. Mr. Coones walked out of prison a free man, having spent more than twelve years incarcerated for a crime he did not commit.

124.    Mr. Coones died only 108 days later, on February 21, 2021.

125.    After his death, Mr. Coones was granted a certificate of innocence and the records of his conviction and arrest were ordered expunged.

126.    A copy of Mr. Coones's Corrected First Amended Memorandum of Fact and Law in support of vacating his conviction, dated October 21, 2020, is attached to this Complaint as an exhibit, and incorporated into this Complaint as if fully stated herein.

### THE POLICIES AND PRACTICES OF THE MUNICIPAL DEFENDANTS CAUSED MR. COONES'S CONVICTION

127.    During the times relevant to Mr. Coones's claims, the Municipal Defendants enacted and maintained policies and practices that caused his wrongful conviction, including permitting and encouraging investigatory misconduct; allowing officers to fabricate evidence through the use of unreliable incentivized accusers/informants; condoning and covering up officer misconduct; refusing to acknowledge or investigate complaints of officer misconduct; and reprimanding, punishing, and allowing retaliation against officers who reported the misconduct of other officers.

128.    KCKPD had a custom and practice of permitting its officers to engage in a wide variety of improper and unreliable investigative practices, including, but not limited to obtaining identifications through manipulative and coercive means; manipulating or coercing witnesses into making false or fabricated statements; failing to document or disclose exculpatory evidence; failing to document witness statements and instead relying solely on an officer's claims about what the witness said; failing to gather or analyze critical physical evidence; and deliberately failing to follow obvious leads or use legitimate and accepted investigative practices.

129.    For example, Officer Roger Golubski, in 1997, fabricated a witness statement to pin the unsolved murder of a convenience store customer on Gentry Bolton. On information and belief, Golubski coerced a witness to name Bolton as the customer's killer by holding her in custody and refusing to let her leave until she made the false identification. Months later, an eyewitness told Golubski that Bolton was not the shooter, but Golubski suppressed the

16

exculpatory statement from the prosecution and Bolton's defense attorney. It came out only after the trial court ordered production of complete copies of the police file based on obvious Brady violations.

130.    In 1997, KCKPD detectives threatened to charge a shooting suspect's uncle with murder unless he testified against his nephews.

131.    In 1998, a KCKPD officer coerced, terrorized, and demanded sexual acts from eyewitnesses in a case to obtain testimony that Charles Jones had murdered a police officer's son.

132.    In 2000, a judge dismissed a murder case after a witness testified that KCKPD officials had tried to force her to identify a suspect even though she could not do so.

133.    In 2000 and 2001, KCKPD detectives coerced witness Loren Artis into fabricating testimony to solve a homicide investigation. Detectives threatened Artis, saying they would "do something" to his family if he did not identify their chosen suspect.

134.    The US Department of Justice is investigating KCKPD homicide investigations from between 1988 and 2010 due to the frequency and severity of officer misconduct permitted by the Department.

135.    As of the time of Plaintiff's arrest and prosecution, the KCKPD chose not to implement adequate policies, training, procedures, and guidelines to ensure the disclosure of exculpatory evidence and to protect the integrity, legitimacy and accuracy of investigations, prosecutions, and convictions.

136.    The KCKPD also chose to not implement or enforce policies that would prevent the suppression and fabrication of evidence. For example, it did not implement or enforce a policy requiring detectives to make contemporaneous reports of interviews and investigative

actions. As a result, detectives were able to add and omit details after the investigation was finished to emphasize inculpatory information and omit exculpatory evidence.

137.    The KCKPD had a practice of not requiring its detectives to document information about incentivized accusers/informants they worked with, including payments and other consideration given to informants. Policymakers at the KCKPD knew that this information was necessary to ensure the reliability of informant testimony, but chose not to require its documentation.

138.    The purpose of the KCKPD's decision not to require detectives to document informants was to allow detectives additional latitude to fabricate testimony and suppress exculpatory information.

139.    Policymakers in the KCKPD knew that if detectives were required to document information about their informants and their interactions with their informants, then it would be harder to hide exculpatory information about those informants from criminal defendants.

140.    Detectives frequently wrote reports referring to information from known informants as coming from "un-named" or "unidentified" informants to hide information about their sources from criminal defendants.

141.    Detectives also frequently pressured informants by threatening to have their children taken away and suppressed evidence of such coercive tactics.

142.    Supervisors within the KCKPD intentionally created an environment in which clearing cases, by any means whatsoever, was more important than preventing wrongful convictions.

143.    For example, Officer Roger Golubski used his position as a KCKPD officer to extort sexual acts from countless women across the city.

144.    Officer Golubski terrorized these women and forced them to provide fabricated witness statements to solve crimes.

145.    Supervisors within the KCKPD knew that Golubski was coercing sex and fabricating evidence but allowed him to do so because that was his method of "solving" crimes.

146.    Golubski was never disciplined for his actions, which started in the 1990s and continued through his retirement in 2010.

147.    KCKPD also failed to provide adequate supervision, discipline, and training to its officers to ensure that officers, including supervisors, met their obligations to report and discipline misconduct by fellow officers.

148.    KCKPD operated an internal affairs system with the purpose of undermining and ignoring civilian complaints instead of responding to them. For example:

149.    Rose McIntyre went to the KCKPD Internal Affairs office to complain about Officer Golubski forcing her to submit to a sexual act but was refused the opportunity to file a complaint. The IA investigator told her, "Our officers don't do things like that."

150.    In the 2000s, another woman was with Golubski in his office when a detective unknowingly opened the closed door and found Golubski with his fly unzipped and his groin not far from the woman's face. Police commanders learned of the incident but did nothing.

151.    As another example, Michael Kobe, a retired captain with the KCKPD, reported Golubski's misconduct to his then-supervisor, Major Gary Wohlforth, but the Department did nothing to address the issue.

152.    Pursuant to the practice of turning a blind eye to police misconduct, supervisors frequently chose not to document, make inquiries regarding, or take action in response to allegations of officer misconduct, including allegations made by KCKPD police officers.

153.    Further, supervisors repudiated officers for reporting misconduct against fellow officers.

154.    KCKPD supervisors endorsed police misconduct, including fabrication and suppression of evidence, by reprimanding officers who reported such misconduct instead of investigating the alleged perpetrators.

155.    Before Mr. Coones's conviction, the KCKPD was on notice of widespread civil rights violations, but chose to hide evidence of those violations instead of fixing its problems and seeking accountability from officers.

156.    In response to an FBI investigation of widespread misconduct by KCKPD officers in the 1990s, officers throughout KCKPD refused to report on one another's misconduct, including criminal misconduct.

157.    In response to that investigation, many supervisors refused to confront and acknowledge wrongdoing and instead sought to cover up evidence of officer misconduct.

158.    At the time of Mr. Coones's arrest, the KCKPD chose not to include any information about how to submit complaints against police officers on its website.

159.    The KCKPD's failures to investigate misconduct by its officers predictably resulted in serious misconduct, including wrongful convictions caused by suppressed and fabricated evidence.

160.    The Defendant Officers were never disciplined in connection with their investigation into Kathleen and Carl's deaths.

161.    The defendant officers knew that the KCKPD would allow them to engage in the misconduct described in this Complaint with impunity in that it would never correct or discipline them.  It was plain from the face of the investigation into Kathleen and Carl's deaths that the

Defendant Officers violated KCKPD policies, but the Defendant Officers knew they would not be disciplined.

162.    In the above ways, among others, the actions and inactions of the Municipal Defendants were a moving force behind the misconduct alleged in this Complaint.

## MR. COONES'S DAMAGES

163.    Mr. Coones spent more than twelve years incarcerated for a crime that he did not commit.

164.    Because of his wrongful conviction, Mr. Coones experienced tremendous pain and suffering. His children grew up and got married, but he did not get to walk his daughters down the aisle. When his grandchildren were born, he did not meet them, because he did not want them to have to visit him in prison. Mr. Coones died less than four months after his exoneration and release from prison.

165.    Mr. Coones suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages set forth above, all caused by the Defendant Officers' misconduct and the policies and practices of the Municipal Defendants.

## COUNT I – 42 U.S.C. § 1983
### Fourteenth Amendment: Due Process, Fair Trial
### Against All Defendants

166.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

167.    In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory and impeachment evidence from Mr. Coones, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Mr. Coones's criminal prosecution.

21

168.    In the manner described more fully above, the Defendant Officers fabricated evidence to convict Mr. Coones, including falsifying statements from their interrogations and interviews with Mr. Coones, his children Ben and Melody, and his wife Deirdre and feeding testimony that they knew to be false to unreliable incentivized accusers.

169.    In addition, these Defendant Officers produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents contained statements and described events that were fabricated and Defendant Officers knew to be false. Defendant Officers signed these reports despite knowing that the information contained in those reports was false. Defendant Officers suppressed and withheld evidence of their wrongdoing.

170.    The Defendant Officers also suppressed evidence that demonstrated their knowledge of Mr. Coones's innocence and revealed Kathleen's motive to commit a murder-suicide and frame Mr. Coones.

171.    The misconduct of all the Defendant Officers directly resulted in the unjust and wrongful criminal prosecution and conviction of Mr. Coones and the deprivation of Mr. Coones's liberty, thereby denying him his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Mr. Coones would not and could not have been pursued, and there is a reasonable probability that he would not have been convicted.

172.    The misconduct of all of the Defendant Officers also directly resulted in Mr. Coones's unjust criminal conviction, thereby denying him his constitutional right to due process, a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

173.    As a result of Defendant Officers' misconduct described in this Count, Mr. Coones suffered loss of liberty and sustained injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous injuries and damages as set forth above.

174.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Coones's constitutional rights.

175.    The misconduct by all of the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Municipal Defendants, which Mr. Coones was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above.

176.    Specifically, the Municipal Defendants, as a matter of practice and policy, allowed officers to: manipulate or coerce witnesses into making false or fabricated statements; fail to document or disclose exculpatory evidence; fail to document witness statements and instead rely solely on an officer's claims about what the witness said; fail to gather or analyze critical physical evidence; and deliberately fail to follow obvious leads or use legitimate and accepted investigative practices.

177.    The Municipal Defendants, as a matter of practice and policy, allowed officers to fabricate evidence from informants and chose to not require officers to document information about their informants or disclose evidence that would allow criminal defendants to impeach informant testimony.

178.    The Municipal Defendants, as a matter of practice and policy, chose to not require officers to report misconduct by fellow officers; condoned a code of silence, allowing and encouraging retaliation against officers who reported against one another; hid and ignored

evidence of officer misconduct; and failed to document, make inquiries regarding, or take action in response to allegations of officer misconduct.

179.    The Municipal Defendants were aware of the widespread practice of fabricating false inculpatory statements and withholding exculpatory information from criminal defendants, but took no action to end the practice, thereby encouraging and perpetuating the very same abusive practices that harmed Mr. Coones.

180.    Municipal Defendants, as a matter of practice and policy, chose to not enact policies or provide trainings that would ensure the integrity of investigations and the disclosure of exculpatory evidence.

**COUNT II – 42 U.S.C. § 1983**
**Fourth and Fourteenth Amendments: Malicious Prosecution and Unlawful Pretrial Detention**
**Against All Defendants**

181.    Each paragraph of this Complaint is incorporated as if restated fully herein.

182.    In the manner described more fully above, the Defendant Officers, acting as investigators, individually, jointly, and in conspiracy with each other, accused Mr. Coones of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Mr. Coones without any probable cause for doing so and in spite of the fact that they knew Mr. Coones was innocent.

183.    The Defendant Officers accused Mr. Coones of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

184.    The Defendant Officers made statements regarding Mr. Coones's purported culpability knowing that those statements were false. They were aware that, as described more fully above, no true or reliable evidence implicated Mr. Coones in the shooting.

185.    The Defendant Officers unreasonably seized Mr. Coones without probable cause and deprived him of his liberty, in violation of his rights secured by the Fourth and Fourteenth Amendments.

186.    The Defendant Officers deprived Mr. Coones of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty.

187.    The Defendant Officers subjected Mr. Coones to arbitrary governmental action that shocks the conscience in that Mr. Coones was deliberately and intentionally framed for a crime of which he was totally innocent, through Defendant Officers' misconduct. Defendant Officers' actions contravened fundamental canons of decency and fairness and violated Mr. Coones's rights under the Fourteenth Amendment.

188.    These judicial proceedings were instituted and continued by Defendant Officers without probable cause, resulting in injury.

189.    The misconduct described in this Count was undertaken intentionally, willfully, and with reckless indifference to the rights of others.

190.    The prosecution terminated in Mr. Coones's favor when, after his conviction was vacated, the State dismissed the charges against him.

191.    As a result of Defendant Officers' misconduct described in this Count, Mr. Coones suffered loss of liberty and sustained injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous injuries and damages as set forth above.

192.    The misconduct by all of the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Municipal Defendants, which Mr. Coones

was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above.

193.    Specifically, the Municipal Defendants, as a matter of practice and policy, allowed officers to: manipulate or coerce witnesses into making false or fabricated statements; fail to document or disclose exculpatory evidence; fail to document witness statements and instead rely solely on an officer's claims about what the witness said; fail to gather or analyze critical physical evidence; and deliberately fail to follow obvious leads or use legitimate and accepted investigative practices.

194.    The Municipal Defendants, as a matter of practice and policy, allowed officers to fabricate evidence from informants and chose to not require officers to document information about their informants or disclose evidence that would allow criminal defendants to impeach informant testimony.

195.    The Municipal Defendants, as a matter of practice and policy, chose to not require officers to report misconduct by fellow officers; condoned a code of silence, allowing and encouraging retaliation against officers who reported against one another; hid and ignored evidence of officer misconduct; and failed to document, make inquiries regarding, or take action in response to allegations of officer misconduct.

196.    The Municipal Defendants were aware of the widespread practice of fabricating false inculpatory statements and withholding exculpatory information from criminal defendants, but took no action to end the practice, thereby encouraging and perpetuating the very same abusive practices that harmed Mr. Coones.

197.    Municipal Defendants, as a matter of practice and policy, chose to not enact policies or provide trainings that would ensure the integrity of investigations and the disclosure of exculpatory evidence.

## COUNT III – 42 U.S.C. § 1983
### Failure to Intervene
### Against All Defendants

198.    Each paragraph of this Complaint is incorporated as if restated fully herein.

199.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Mr. Coones's constitutional rights, even though they had the opportunity to do so.

200.    These Defendant Officers had a reasonable opportunity to prevent this harm, but failed to do so.

201.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Coones's constitutional rights.

202.    As a result of the Defendant Officers' failure to intervene to prevent the violation of Mr. Coones's constitutional rights, Mr. Coones suffered loss of liberty and sustained injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous injuries and damages as set forth above.

203.    The misconduct by all of the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Municipal Defendants, which Mr. Coones was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above.

204.    Specifically, the Municipal Defendants, as a matter of practice and policy, allowed officers to: manipulate or coerce witnesses into making false or fabricated statements; fail to document or disclose exculpatory evidence; fail to document witness statements and instead rely solely on an officer's claims about what the witness said; fail to gather or analyze critical physical evidence; and deliberately fail to follow obvious leads or use legitimate and accepted investigative practices.

205.    The Municipal Defendants, as a matter of practice and policy, allowed officers to fabricate evidence from informants and chose to not require officers to document information about their informants or disclose evidence that would allow criminal defendants to impeach informant testimony.

206.    The Municipal Defendants, as a matter of practice and policy, chose to not require officers to report misconduct by fellow officers; condoned a code of silence, allowing and encouraging retaliation against officers who reported against one another; hid and ignored evidence of officer misconduct; and failed to document, make inquiries regarding, or take action in response to allegations of officer misconduct.

207.    The Municipal Defendants were aware of the widespread practice of fabricating false inculpatory statements and withholding exculpatory information from criminal defendants, but took no action to end the practice, thereby encouraging and perpetuating the very same abusive practices that harmed Mr. Coones.

208.    Municipal Defendants, as a matter of practice and policy, chose to not enact policies or provide trainings that would ensure the integrity of investigations and the disclosure of exculpatory evidence.

**COUNT IV – 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**
**Against all Defendants**

209.   Each paragraph of this Complaint is incorporated as if restated fully herein.

210.   The Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Coones of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

211.   Additionally, before and after Mr. Coones's conviction, the Defendant Officers further conspired to deprive Mr. Coones of exculpatory information to which he was lawfully entitled.

212.   In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

213.   In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above, and was an otherwise willful participant in joint activity.

214.   As a result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Mr. Coones's rights were violated, and he suffered loss of liberty and sustained injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous injuries and damages as set forth above.

215.   The misconduct by all of the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the Municipal Defendants, which Mr. Coones

was the victim of, and his injuries were caused by the policies and practices of those Defendants, as described more fully above.

216.    Specifically, the Municipal Defendants, as a matter of practice and policy, allowed officers to: manipulate or coerce witnesses into making false or fabricated statements; fail to document or disclose exculpatory evidence; fail to document witness statements and instead rely solely on an officer's claims about what the witness said; fail to gather or analyze critical physical evidence; and deliberately fail to follow obvious leads or use legitimate and accepted investigative practices.

217.    The Municipal Defendants, as a matter of practice and policy, allowed officers to fabricate evidence from informants and chose to not require officers to document information about their informants or disclose evidence that would allow criminal defendants to impeach informant testimony.

218.    The Municipal Defendants, as a matter of practice and policy, chose to not require officers to report misconduct by fellow officers; condoned a code of silence, allowing and encouraging retaliation against officers who reported against one another; hid and ignored evidence of officer misconduct; and failed to document, make inquiries regarding, or take action in response to allegations of officer misconduct.

219.    The Municipal Defendants were aware of the widespread practice of fabricating false inculpatory statements and withholding exculpatory information from criminal defendants, but took no action to end the practice, thereby encouraging and perpetuating the very same abusive practices that harmed Mr. Coones.

220.    Municipal Defendants, as a matter of practice and policy, chose to not enact policies or provide trainings that would ensure the integrity of investigations and the disclosure of exculpatory evidence.

## COUNT V – State Law Claim
### Indemnification

221.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

222.    Kansas law requires governmental entities to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

223.    The Defendant Officers were employees and agents of the Municipal Defendants, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

224.    The Municipal Defendants are obligated by Kansas statute to pay any judgments against the Defendant Officers.

## COUNT VI – State Law Claim
### Malicious Prosecution Under Kansas State Law
### Against All Defendants

225.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

226.    Defendants initiated or continued proceedings against Mr. Coones without probable cause. They intentionally and knowingly deliberately misrepresented the truth and withheld exculpatory facts from prosecutors that vitiated probable cause, including but not limited to the facts that various statements were fabricated and the product of coercion, and that Defendants fed witnesses nonpublic and false details they did not know and could not have known, because Mr. Coones was innocent.

227.    The proceedings terminated in Mr. Coones's favor after his conviction was vacated and the charges dropped against him.

228.    Defendants committed these acts within the scope of their employment.

229.    As a result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Mr. Coones's rights were violated, and he suffered loss of liberty and sustained injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous injuries and damages as set forth above.

### COUNT VII – State Law Claim
### Intentional or Reckless Infliction of Emotional Distress Under Kansas State Law Against All Defendants

230.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

231.    Defendants intentionally and/or recklessly, and in breach of their duties owed to Mr. Coones, caused Mr. Coones, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for more than 12 years.

232.    Defendants committed these acts within the scope of their employment.

233.    Defendants caused Mr. Coones to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

234.    As a result of Defendants' misconduct, Mr. Coones's rights were violated, and he suffered loss of liberty and sustained injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous injuries and damages as set forth above.

**COUNT VIII – State Law Claim**
**Negligent Infliction of Emotional Distress Under Kansas State Law**
**Against All Defendants**

235.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

236.    Defendants negligently and grossly negligently, and in breach of their duties owed to Mr. Coones, caused Mr. Coones, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for more than 12 years.

237.    Defendants committed these acts within the scope of their employment.

238.    Defendants caused Mr. Coones to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

239.    As a result of Defendants' misconduct, Mr. Coones's rights were violated, and he suffered loss of liberty and sustained injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous injuries and damages as set forth above.

**COUNT IX – State Law Claim**
**Civil Conspiracy**
**Against All Defendants**

240.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

241.    The Defendant Officers agreed to suppress and fabricate evidence to secure Mr. Coones's conviction.

242.    Their conspiracy caused Mr. Coones, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for more than 12 years.

243.    Defendants committed these acts within the scope of their employment.

244.    Defendants caused Mr. Coones to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

245.    As a result of Defendants' misconduct, Mr. Coones's rights were violated, and he suffered loss of liberty and sustained injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous injuries and damages as set forth above.

### COUNT X – State Law Claim
### Respondeat Superior Liability
### Against the Municipal Defendants

246.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

247.    The Officer Defendants were at all times material to this Complaint employees of the Municipal Defendants, and acted within the scope of their employment in committing the above-described misconduct.

248.    The Officer Defendants' tortious conduct was undertaken while carrying out routine investigative functions. The conduct was reasonably expected by, and in fact foreseen by, Defendants' employer.

249.    The Municipal Defendants are liable as principal for all intentional torts committed by their agents.

### COMPLIANCE WITH KS 12-105b

250.    Plaintiff served the Municipal Defendants with notice of his claims on November 3, 2022.

251.    The Municipal Defendants did not respond to Plaintiff's notice of claims.

252.    All conditions precedent to Plaintiff bringing his state-law tort claims pursuant to KS 12-105b have been met.

WHEREFORE, Plaintiff Deirdre Coones, as executor of the estate of Olin Coones, respectfully requests that this Court enter a judgment in his favor and against all Defendants, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, interest, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Deirdre Coones, as executor of the estate of Olin Coones, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Pursuant to D. Kan. Rule 40.2, Plaintiff requests Kansas City, Kansas as the place of trial.

Respectfully submitted,

**DEIRDRE COONES**

BY: /s/ Joshua Loevy
 *One of Plaintiff's Attorneys*

Joshua Loevy
Jon Loevy*
Russell Ainsworth*
Locke Bowman*
Wally Hilke*
LOEVY & LOEVY
311 North Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 243-5900

*Admitted pro hac vice

Branden A. Bell

Lindsay Runnels
MORGAN PILATE LLC
926 Cherry Street
Kansas City, MO 64106
(816) 471-6694