IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DEIRDRE COONES, Executor of the Estate of Olin Coones,<br><br>**Plaintiff,**<br><br>v.<br><br>**UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS BOARD OF COUNTY COMMISSIONERS, et al.,**<br><br>**Defendants.** | Case No. 22-2447-JAR |

**MEMORANDUM AND ORDER**

Plaintiff Deirdre Coones, as Executor of the Estate of Olin Coones, brings this action asserting federal civil rights claims and state law tort claims against Defendants Board Of County Commissioners of the Unified Government of Wyandotte County and Kansas City, Kansas ("Board"); Unified Government of Wyandotte County and Kansas City, Kansas ("Unified Government"); William Michael; Angela Garrison; Sergeant G. Dorsett; Bryan Block; Susan Brown; and Detective Sanchez. Plaintiff's claims arise out of her deceased husband, Olin Coones' wrongful conviction for the murder of Kathleen Schroll. Before the Court is Defendants' Motion to Exclude Testimony from Balash, Harvey, and Roe (Doc. 102), three of Plaintiff's experts designated to testify at trial. The motion is fully briefed and the Court is prepared to rule. As described more fully below, the Court denies Defendants' motion to exclude.

**I.  Background**

In 2009, Olin "Pete" Coones ("Mr. Coones") was tried and convicted of the murder of Kathleen Schroll ("Kathleen"). Kathleen and her husband, Carl Schroll ("Carl") were found shot

to death in the home they shared in the early morning of April 7, 2008.  Mr. Coones successfully challenged his conviction and sentence under K.S.A. § 60-1507, after new evidence was discovered that showed the homicides were not a double murder, but were instead a murder-suicide.  Kathleen killed Carl and then killed herself, after placing a phone call to her mother to create the false impression that Mr. Coones had just killed her husband and was threatening to kill her.

On November 5, 2020, the Wyandotte County, Kansas District Court vacated Mr. Coones' conviction, all charges against him were dismissed, and he was released from custody.  Before his conviction was vacated, Mr. Coones spent more than twelve years incarcerated.  Mr. Coones passed away 108 days after his release, on February 21, 2021, and was posthumously granted a certificate of innocence.  The records of his conviction and arrest were expunged.[1]

Plaintiff Deirdre Coones, Mr. Coones' wife, brings this civil rights lawsuit against Kansas City, Kansas police detectives who investigated the murder, as well as the Board and Unified Government, alleging that they intentionally or recklessly withheld and fabricated material evidence used to wrongfully convict him.  Plaintiff alleges § 1983 claims based on due process violations, malicious prosecution, and failure to intervene, as well as state-law claims for malicious prosecution, intentional infliction of emotional distress, and conspiracy.

Plaintiff designated David E. Balash as an expert in ballistics and crime scene reconstruction.  He plans to testify about the processing of the crime scene, the significance of the findings of gunshot residue ("GSR") and primer gunshot residue ("PGSR) at particular locations on each victim's body, and his deductions from the crime scene evidence as to the events that led up to and caused the Schrolls' deaths.

---

[1] Doc. 106-29.

2

Plaintiff designated David Harvey as an expert on investigative practices in homicide investigations. Plaintiff proffers that Harvey will testify about accepted standards of police practice, including the types of evidence that should be preserved and disclosed, and the circumstances under which a reasonable investigator would question the presence of probable cause.

Plaintiff designated Susan Roe as a pathology expert. She testified during Mr. Coones' post-conviction proceedings that she disagreed with the original findings of the pathologist who performed the autopsies on Kathleen and Carl regarding: (1) the manner of Kathleen's death, and (2) the cause of a laceration to the side of Carl's head.

## II. Standard

Defendants move to exclude the reports and testimony of Balash, Harvey, and Roe under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[2] Rule 702, which was recently amended effective December 1, 2023, governs the admissibility of expert witness testimony by allowing someone "who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of an opinion."[3] The proponent of the expert's opinion must

> demonstrate[] to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

---

[2] 509 U.S. 579 (1993).

[3] Fed. R. Evid. 702.

        (d)       the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[4]

In *Daubert*, the Supreme Court held that Rule 702 imposes a gatekeeping responsibility on trial courts to ensure that proposed expert testimony "is not only relevant, but reliable."[5]

In performing this gatekeeping function, the court "generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion."[6] This Court has "'wide discretion' in determining whether a witness's experience is sufficient to qualify him as an expert."[7] "[A]s long as an expert stays 'within the reasonable confines of his subject area,' [Tenth Circuit] case law establishes 'a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight.'"[8]

If the expert is sufficiently qualified, the court must next determine whether the expert's testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline."[9] The Supreme Court in *Daubert* set forth a non-exhaustive list of four factors that courts may consider in determining the reliability of the proffered expert testimony: (1) whether the theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate; and (4) its degree of general acceptance in the relevant scientific community.[10]

---

[4] *Id.*

[5] 509 U.S. at 589.

[6] *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting Fed. R. Evid. 702).

[7] *Ronwin v. Bayer Corp.*, 332 F. App'x 508, 513 (10th Cir. 2009) (citing *United States v. Arney,* 248 F.3d 984, 991 (10th Cir. 2001)).

[8] *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (second alteration in original) (quoting *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996)).

[9] *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 592).

[10] *Daubert*, 509 U.S. at 593–94.

Finally, the court must determine whether the expert testimony is sufficiently "relevant to the task at hand."[11]  Under Fed. R. Evid. 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action."[12]  "Relevant expert testimony must 'logically advance[] a material aspect of the case' and be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"[13]  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."[14]  In assessing whether expert testimony will assist the jury, the court should consider whether the testimony "is within the juror's common knowledge and experience."[15]

It is within the court's discretion to determine how to perform its gatekeeping function under *Daubert*.[16]  The most common method for fulfilling this function is a *Daubert* hearing, although it is not specifically mandated.[17]  Here, neither party has requested a hearing on this motion.  All three experts were deposed and excerpts from this testimony are before the Court, in addition to their reports.  The Court finds that it can perform its gatekeeping function by examining the exhibits submitted by the parties and without conducting a hearing.

---

[11] *Bitler*, 400 F.3d at 1234 (quoting *Daubert*, 509 U.S. at 597).

[12] Fed. R. Evid. 401; *see* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

[13] *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (alteration in original) (first quoting *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 n.2 (10th Cir. 2005); and then quoting *Daubert*, 509 U.S. at 591).

[14] *Daubert*, 509 U.S. at 591 (quoting 3 Weinstein & Berger ¶ 702[02] (1988)).

[15] *Garcia*, 635 F.3d at 476–77 (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006)).

[16] *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

[17] *Id.*

### III. Discussion

#### A. Balash

##### 1. Qualification

First, Defendants challenge Balash's qualifications to render an opinion about crime scene investigations. They claim that his qualifications as an expert are based on his limited experience as a homicide investigator, and that his training is outdated. Plaintiff argues that Balash's Curriculum Vitae ("CV") demonstrates that he has the requisite knowledge, skill, and training to opine on crime scene reconstruction, and ballistics. The Court agrees.

Balash has worked as an independent examiner/forensic science consultant since his retirement from the Michigan Department of State Police in 1992, examining evidence, evaluating cases, and performing crime scene reconstruction. He explains in his CV that he has: "worked on thousands of cases that were submitted to the laboratory for analysis, as well as participating in hundreds of crime scene investigations while employed by the Michigan State Police and I have continued to work on homicide investigations and crime scene reconstruction as a civilian examiner combining for over 50 years of work in the field."[18] Balash provides a lengthy list of noteworthy cases he has worked on, including discovering firearms errors at the Detroit Police Laboratory in 2008, resulting in the closure of the Detroit Police Crime Laboratory and the eventual opening of a satellite Michigan State Police Forensic Laboratory in the city of Detroit. His professional associations include the Association of Firearm and Tool Mark Examiners, and through 2010, he belonged to the International Wound Ballistics Association and the International Association of Bloodstain Pattern Analysts. The

---

[18] Doc. 105-1 at 7.

Court finds that Balash's training and experience qualify him to testify as an expert and submit the proffered report in this case.

Defendants next argue that Balash's opinions that go beyond ballistics are outside his area of expertise and therefore should be excluded. They specifically cite his opinion about blood spatter, bullet wounds, the distance from which Carl was shot, whether the Kansas Bureau of Investigation ("KBI") misidentified a round as a live cartridge, and his ultimate opinion that the Schrolls died by murder-suicide. Defendants cite several other cases where they claim courts excluded Balash's opinion testimony that went beyond the bounds of his expertise. Plaintiff responds that Balash has extensive experience as a crime scene investigator, and that his expert opinions on these issues have been admitted many times on the same subject areas in other cases.

Here, while the Court acknowledges Balash's experience testifying as an expert on these subjects in many other cases, the Court cannot do an end-run around its gatekeeping duty by resting its decision on other courts' analyses of Balash's expertise under different facts and with different records.[19] The Court finds that Balash's opinions on the crime scene investigation is reliable. His CV supports Plaintiff's argument that Balash has sufficient training and experience in gunpowder patterns and GSR, determining bullet entrance and exit holes, blood spatter interpretation, crime scene reconstruction, and evidence collection and preservation. To the extent Defendants maintain that his opinions go beyond the limits of his training and expertise, they can cross-examine him on those limitations.

### 2.  Reliability

Defendants challenge the assumptions Balash used to render his opinions about the ballistics testing in this case. Specifically, Defendants argue that he improperly assumed that the

---

[19] *See United States v. Hunt*, 63 F.4th 1229, 1243 (10th Cir. 2023).

collection of PGSR samples from the victims was conducted without contamination. Defendants also argue that Balash improperly opines that Kathleen fired a weapon from her left hand. Plaintiff responds that this issue goes to the weight and not the admissibility of Balash's testimony. The Court agrees.

One of the issues in this case concerns PGSR testing of the victims that took place in 2019, years after Mr. Coones' conviction. This report ultimately showed that Kathleen had PGSR particles on her left hand and none on her right hand. In his report, Balash states that the PGSR samples from the victims were not contaminated. Defendants argue that this was an unreasonable assumption, pointing to Balash's deposition testimony that he has "no way of knowing that" the material was not subject to contamination.[20] But just before this testimony, Balash explained that "if there's still primer gunshot residue found on the material, it must have been properly preserved or else it probably would have been gone."[21]

Under Tenth Circuit law, this Court "must admit expert testimony as long as it is based on a reliable methodology. It is then for the jury to evaluate the reliability of the underlying data, assumptions, and conclusions."[22] Moreover, an expert's testimony need not be "undisputably correct" to be admissible.[23] The Court finds that Balash's testimony on the PSGR testing is not based on speculation; it is reasoned and based on his vast experience working with ballistics. Whether his assumption that the PSGR samples were not contaminated was reliable is a question for the jury.

---

[20] Doc. 102-2 at 36:7–9.

[21] *Id.* at 36:4–6.

[22] *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014) (citing *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806–08 (7th Cir. 2013)).

[23] *United States v. Pehrson*, 65 F.4th 526, 540 (10th Cir. 2023) (quoting *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005)).

### 3. Relevance

Finally, Defendants argue that Balash's testimony will not help the trier of fact with an issue it must decide in this case. They argue that: (1) GSR testing played no role in Mr. Coones' criminal trial, so it is irrelevant to the claims alleged in this case; (2) because Mr. Coones has already been exonerated, his innocence is not at issue in this trial; and (3) Balash offers opinions that a non-expert could reach.

During the 2008 investigation, officers took swabs from Kathleen and Carl Schroll for the purpose of determining whether GSR and/or PGSR was present on each victim's hands. The swabs were not tested at that time. Years later, in 2019, the testing was done, which showed that Kathleen had PGSR particles on her left hand, but not her right. Carl had PGSR on both of his hands, which meant his hands were positioned to receive PGSR particles. Balash opines that these results are consistent with Kathleen firing the revolver with her left hand. Defendants argue that Balash's opinion on the ballistics testing will not be relevant because the State did not present evidence about the GSR testing during Mr. Coones' trial. Moreover, they argue that because Mr. Coones was exonerated, evidence tending to show his innocence is not relevant and the only material issue is the intent of the Defendants during the investigation.

The Court agrees with Plaintiff that this evidence is relevant. Defendants have declined to stipulate to Mr. Coones' innocence in this matter, despite the fact that he was posthumously awarded a certificate of innocence in 2021. Moreover, one of Plaintiff's claims in this case is that his due process rights were violated because exculpatory evidence was ignored or withheld. Cumulative exculpatory evidence tends to bear on the degree to which reasonable investigators should have evaluated the other evidence in the record. Specifically, the existence of this evidence could help the jury in determining Defendants' culpability. If investigators did not

follow accepted practices and procedures for handling the crime scene and interpreting the physical evidence, it could tend to show reckless disregard for the truth, a standard Plaintiff must meet at trial.[24]

Next, Defendants argue that Balash's opinion that the investigation was poorly handled is based on "common-sense" applications of information that a lay person could reach; thus, it is inappropriate expert testimony. The Court disagrees. Balash's opinion that the investigation was poorly handled is based on his review of the evidence and his technical skill and experience. The Court would not expect a lay juror to be able to look at the evidence and form a conclusion about blood spatter without the help of an expert. The Court would not expect a lay juror to look at the lab reports or ballistic findings and understand if they were handled properly, or if the correct conclusions were drawn therefrom. Balash's opinions on this point are helpful to the jury because they are based on his training and expertise, not his common-sense conclusions about the investigation.

### B. Harvey

#### 1. Qualification

Defendants challenge Harvey's qualifications to testify about the investigators' methods and conclusions in the Schroll investigation because he testifies outside of his expertise. Harvey testified in his deposition that he owns a consulting business that offers leadership training for police officers. His business also includes background investigation and internal affairs work.[25] Harvey has taught criminal justice at Madonna University for 21 years, including classes such as crime scene investigations and interview/interrogation techniques. Prior to teaching and

---

[24] *See Johnson v. City of Cheyenne*, 99 F.4th 1206, 1232 (10th Cir. 2024) (quoting *Porro v. Barnes*, 635 F.3d 1322, 1327 (10th Cir. 2010)).

[25] Neither party attached Harvey's CV for the Court's review.

10

consulting, Harvey was a military police officer, and attended many intensive law enforcement schools as part of his training and education. That work included assisting in several homicide investigations. After Harvey left the military, he joined the Garden City, Michigan Police Department. He worked on approximately 12 homicide investigations as a detective sergeant before rising through the ranks to becoming Chief of Police. In 2004, Harvey was appointed to the Michigan Commission on Law Enforcement Standards, where he helped formulate standards for hiring and training police officers in Michigan.

Defendants argue that Harvey's most recent work in the field is administrative rather than field experience, and that any experience on the ground is based on outdated training and experience. But the Court agrees with Plaintiff that Defendants understate Harvey's experience, which was not purely administrative. Harvey's leadership roles were the result of several promotions after he worked on many homicide investigations with the military and as a Garden City, Michigan police officer and detective. Once he was promoted, he supervised the entire department and then took part in a statewide commission that determined the standards that should apply to licensing police officers there. Since that time, Harvey has worked for years as a consultant and professor on the very issues he has been retained to consider in this case. This is not a case where Harvey's training and experience is too stale to qualify him to testify as an expert in this matter. He has not been absent from the industry since leaving the police force.[26] To the contrary, he has helped train and educate the next generation of police officers on appropriate policing standards and protocols. Plaintiff can cross-examine Harvey on any limitations his lack of field experience in recent years may have on his opinions.

---

[26] *See Meyerhoff v. Michelin Tire Corp.*, 70 F.3d 1175 (10th Cir. 1995) (affirming district court's exclusion of expert where expert had neither worked in the relevant industry for 30 years, nor was familiar with the governing technical requirements).

Defendants also complain that Harvey failed to consider the Kansas City, Kansas Police Department ("KCKPD") investigative standards and policies from 2008 in forming his opinions in this matter, and that he did not use a clear standard to support his review.  Harvey testified that he never reviewed the policies and procedures that were in place in the KCKPD in 2008 when reviewing the Scholl investigation.  Instead, he relied on what he considers to be universal standards on investigative practices that all police officers are trained on, including *O'Hara's Fundamentals of Criminal Investigations*, which he cites in his report.  He testified that this was a widely accepted standard used by police officers around the country at the time.  The Court finds that Plaintiff has established that Harvey has the requisite level of skill, training, and experience required to testify as an expert in this matter on the extent to which the KCKPD adhered to widely accepted police standards and practices during the Schroll death investigation.  Defendants may challenge the weight of his testimony by cross-examining him about the sources he used to formulate his opinion.

### 2. Reliability

Next, Defendants argue that Harvey's opinions are not reliable because they rely on faulty assumptions and incorrect facts that will confuse the jury.  Defendants specifically argue that Harvey testified in his deposition that he was uncertain about whether or not the detectives did certain things that he opines should have been done, specifically citing two topics discussed in his deposition: (1) his testimony about the evidence that Kathleen was embezzling money from her employer, which the employer discovered on the day that she died; and (2) evidence that the Schrolls were experiencing marital tension at the time of their deaths.

Harvey opines that the detectives should have questioned Kathleen's supervisor, Thad Jones, about her embezzlement, documented the conversation, and inventoried any evidence they

obtained. He states in his report that in a murder investigation, "a routine step" is to question the victim's place of work and supervisor and try to determine if there were recent problems there.[27] In this case, he opines that it was particularly important because Kathleen's history with the elder abuse investigation, and her motive to commit suicide should not have been so readily discounted. Harvey also opined that, in addition to many other facts, the detectives should have taken into account that Kathleen and Carl were experiencing marital tension at the time of their deaths. His report states that these facts, when taken together, "would indicate to a homicide detective that there was no longer probable cause to believe that Mr. Coones had killed Carl and Kathleen Schroll."[28]

Defendants argue that Harvey admitted during his deposition that he actually does not know if the detectives knew about the embezzlement or the Schrolls' marital tension; therefore, his opinion that the detectives did not consider this evidence is not reliable. First, as discussed with respect to Balash's testimony, the reliability of these sorts of assumptions are within the province of the jury. Second, Defendants misunderstand the import of Harvey's opinions about these matters. The point of his opinion is not necessarily that the detectives knew or did not know or investigate the facts surrounding Kathleen's embezzlement, or the Schrolls' marital tension. The point is that these were important facts that should have been documented if they were considered, yet they were not. Harvey opines that if they were known, they should have been documented and considered, and if they were not known, they should have been if the detectives followed accepted investigative practices.[29] Harvey's lack of knowledge about what the detectives in fact knew does not make his opinion unreliable.

---

[27] Doc. 102-3 at 8.

[28] *Id.* at 12.

[29] *See* Doc. 102-4 at 101:11–105:5.

Similarly, Defendants assert that Harvey based his opinion on certain facts that are possibly false. Again, Harvey provided a laundry list in his report of facts that he believed would have led a homicide detective to believe that there was no longer probable cause to believe that Mr. Coones killed the Schrolls. During Harvey's deposition, defense counsel explored many of these topics, and elicited testimony that Harvey did not know for sure whether certain facts on this list were true. Again, this is beside the point. Harvey was retained to look at the evidence and facts known to the detectives at the time and help determine if it was reasonable for them to continue to assert that Mr. Coones had committed both murders and fail to investigate it as a murder-suicide. To the extent Defendants maintain that certain underlying facts in the report are "possibly false," it goes to the weight and not the admissibility of the evidence.

### 3. Relevance

Finally, Defendants argue that Harvey's opinions are not relevant because they do not help the trier of fact determine the issues of deliberate indifference or the detectives' culpability. The Court disagrees. The jury will be called to determine many issues in this case, including whether Defendants acted with deliberate or reckless intent,[30] and whether there was probable cause for Mr. Coones' prosecution.[31] Harvey's testimony goes directly to the second issue. And testimony about the extent to which the detectives followed established police practices will be helpful to the trier of fact in determining whether the detectives acted with reckless disregard for the truth, or instead negligently.[32]

---

[30] *See Johnson v. City of Cheyenne*, 99 F.4th 1206, 1232 (10th Cir. 2024).

[31] *See Bledsoe v. Carreno*, 53 F.4th 589, 614–15 (10th Cir. 2022).

[32] *See Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014).

The Court has fully considered the requisite factors under Rule 702 and *Daubert* and finds Harvey's opinions are admissible.

### C.     Roe

Dr. Susan Roe is a medical examiner and forensic pathologist who testified at Mr. Coones' post-conviction proceedings about the autopsy reports in the underlying criminal case. She disagrees with the original examiner's conclusion that Kathleen's death was homicide, and she concludes that the examiner misidentified a laceration on the side of Carl's head as blunt force trauma, rather than a result of a bullet graze.  Defendants move to exclude Dr. Roe's testimony as not helpful to the trier of fact because it is only relevant to a fact not at issue in this case—Mr. Coones' innocence.  They also criticize her prior work on Innocence Project cases. Plaintiff responds that Mr. Coones' innocence will be an issue at trial, and that there is no evidence of bias sufficient to exclude Dr. Roe's testimony.

As an initial matter, the Court finds that Dr. Roe is qualified to render an opinion on the autopsy reports in this case.  She has been a forensic pathologist since 1987, testifying at least 500 times in that capacity.  She is currently a clinical professor at the Department of Pathology at the University of North Dakota School of Medicine and Health Sciences.  As to the issue of bias, the Court finds that Defendants fail to demonstrate that Dr. Roe's prior work necessitates a finding of bias.  Her deposition testimony establishes that she was been a prosecution witness for most of her career and has only worked on approximately six innocence cases providing testimony for the defense.  There is no indication that her previous work would make her more or less likely to reach the opinions she does in this case.  To the extent any bias impacts her credibility as a witness, it goes to the weight and not the admissibility of her testimony.

The Court also finds Dr. Roe's opinion both reliable and relevant. Defendants offer no challenge to her reliability, and the Court finds that her opinion is based on reliable data and methods. She has reviewed the relevant information from this case and has based her opinion on accepted methods and practices in the field of forensic pathology. The Court is convinced after reviewing Dr. Roe's deposition testimony that she "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[33]

Finally, the Court addresses relevance. Defendants again argue that whether Mr. Coones was guilty of Kathleen's murder is not a fact at issue because he has already been exonerated, and that Dr. Roe's testimony will not help the jury decide Defendants' culpability during the investigation and prosecution of the underlying criminal case. The Court disagrees. Assuming Mr. Coones' innocence is not relevant, whether investigators adhered to accepted practices and procedures during the investigation and prosecution will be at the heart of what the jury considers in this case. Evidence that the autopsy report was based on a faulty premise supplied by the named Defendants in this case goes to whether they were deliberately indifferent to Mr. Coones' constitutional rights during that investigation and prosecution.[34] Dr. Roe's opinions are thus relevant and admissible.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Exclude Testimony from Balash, Harvey, and Roe (Doc. 102) is **denied**.

**IT IS SO ORDERED.**

Dated: November 14, 2024

---

[33] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,152 (1999).

[34] *See Johnson*, 99 F.4th at 1232.

<u>S/ Julie A. Robinson</u><br>
JULIE A. ROBINSON<br>
UNITED STATES DISTRICT JUDGE